# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: ) CDC Number D-87412
)
GERARDO MENCHACA )
)
_____ )

**INMATE COPY**

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MAY 12, 2006

10:31 A.M.


PANEL PRESENT:

Mr. Jack Garner, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner



OTHERS PRESENT:
Mr. Gerardo Menchaca, Inmate
Mr. John Stringer, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney, Santa
Clara County (Video)
Ms. Cynthia Figueroa, Victim's family
Mr. Dave Figueroa, Victim's family
Two Correctional Officers, Unidentified



CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum



J. Farncomb              Peters Shorthand Reporting

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 29 |
| Post-Commitment Factors | 41 |
| Parole Plans | 34 |
| Closing Statements | 81 |
| Recess | 102 |
| Decision | 103 |
| Adjournment | 111 |
| Transcriber Certification | 112 |

--oOo--

1

1        P R O C E E D I N G S

2            **DEPUTY COMMISSIONER SMITH:**  We're on the

3    record.

4            **PRESIDING COMMISSIONER GARNER:**  All

5    right, this is a Subsequent Parole Consideration

6    Hearing for Gerardo, G-E-R-A-R-D-O, Menchaca,

7    M-E-N-C-H-A-C-A, CDC number D, like David,

8    87412.  The date today is May 12, 2006.  It is

9    now 10:31 A.M., and we are located at San

10   Quentin State Prison.  The inmate was received

11   on February 18, 1992, and that's the date the

12   life-term started.  He was received from Santa

13   Clara County.  The offense was murder in the

14   second-degree with Penal Code 667.5.  The case

15   number is 148873.  Count number one is P.C. 187

16   in the second with a prior term.  The term is 16

17   years to life, and the minimum eligible parole

18   date is April 30, 2002.  This Hearing is going

19   to be tape-recorded and for purposes of voice

20   identification each of us at the table is going

21   to be required to give our first name, last

22   name, spelling the last name.  And when we get

23   to you, Mr. Menchaca, if you would also give us

24   your CDC number.  I'll start and go to my right,

25   I'm Jack Garner, G-A-R-N-E-R, Commissioner.

26           **DEPUTY COMMISSIONER SMITH:**  My name is

27   Dennis Smith, S-M-I-T-H, Deputy Commissioner.

2

1           INMATE MENCHACA:  I'm inmate Menchaca,

2    M-E-N-C-H-A-C-A, D-87412.

3           PRESIDING COMMISSIONER GARNER:  Okay.

4           ATTORNEY STRINGER:  John Stringer,

5    S-T-R-I-N-G-E-R, attorney for Mr. Menchaca.

6           CYNTHIA FIGUEROA:  Cynthia Figueroa,

7    F-I-G-U-E-R-O-A, victim's sister.

8           DAVE FIGUEROA:  Dave Figueroa,

9    F-I-G-U-E-R-O-A, victim's brother.

10          PRESIDING COMMISSIONER GARNER:  Ron?

11          DEPUTY DISTRICT ATTORNEY RICO:  Ronald

12   Rico, R-I-C-O, Deputy District Attorney, Santa

13   Clara County, by way of videoconference.

14          DEPUTY COMMISSIONER SMITH:  Thank you.

15          PRESIDING COMMISSIONER GARNER:  Thank

16   you, Mr. Rico.  Also for the record, we do have

17   two correctional peace officers in the room for

18   purposes of security.  Okay, Mr. Menchaca and

19   Mr. Stinger, I have an BPT 1073, this is the

20   Reasonable Accommodation for ADA, and there is

21   an indication that as of April 19, 2006, that

22   Mr. Menchaca indicated that the didn't any

23   assistance for the Hearing other than legal

24   representation and that no disabilities were

25   identified in the file.  So let me ask for the

26   record, sir, is there anything that has occurred

27   since April of 2006 that we need to provide an

3

1  accommodation for today?

2       INMATE MENCHACA:  No.

3       PRESIDING COMMISSIONER GARNER:  The

4  glasses that you are wearing for reading?

5       INMATE MENCHACA:  No.

6       PRESIDING COMMISSIONER GARNER:  Okay.

7  And are you on any medications, sir?

8       INMATE MENCHACA:  No.

9       PRESIDING COMMISSIONER GARNER:  No

10  medications.  Are you satisfied, Mr. Stinger?

11       ATTORNEY STRINGER:  I am.

12       PRESIDING COMMISSIONER GARNER:  All

13  right, this Hearing is being conducted pursuant

14  to Penal Code Sections 3041 and 3042, and the

15  Rules and Regulations of the Board of Parole

16  Hearings governing Parole Consideration Hearings

17  for life inmates.  The purpose of today's

18  Hearing is to consider your suitability for

19  parole.  In doing so we will consider the number

20  and nature of the crimes that you were committed

21  for, your prior criminal and social history and

22  your behavior and programming since your

23  commitment.  We have had the opportunity to

24  review your Central File and your prior Hearing

25  transcript.  You will be given an opportunity to

26  correct or clarify the record.  We will consider

27  your progress since your commitment and since

4

1    your last Hearing, your updated counselor's

2    report and psychological report will also be

3    considered.  And any change in your parole plans

4    should be brought to our attention.  We will

5    reach a decision today and inform you whether or

6    not we find you suitable for parole and the

7    reason for our decision.  If you are found

8    suitable for parole the length of your

9    confinement will be explained to you.  This

10   Hearing is going to be conducted in two phases:

11   I will discuss with you the crime that you were

12   committed for, your prior criminal and social

13   history, your parole plans and any letters of

14   support or opposition that may be in the file.

15   Commissioner Smith will discuss with you your

16   progress since your commitment, your counselor's

17   report and your psychological evaluation.  Once

18   that is concluded the Commissioners, the

19   District Attorney and your Attorney will be

20   given an opportunity to ask you questions.  The

21   questions from the District Attorney will be

22   asked through the Chair, and you should direct

23   your answers back to the Panel.  Before we

24   recess for deliberation, the District Attorney,

25   your Attorney and you will be given an

26   opportunity to make a final statement regarding

27   your parole suitability.  Your statement should

5

1   be directed to why you feel that you are

2   suitable for parole.  The victim's next-of-kin

3   or representatives will then have the

4   opportunity to give a statement regarding the

5   crime and your responsibility.  We will then

6   recess, clear the room and deliberation.  Once

7   we have completed our deliberations we will

8   resume the Hearing and announce our decisions.

9   The California Code of Regulations states that

10  regardless of time served, a life inmate shall

11  be found unsuitable for and denied parole if, in

12  the judgment of the Panel, the inmate would pose

13  an unreasonable risk of danger to society if

14  released from prison.  Mr. Menchaca, you have

15  certain rights.  They include:  the right to a

16  timely notice of this Hearing; the right to

17  review your Central File; and a right to present

18  relevant documents.  And I'm going to ask you at

19  this time:  Have those rights been met?

20          INMATE MENCHACA:  Yes.

21          PRESIDING COMMISSIONER GARNER:  You also

22  have the right to be heard by an impartial

23  Panel.  Today your Panel will consist of myself

24  and Commissioner Smith.  Any objections to the

25  Panel?

26          INMATE MENCHACA:  No.

27          PRESIDING COMMISSIONER GARNER:  You will

6

1   receive a written copy of our written tentative

2   decision today.  That decision becomes effective

3   within 120 days.  It is also subject to review

4   by the Governor.  And a copy of the tentative

5   decision and a copy of the transcript will be

6   sent to you and you.  You may recall from your

7   Initial Hearing that in May 2004 the appeal

8   procedures changed, and any appeal now must go

9   through the courts.  Are you aware of that?

10           **INMATE MENCHACA:**  Yes.

11           **PRESIDING COMMISSIONER GARNER:**  You are

12   not required to admit your offense or discuss

13   your offense if you do not wish to do so.

14   However, this Panel does accept as true the

15   findings of the Court.  And you are invited to

16   discuss the facts and circumstances of the

17   offense if you desire.  The Board will review

18   and consider any prior statements that you have

19   made regarding the offense in determining your

20   suitability for parole.  At this time I will ask

21   Commissioner Smith if there is any confidential

22   material in your file and if we will be using it

23   today?

24           **DEPUTY COMMISSIONER SMITH:**  There is

25   confidential information and it will be used.

26           **PRESIDING COMMISSIONER GARNER:**  Okay.

27           **ATTORNEY STRINGER:**  May I inquire about

7

1  that, Commissioner?  Is that information from

2  outside the institution or is that information

3  developed in the institution?

4      **DEPUTY COMMISSIONER SMITH:**  From outside

5  the institution.

6      **ATTORNEY STRINGER:**  Outside.

7      **PRESIDING COMMISSIONER GARNER:**

8  Mr. Stinger, I'm not finding the Hearing

9  checklist in my packet.  I don't know if you

10  have one in yours?  Do you have one in yours?

11      **ATTORNEY STRINGER:**  The defendant has

12  these documents, Commissioner.

13      **PRESIDING COMMISSIONER GARNER:**  Mr. Rico?

14      **DEPUTY DISTRICT ATTORNEY RICO:**  I did not

15  receive a checklist with my packet.  However,

16  I'm assuming that I have all the necessary

17  documents.  And I'm ready to proceed this

18  morning.

19      **PRESIDING COMMISSIONER GARNER:**  Thank

20  you.  If we refer to something that you don't

21  have, let us know and we'll make sure that we

22  get that part on the record.

23      **DEPUTY DISTRICT ATTORNEY RICO:**  Thank

24  you.

25      **PRESIDING COMMISSIONER GARNER:**  Okay,

26  Mr. Stinger, do you have any additional

27  documents?

8

1      ATTORNEY STRINGER:  We do, Commissioner.

2  We have an abstract of a judgment from the

3  Superior Court of the County of Santa Clara that

4  we would like to have entered into the record.

5  If there are any questions about why my client

6  is here relative to the offense.

7      PRESIDING COMMISSIONER GARNER:  Okay.

8      ATTORNEY STRINGER:  I also have a copy of

9  a test from the National Toxicology Lab in

10 Bakersfield, that's going to be relevant to one

11 of the 115s.  Also a declaration from Damien

12 [phonetic] Rodriquez, talking responsibility for

13 the recent 115s.  We have some certificates of

14 completion.  And a letter from Christina,

15 Sinclaire, a support letter.  I know also that

16 in the file there is an addendum to a

17 psychological report signed by Dr. Inaba.  I

18 don't know if Mr. Rico has that or not.

19     DEPUTY DISTRICT ATTORNEY RICO:  I do not.

20     PRESIDING COMMISSIONER GARNER:  When we

21 do the psych report portion we will make sure

22 that we read it into the record to get it for

23 you.  It's dated May 3rd for the record.

24     DEPUTY DISTRICT ATTORNEY RICO:  Thank

25 you.

26     ATTORNEY STRINGER:  And finally I

27 received a packet, given to me this morning, a

9

1    letter from Robert Davis, Chief of Police, from

2    San Jose.  Although it is dated April 13th, it

3    was just provided to the defendant about an hour

4    ago.  So I would invoke the ten-day rule under

5    CCR 2030 and ask that it not be entered.

6          **DEPUTY DISTRICT ATTORNEY RICO:**

7    Commissioner, if I might.  I have some

8    difficulty when materials are furnished to San

9    Quentin or any other facility in a timely

10   fashion and for whatever reasons the prison

11   decides not to forward them on to defendant

12   Counsel.  It seems to me that it is wrong to

13   somehow penalize the submitter of those

14   documents for the actions of the institution.

15   Secondly, if the Panel were to consider honoring

16   Mr. Stinger's request, I would ask that the C-

17   File be examined to see if the police department

18   has in the past submitted opposition letters and

19   that that be taken into account in determining

20   the Department's position.  Thank you.

21         **PRESIDING COMMISSIONER GARNER:**  Thank you

22   for your comment.  Mr. Stinger, there is a

23   letter from the San Jose Police Department dated

24   April 13th.  Is that the one that you are

25   referring to?

26         **ATTORNEY STRINGER:**  Yes.

27         **PRESIDING COMMISSIONER GARNER:**  That's in

10

1    my Board packet.  I am wondering if the one that

2    you are addressing --

3            **ATTORNEY STRINGER:**  I'll double check.

4            **PRESIDING COMMISSIONER GARNER:**  -- is a

5    duplicate.  It's in my Board packet as the first

6    letter under Notices and Responses.

7            **ATTORNEY STRINGER:**  I think the

8    difficulty is your files are put together after

9    ours are already mailed, because my last one is

10   January 10, 2005.  Is that the same one you guys

11   are seeing?

12           **PRESIDING COMMISSIONER GARNER:**  Is that

13   the same one you have, Mr. Stinger?

14           **ATTORNEY STRINGER:**  Commissioner, I do

15   have and it's mixed in with the notices.

16           **PRESIDING COMMISSIONER GARNER:**  Okay, the

17   one from April 13th?

18           **ATTORNEY STRINGER:**  I do.

19           **PRESIDING COMMISSIONER GARNER:**  Okay.

20           **ATTORNEY STRINGER:**  No, I'll take that

21   back.  This one is January 10, 2005.

22           **DEPUTY COMMISSIONER SMITH:**  Well, we can

23   use that one because that letter has not been

24   used at a prior Hearing.

25           **PRESIDING COMMISSIONER GARNER:**  All

26   right.  Mr. Rico, did you hear that discussion?

27           **DEPUTY DISTRICT ATTORNEY RICO:**  Yes, I

11

1   did.  I note that it has not been used at the

2   prior Hearing.  There was the June 30, 2005, but

3   there was a Stip in that regard.

4         PRESIDING COMMISSIONER GARNER:  All

5   right, thank you.  All right.  Mr. Stinger, any

6   other preliminary objections?

7         ATTORNEY STRINGER:  I'm ready to proceed.

8         PRESIDING COMMISSIONER GARNER:  Will

9   Mr. Menchaca be speaking with the Panel?

10        ATTORNEY STRINGER:  Yes.  The facts of

11  the life-crime are well known and Mr. Menchaca

12  has agreed to answer any questions about the

13  life-crime, parole plans, and institutional

14  behavior.

15        PRESIDING COMMISSIONER GARNER:  Okay,

16  Mr. Menchaca, will you raise your right hand,

17  please.  Do you solemnly swear or affirm that

18  the testimony you give at this Hearing will be

19  the truth, the whole truth and nothing but the

20  truth?

21        INMATE MENCHACA:  Yes, I do.

22        PRESIDING COMMISSIONER GARNER:  All

23  right, at this time I'm going to read into the

24  record a fairly lengthy summary of the crime

25  offense.  And this was taken from the May 2006

26  Board Report that was prepared by Correctional

27  Counselor, initial K, and the last name

12

1    Hilliard, H-I-L-L-A-R-D, Correctional

2    Counselor I.

3              On March 1, 1991, at approximately

4              10:00 P.M., Jerry, and that's

5              J-E-R-R-Y, Menchaca, Hector,

6              H-E-C-T-O-R, Oroteza,

7              O-R-O-T-E-Z-A, and another friend

8              went bowling.  They were bowling

9              and consuming beers until

10             approximately 1:45 A.M. the next

11             morning.  Their friend then drove

12             them back to his house where

13             Menchaca and Oroteza then entered

14             Menchaca's 1978 Silver Honda Civic

15             and reportedly began to drive

16             toward Oroteza's home.  During the

17             same time the victim Richard

18             Figueroa, F-I-G-U-E-R-O-A, age 33,

19             and his brother Dennis had gone to

20             the Cardinal, C-A-R-D-I-N-A-L,

21             where they consumed alcohol and

22             socialized.  While at the bar,

23             Richard Figueroa invited one of

24             the cocktail waitresses, Susan

25             Douglas, D-O-U-G-L-A-S, to join

26             him, his brother and two others.

27             Brenda Butler, B-U-T-L-E-R,

13

```
1        age 28, and Dust [phonetic]

2        Tumioh, T-U-M-O-I-H, age 26.

3        After the bar closed, Butler,

4        Tumioh, and Dennis Figueroa left

5        in Butler's vehicle to drive to

6        Butler's condominium where she was

7        going to cook breakfast.  Richard

8        Figueroa went as a passenger with

9        Douglas, who was driving her own

10       vehicle.  While eastbound on

11       Capital Expressway, Butler's

12       vehicle and Menchaca's vehicle

13       apparently came along side of each

14       other.  Menchaca later reported to

15       police that he believed at the

16       time that he recognized one of the

17       males in Butler's vehicle as an

18       individual with whom he had

19       previously had problems with.

20       Testimony in this case also

21       indicates that there may have been

22       some type of near miss accident

23       caused by Menchaca.  What did

24       happen; however was the words and

25       gestures were exchanged between

26       the occupants of both vehicles.

27       Menchaca began to pursue Butler.
```

14

1       while all of this was initiated,

2       Douglas and Figueroa were

3       oblivious to the problem.  Butler

4       turned off at the Cloverleaf at

5       Monterey Road, driving north on

6       Monterey Road to Southside Drive.

7       Butler was driving toward home,

8       which was located off Southside

9       Drive, an address is noted on

10      Kenbrook, K-E-N-B-R-O-O-K, Circle.

11      While Butler was pulled over

12      waiting for Douglas and Figueroa

13      to catch up, Menchaca pulled up

14      next to Butler's vehicle.  More

15      words were exchanged between the

16      occupants of both vehicles.  When

17      Douglas stopped behind Butler's

18      vehicle, Tumioh exited Butler's

19      vehicle and ran back to tell

20      Douglas and Figueroa that they

21      were having problems with people

22      in the Honda.  Butler quickly

23      pulled away, chased by Menchaca.

24      Tumioh entered Douglas' vehicle

25      and Douglas followed in the

26      direction that Menchaca and Butler

27      had driven off towards.  Butler

15

1        meanwhile had hidden by turning

2        off her lights and stopping in a

3        driveway and Menchaca had lost

4        sight of her.  As Douglas was

5        driving up the street where

6        Menchaca was located, something

7        was thrown from Menchaca's

8        vehicle, which hit Douglas'

9        vehicle.  She stopped to check it

10       for damages.  Menchaca then pulled

11       up next to her vehicle and she saw

12       Menchaca and Oroteza, exchanging

13       heated words.  Douglas then saw

14       that Oroteza was brandishing a

15       large hunting-style knife and she

16       returned to her vehicle and

17       accelerated away trying to lose

18       Menchaca and Oroteza.  Douglas

19       returned to the Monterey Road

20       turning right and accelerating.  A

21       short distance away she made a U-

22       turn and drove back down to

23       Southside Drive turning left and

24       driving down to Butler's

25       condominium complex on Kenbrook

26       Circle.  It was the belief of the

27       occupants of her vehicle had

16

1    managed to allude Menchaca or

2    Oroteza.  Douglas parked in one of

3    the visitor parking spots near

4    Butler's condominium.  Figueroa

5    exited the car and was reportedly

6    in the process of moving the

7    passenger seat forward to allow

8    Tumioh to exit when Menchaca

9    pulled in behind Butler's vehicle

10   blocking it.  Oroteza and Menchaca

11   both exited their vehicle and

12   walked toward Figueroa.  Douglas

13   and Tumioh sat in the vehicle and

14   watched as Oroteza and Menchaca

15   assaulted Figueroa.  After a one

16   to two minute flurry of blows,

17   Oroteza and Menchaca fled back to

18   their vehicle and drove off

19   leaving Menchaca red baseball cap

20   with the logo, quote, "San Jose

21   Bad Boys," end quote, lying under

22   Douglas' car where it had fallen

23   during the assault.  Figueroa got

24   back into Douglas' car and Douglas

25   noticed that Figueroa's white

26   sweater had many slits in it and

27   that he was bleeding.  Figueroa

17

1    tried to get out of the car but

2    collapsed.  Neighborhoods who

3    heard or witnessed the assault

4    called 911 for assistance.

5    Figueroa was taken to San Jose

6    Hospital (indiscernible) where he

7    died.  The autopsy indicated that

8    Figueroa received 23 wounds to his

9    body; 15 which were actually stab

10   wounds, the others were

11   lacerations or superficial

12   (indiscernible) wounds.

13   (indiscernible) possibility of

14   more than one weapon had been

15   used.  The stab wounds include

16   four and a half inch deep stab

17   wounds which penetrated Figueroa

18   chest and right lung, two stab

19   wounds to his liver and one to his

20   abdomen and intestines.  Cause of

21   death was listed as stab wounds to

22   the head, chest, and abdomen.

23   There was also indications that

24   there were stab wounds to his left

25   (indiscernible).

26   All right, Mr. Menchaca, let me start by asking:

27   Is that a fairly accurate version of what

18

1  happened that evening?

2      INMATE MENCHACA:  Some of it, yes.

3      PRESIDING COMMISSIONER GARNER:  All

4  right, let's go back and rebuilt it.  Were you

5  and Mr. Oroteza in the San Jose area --

6      INMATE MENCHACA:  Yes.

7      PRESIDING COMMISSIONER GARNER:  --that

8  evening?

9      INMATE MENCHACA:  Yes, we were.

10     PRESIDING COMMISSIONER GARNER:  And had

11 you been drinking?

12     INMATE MENCHACA:  Yes.

13     PRESIDING COMMISSIONER GARNER:  Had you

14 been using anything else?

15     INMATE MENCHACA:  No, not that day.

16     PRESIDING COMMISSIONER GARNER:  And where

17 did -- where had you been let's say before

18 1:35 A.M.?

19     INMATE MENCHACA:  Uh --

20     PRESIDING COMMISSIONER GARNER:  Bowling?

21     INMATE MENCHACA:  That day, yes, we were

22 bowling.

23     PRESIDING COMMISSIONER GARNER:  Okay, and

24 how much alcohol did you consume let's say

25 between 10:00 o'clock and 1:00 A.M.?

26     INMATE MENCHACA:  Maybe four or five at

27 the bowling alley.

19

1    **PRESIDING COMMISSIONER GARNER:**  And was
2    the 1978 Silver Honda Civic yours?  Did you own
3    it?

4    **INMATE MENCHACA:**  I owned the blue.

5    **PRESIDING COMMISSIONER GARNER:**  So the
6    vehicle color was actual blue?

7    **INMATE MENCHACA:**  Yes.

8    **PRESIDING COMMISSIONER GARNER:**  Silver is
9    indicated here.  At some point and time did you
10   come into contact with another vehicle on the
11   Capital Expressway?

12   **INMATE MENCHACA:**  Yes, we did.

13   **PRESIDING COMMISSIONER GARNER:**  Do you
14   recall the description of that vehicle?

15   **INMATE MENCHACA:**  No, I don't.

16   **PRESIDING COMMISSIONER GARNER:**  But you
17   thought you recognized one of the males in the
18   vehicle as an individual that you previously had
19   problems with?

20   **INMATE MENCHACA:**  I had problems that --
21   was that statement there?

22   **PRESIDING COMMISSIONER GARNER:**  You had
23   problems with the statement?

24   **INMATE MENCHACA:**  Yes, I don't remember
25   saying that.

26   **PRESIDING COMMISSIONER GARNER:**  You don't
27   remember saying that.  Let me just ask you for

20

1  the record today:  Did you recognize anyone in

2  the other vehicle?

3         INMATE MENCHACA:  No.

4         PRESIDING COMMISSIONER GARNER:  And you

5  were driving the vehicle?

6         INMATE MENCHACA:  Yes, I was.

7         PRESIDING COMMISSIONER GARNER:  And at

8  some point in time did an exchange of words and

9  gestures occur?

10        INMATE MENCHACA:  Yes, they did.

11        PRESIDING COMMISSIONER GARNER:  Were you

12 -- did you have your driver's window down?

13        INMATE MENCHACA:  Yes.  I was the one

14 that was exchanging the gestures.

15        PRESIDING COMMISSIONER GARNER:  Was the

16 vehicle next to you or was it next to your

17 passenger?

18        INMATE MENCHACA:  Next to the passenger.

19        PRESIDING COMMISSIONER GARNER:  So it was

20 on the passenger side.  Capital Expressway, how

21 many lanes do you recall?  Is it two lanes, or

22 three lanes in each direction?

23        INMATE MENCHACA:  I believe it was three.

24 Two right there in that area.

25        PRESIDING COMMISSIONER GARNER:  So you

26 would have been in the lane closets to the --

27        INMATE MENCHACA:  I was in the --

21

1        PRESIDING COMMISSIONER GARNER:  --

2    (indiscernible) road?

3        INMATE MENCHACA:  Yes, because I was

4    trying to make a U-turn.  And in the process of

5    trying to get into the exit lane I might have

6    cut off that other group.

7        PRESIDING COMMISSIONER GARNER:  In any

8    event there were words being exchanged between

9    the two vehicles?

10       INMATE MENCHACA:  Yes.

11       PRESIDING COMMISSIONER GARNER:  Was it

12   your statement that the words coming from your

13   vehicle were coming from Mr. Oroteza?

14       INMATE MENCHACA:  Yes.

15       PRESIDING COMMISSIONER GARNER:  Do you

16   recall the nature of any of these words?

17       INMATE MENCHACA:  Just basically watch

18   where your driving, you this and that.

19       PRESIDING COMMISSIONER GARNER:  And the

20   gestures?

21       INMATE MENCHACA:  Were a bunch of

22   flipping of and calling each other motherfuckers

23   and watch where you're driving and stuff like

24   that.

25       PRESIDING COMMISSIONER GARNER:  And do

26   you have any recollection where the words were

27   being generated from the other vehicle?

22

1       INMATE MENCHACA:  No.

2       PRESIDING COMMISSIONER GARNER:  Did you

3 see the occupants in the other vehicle?

4       INMATE MENCHACA:  I'm going to say I did,

5 but I just don't remember.

6       PRESIDING COMMISSIONER GARNER:  Do you

7 recall if the vehicle was being driven by a male

8 or lady?

9       INMATE MENCHACA:  No.

10      PRESIDING COMMISSIONER GARNER:  At some

11 point did it become necessary for you to begin

12 pursuing the vehicle?

13      INMATE MENCHACA:  No, I just had to keep

14 going straight.

15      PRESIDING COMMISSIONER GARNER:  So your

16 contention is that you did not pursue the

17 vehicle?

18      INMATE MENCHACA:  That's it exactly.

19      PRESIDING COMMISSIONER GARNER:  Did the

20 vehicle give any indication that it was trying

21 to get away from you?

22      INMATE MENCHACA:  I really didn't pay any

23 attention to that.  I thought it was over right

24 there and then.

25      PRESIDING COMMISSIONER GARNER:  How much

26 time elapsed from when you first saw the vehicle

27 until you lost sight of it for a while and then

23

1  found it again?

2       INMATE MENCHACA:  Where that incident

3  took place on Capital Expressway, it was at a

4  stoplight when we left.  When it turned green I

5  left, we left, and I missed the exit.  I drove

6  down like maybe a mile to Monterey Road and

7  exited there.  I drove a couple of blocks down

8  and made a right on Southside Drive and drove a

9  couple of blocks down and made a left on Garden

10 Avenue, and that's where I was at my friend's

11 (indiscernible).  And about a minute after that

12 that's when we seen the car again.

13      PRESIDING COMMISSIONER GARNER:  At some

14 point and time did you find the vehicle again at

15 a condominium complex?

16      INMATE MENCHACA:  Yes.

17      PRESIDING COMMISSIONER GARNER:  Were you

18 looking for the vehicle?

19      INMATE MENCHACA:  I followed the vehicle.

20      PRESIDING COMMISSIONER GARNER:  So you

21 were following it?

22      INMATE MENCHACA:  I followed it that

23 time.

24      PRESIDING COMMISSIONER GARNER:  And why

25 were you following it?

26      INMATE MENCHACA:  Because when they came

27 back -- well when I was (indiscernible) house,

24

1   me and Oroteza we thought it was over; I thought

2   it was over.  We got down and I'm going to the

3   house and then this car comes, passes us, comes

4   back and a lady gets out of the car and starts

5   telling him about now I know where you live at

6   and I'm going to get my 45 and blow your fucking

7   Mexican heads off and this and that.  And she

8   jumped back in the car and she sped away and she

9   left.  At that time I jumped in my car and I

10  just followed her.  Oroteza jumped in and I

11  jumped in, we got in and we left, drove,

12  followed the car down Garden Avenue, made a

13  right on Southside Drive, made a left into the

14  Kenbrook Apartments.  And when the car pulled

15  into the driveway they stopped and I stopped.

16       PRESIDING COMMISSIONER GARNER:  At the

17  time you stopped where was the driver of the

18  vehicle that you followed?

19       INMATE MENCHACA:  They were already

20  stopping.

21       PRESIDING COMMISSIONER GARNER:  Was the

22  driver still in the vehicle?

23       INMATE MENCHACA:  Yes.

24       PRESIDING COMMISSIONER GARNER:  And this

25  is the same vehicle that you had the initial

26  contact with on the Expressway?

27       INMATE MENCHACA:  Yes.

25

1       PRESIDING COMMISSIONER GARNER:  So who

2   was the first one that exited the vehicle, you

3   or the occupants of the other vehicle?

4       INMATE MENCHACA:  The driver of the

5   vehicle, the lady driving the car.

6       PRESIDING COMMISSIONER GARNER:  The same

7   one that had previously --

8       INMATE MENCHACA:  Got out of the car.

9       PRESIDING COMMISSIONER GARNER:  --

10  contacted you about -- made the comments that

11  you said earlier?

12      INMATE MENCHACA:  Yes.

13      PRESIDING COMMISSIONER GARNER:  She was

14  the first one out of the vehicle.  And then what

15  did she do?

16      INMATE MENCHACA:  She walked to the back

17  of the car and that's when Oroteza got out of

18  the passenger side of my car and they started

19  exchanging words.

20      PRESIDING COMMISSIONER GARNER:  With her?

21      INMATE MENCHACA:  Yes.

22      PRESIDING COMMISSIONER GARNER:  At what

23  point in time did you come in contact with

24  Mr. Figueroa?

25      INMATE MENCHACA:  He got out of the car

26  shortly after that and started taking with

27  Oroteza.  And they started arguing.  And the

26

1  next thing they started fighting and that's when

2  I got into it.

3         PRESIDING COMMISSIONER GARNER:  That's

4  when you go involved.  Is that what you said?

5         INMATE MENCHACA:  That's when I got out

6  of the car?

7         PRESIDING COMMISSIONER GARNER:  You got

8  out of the car.  What did you do?

9         INMATE MENCHACA:  I went -- I came around

10  my car where they were at.  He had Oroteza by

11  the throat and I tried to get in between the

12  middle of it.  And as quick as I got in the

13  middle is as quick as I got out, because I got

14  stuck.

15         PRESIDING COMMISSIONER GARNER:  Were you

16  armed with a weapon or anything?

17         INMATE MENCHACA:  Was I?

18         PRESIDING COMMISSIONER GARNER:  Yes.

19         INMATE MENCHACA:  No.

20         PRESIDING COMMISSIONER GARNER:  Who was

21  it that displayed the weapon earlier in the

22  evening from the vehicle?  The one that was

23  described as hunting-type.

24         INMATE MENCHACA:  I don't recall that

25  happening.

26         PRESIDING COMMISSIONER GARNER:  You don't

27  recall that happening.  Do you recall seeing

1   anyone that had a knife between the three

2   individuals that were involved in this dispute,

3   yourself, Mr. Oroteza, Mr. Figueroa?

4       INMATE MENCHACA:  When I got out of the

5   car I didn't see Oroteza stabbing Richard.  I

6   got in the middle.  He had Oroteza by the neck

7   pinned up against the car and I just wanted to

8   try to get in the middle and break it up.  And

9   in the process of doing that I got stabbed in

10   the back.  And that's when I just jumped back

11   into my car and he, Hector Oroteza got into the

12   car and we left.

13       PRESIDING COMMISSIONER GARNER:  Where was

14   the last place that you saw Mr. Figueroa?

15       INMATE MENCHACA:  Standing right there at

16   the car.

17       PRESIDING COMMISSIONER GARNER:  When

18   Mr. Oroteza returned to the vehicle did he have

19   a knife with him?

20       INMATE MENCHACA:  No.

21       PRESIDING COMMISSIONER GARNER:  Did you

22   see a knife on the ground?

23       INMATE MENCHACA:  No.

24       PRESIDING COMMISSIONER GARNER:  Did

25   Mr. Oroteza have any blood on him?

26       INMATE MENCHACA:  No, I didn't see any.

27       PRESIDING COMMISSIONER GARNER:  Where

28

1  were you stabbed?

2      INMATE MENCHACA:  Excuse me?

3      PRESIDING COMMISSIONER GARNER:  Where you

4  stabbed?

5      INMATE MENCHACA:  In the lower back.

6      PRESIDING COMMISSIONER GARNER:  Did you

7  put your hand on the wound at all?

8      INMATE MENCHACA:  Did I?

9      PRESIDING COMMISSIONER GARNER:  Yes.

10     INMATE MENCHACA:  Yes.

11     PRESIDING COMMISSIONER GARNER:  And what

12 did you find on your hand?

13     INMATE MENCHACA:  (indiscernible).

14     PRESIDING COMMISSIONER GARNER:  And where

15 did you go after this happened?

16     INMATE MENCHACA:  I drove to my brother's

17 house and I told him that I got stabbed.  And he

18 said that he would take me to the hospital and

19 that's what happened; that's what he did.

20     PRESIDING COMMISSIONER GARNER:  How long

21 was it after this incident occurred that you

22 were arrested?

23     INMATE MENCHACA:  A couple of months.

24     PRESIDING COMMISSIONER GARNER:  A couple

25 of months.  All right, we'll leave it for the

26 time being, but we may need to come back to it

27 later.  Let's talk a little about your prior

29

1  criminal record.  And it looks like you were

2  first brought to the attention of the

3  authorities on June 2, 1976, for a battery.  And

4  you were sent to the Boys Ranch later after

5  committing a burglary.  You escaped from the

6  Boys Ranch and subsequently sent to the Youth

7  Authority.  Which facility was that?

8        INMATE MENCHACA:  Which facility?

9        PRESIDING COMMISSIONER GARNER:  CYA.

10       INMATE MENCHACA:  Yes.

11       PRESIDING COMMISSIONER GARNER:  What

12 facility did you go to?

13       INMATE MENCHACA:  O.H. [phonetic].

14       PRESIDING COMMISSIONER GARNER:  And you

15 paroled from CYA May 7, 1980, but you were

16 remanded back into their custody in October '71

17 for driving under the influence of liquor or

18 drugs and a hit-and-run that resulted in the

19 death or injury.  I believe I recall reading

20 (indiscernible) like that.  Is that correct?

21       INMATE MENCHACA:  Yes.

22       PRESIDING COMMISSIONER GARNER:  And you

23 were discharged from CYA on August 2, 1985.

24 Your first San Jose P.D. arrest as an adult was

25 in, as indicated here, was July 16, '85 and it

26 was for H and S, controlled substance for sale.

27       INMATE MENCHACA:  Yes.

30

1        **PRESIDING COMMISSIONER GARNER:**  And you

2    got three years probation, a year in jail, and a

3    fine of $750.  And on July 25, 1987, you were

4    arrested by San Jose P.D. for battery on a

5    police officer, possession of PCP for sale,

6    possession of controlled substance, obstruction,

7    and resisting a police office.  In the Court the

8    charges were dismissed; however, the original

9    probation was revoked and you were sent to CDC

10   for a three-year term.  You paroled from CDC in

11   November of '89.  Is that correct?

12        **INMATE MENCHACA:**  Yes.

13        **PRESIDING COMMISSIONER GARNER:**  Where did

14   you do this time?

15        **INMATE MENCHACA:**  Mule Creek.

16        **PRESIDING COMMISSIONER GARNER:**  Mule

17   Creek.  And then, of course, on June 1, '99, you

18   were arrested by San Jose P.D. for the

19   commitment offense with a prior felony

20   conviction.  As far as your personal factors, --

21        **INMATE MENCHACA:**  Excuse me?

22        **PRESIDING COMMISSIONER GARNER:**  Yes.

23        **INMATE MENCHACA:**  Can I say something

24   about what you just read off?  When I was

25   arrested in '85 and then re-arrested in '87 for

26   possession, those were the same charges.  I just

27   want to make sure that that's understand.  It

31

1   was the same charges.  I revoked my probation; I

2   violated my probation so I had a three-year

3   prison suspension, that's how I come to prison.

4          PRESIDING COMMISSIONER GARNER:  What was

5   the battery on the peace officer?

6          INMATE MENCHACA:  What was it?

7          PRESIDING COMMISSIONER GARNER:  Yes.

8          INMATE MENCHACA:  They pulled me over for

9   DUI; I tried to run.  I got my ass whopped by

10  two cops.  And that's how I got an assault on a

11  peace officer.

12         PRESIDING COMMISSIONER GARNER:  All

13  right.  So far as your personal factors, you are

14  the second of five children born to Alfonso,

15  A-L-F-O-N-S-O, and Guadalupe Cadallero,

16  C-A-D-A-L-L-E-R-O.  Your parents divorced in '68

17  when you were four years old.  And that you

18  indicated that you had a normal childhood.  Your

19  mother developed a common law marriage with

20  Ramon [phonetic] Castro [phonetic], where she

21  has continued to reside for the last 23 years.

22  Any abuse as you were growing up associated with

23  that relationship?

24         INMATE MENCHACA:  No.

25         PRESIDING COMMISSIONER GARNER:  Any

26  alcohol or drugs a factor of your home when you

27  were growing up?

32

1          INMATE MENCHACA:  Only my mother drank

2     occasionally.

3          PRESIDING COMMISSIONER GARNER:  Did your

4     mother work?

5          INMATE MENCHACA:  Yes.

6          PRESIDING COMMISSIONER GARNER:  What did

7     she do?

8          INMATE MENCHACA:  My mother was a cook,

9     two different jobs.  A cook.

10          PRESIDING COMMISSIONER GARNER:  A cook.

11     And did your stepfather work?

12          INMATE MENCHACA:  Yes, he did.

13          PRESIDING COMMISSIONER GARNER:  It was a

14     common law relationship.

15          INMATE MENCHACA:  I remember that before

16     my mother met Ramon Castro that she worked and

17     she was raising us by herself.

18          PRESIDING COMMISSIONER GARNER:  And you

19     started experimenting with drugs and alcohol

20     when you were 15?

21          INMATE MENCHACA:  Yes.

22          PRESIDING COMMISSIONER GARNER:  What

23     drugs?  What kind of drugs?

24          INMATE MENCHACA:  Just beer.  I tried

25     marijuana when I was young.

26          PRESIDING COMMISSIONER GARNER:  And

27     February of '86 you married Olga [phonetic]

33

1    Menchaca?

2        INMATE MENCHACA:  Yes.

3        PRESIDING COMMISSIONER GARNER:  And that

4    ended in divorce.

5        INMATE MENCHACA:  Yes.

6        PRESIDING COMMISSIONER GARNER:  You have

7    two sons:  Gary and Manuel.  And it looks like

8    recently you married Peggy Ortega,

9    O-R-T-E-G-A, February of 2005?

10        INMATE MENCHACA:  Yes.

11        PRESIDING COMMISSIONER GARNER:  And you

12    went through the twelfth grade, but got your

13    high school diploma while at DeWitt Nelson.  Is

14    that CYA?

15        INMATE MENCHACA:  Yes.

16        PRESIDING COMMISSIONER GARNER:  You

17    worked as a laborer and you were a member of the

18    Laborer's Union.  And, again, no abuse for

19    several years prior to the term of incarcerated

20    including marijuana and then you advanced to the

21    use of PCP and cocaine.  When was the last time

22    prior to this offense that you used any drugs?

23        INMATE MENCHACA:  Prior to the offense?

24        PRESIDING COMMISSIONER GARNER:  Yes.

25        INMATE MENCHACA:  Probably a couple of

26    weeks prior to the offense.

27        PRESIDING COMMISSIONER GARNER:  And any

34

1    time when you were growing up were you ever

2    hospitalized for injuries or illness?

3         **INMATE MENCHACA:**  Just as a little kid.

4    An electricity box -- I had my hand burned.

5         **PRESIDING COMMISSIONER GARNER:**  Okay.  As

6    far as your parole plans, again this is from the

7    May 2006 report, that you would like to live

8    with your wife Peggy at the address noted in San

9    Jose.  And you would seek employment through the

10   Union Local 270, the Laborer's Union.  Also that

11   it speaks to some other locations which you

12   (indiscernible) while institutionalized.  Let me

13   go ahead and read into the record any letters of

14   support or opposition that are in the file.

15        **INMATE MENCHACA:**  Can I add something

16   real quick?  As far as the parole plans were,

17   the address, I had tried to change it with my

18   counselor, but I guess she did not change it.  I

19   want to parole to my mother's residence.

20        **PRESIDING COMMISSIONER GARNER:**  Okay.

21   When we get through reading the letters, I'll

22   ask you about where that is and we will get that

23   on the record as quick as we can.  I didn't ask

24   you earlier if there were any changes in your

25   parole plans.  All right, the first letter that

26   was in the packet was October 10, 2004, and it's

27   a letter from a (indiscernible) Cadallero.  "I'm

35

1  writing on behalf of my brother." He expresses

2  concern and "I hope to help my brother. He has

3  only had contact through these letters and phone

4  calls over the years." He says that you have

5  changed that you want to be with family. He

6  speaks with your two sons. He speaks of the

7  programs that you have completed and the college

8  courses that you've taken. And that given a

9  chance to prove to the board that you can change

10  your life for the better and rise beyond this

11  task. It speaks to the support of the family.

12  And again that's dated October 10, 2004. The

13  next letter is April 8, 2004, and it's from a

14  Michael Garewal, G-A-R-E-W-A-L, and it's typed

15  and signed. This is an individual that he was

16  once on CDC parole for numerous years but he

17  never had a life sentence. And he hopes that we

18  will consider releasing you to society. So far

19  as his support and friendship he has offered

20  that he would be willing to do there. He says

21  that upon your release he would do his part to

22  introducing you to the beautiful people that

23  "freely teaching me to live as a part of

24  society." A letter from a Lance Corporal

25  Arndres, A-R-N-D-R-E-S, Aguirre, A-G-U-I-R-R-E,

26  and he's a relative, a nephew, and he's known

27  you all your life. Memories are positive. He

36

1    talks about the mistake that you made.   And he

2    speaks to some of the spiritual things that you

3    are doing know and his support would be to

4    provide you money, clothing and emotional

5    support.   He would support you with housing, but

6    he is at Camp Lejeune [phonetic] at the time

7    this letter was written, and he would be unable

8    to do that.   Okay, April 26, 2004, letter from

9    Peggy Ortega typed and signed.   This one speaks

10   to the fact that you have a -- well, first of

11   all the indication that you were going to marry.

12   And we have already put the fact that you were

13   married on the record.   And that you have a home

14   to come to where there are no drugs or alcohol.

15   All that will be around you are those in NA.

16   And the next letter is from Brian Lopez, and

17   Brian is B-R-I-A-N, Lopez is L-O-P-E-Z.   It is

18   dated August 2, 2004, letter of support.   He is

19   a recovering addict and for many years clean.

20   He was asked by your fiancée at the time if he

21   would be your NA sponsor (indiscernible) through

22   the mail.   Being a sponsor is like a second job,

23   it takes time and energy.   But through the

24   fellowship of NA you will have a support group

25   and this individual will introduce you to the

26   community and support you through your re-

27   integration back into society.   Then from

37

1    Francisco Garcia [phonetic], July 21, 2004, and

2    it's done in a memo form letter.  And he has

3    resided at an address in San Jose for 19 years.

4    He has known you and your family for 25 years.

5    He speaks to the time that you've served that

6    you are ready for another opportunity.  That you

7    regret the mistakes that you have made.  You're

8    ready to have a better life so that you can be

9    there for two teenage boys.  "My wife and I are

10    willing to help in any way to support him and

11    start his own better life if released."

12    Guadalupe Cadallero, it's handwritten, July 13,

13    2004, and it's your mother.  And she believes

14    that you deserve another opportunity in life so

15    that you can be with your teenage boys.  She has

16    a house and you can live with her, that she has

17    an extra room and will give you to support to

18    start over your life.  And the last one that I

19    have is the most recent and it's May 4, 2006,

20    and it's typed and it's from a Christina,

21    C-R-I-S-T-I-N-A, Sinclaire, S-I-N-C-L-A-I-R-E,

22    with an address in San Francisco.  "I'm writing

23    to encourage you to release Mr. Menchaca.  He

24    has spent more than two decades in

25    incarceration.  He has remorse for the crime.

26    He has made efforts to right his wrongs.  He has

27    taken a new path.  He has made every effort of

38

1    self-improvement." And she lists the programs

2    that you have achieved. "And allow him to

3    reunite with his family and fulfill his

4    potential as a valuable resource to the

5    community." Do I have all the support letters

6    that you have?

7         **INMATE MENCHACA:** No. There was some

8    that was in just this year. My counselor was

9    supposed to have put them in. She had me send

10   them all to her this time around.

11        **PRESIDING COMMISSIONER GARNER:**

12   Mr. Stinger, do you have any others in your

13   packet?

14        **ATTORNEY STRINGER:** No, I don't,

15   Commissioner, other than his own letter that we

16   presented at the Hearing.

17        **PRESIDING COMMISSIONER GARNER:** All

18   right. As I continue I'll ask Commissioner

19   Smith to see if they're in your Central File and

20   they just haven't been provided to us. Let me

21   indicate the whole series of 3042 notices were

22   sent and that in response we do have a

23   representative from the Santa Clara County

24   District Attorney Office who will be speaking

25   later in the Hearing. And we also do have a

26   January 10, 2005, letter from Robert L. Davis,

27   the Chief of Police in the San Jose Police

39

1    Department, indicating opposition to parole.

2    Okay, I've been provided with three additional

3    letters.

4         INMATE MENCHACA:  Yeah.

5         DEPUTY COMMISSIONER SMITH:  There are

6    actually a number of letters, but I went through

7    and found those that are the most current.

8         PRESIDING COMMISSIONER GARNER:  All

9    right.  Let me go ahead and just start while you

10   continue to go through the C-File.  The first is

11   April 9, 2006, and this again is from Guadalupe

12   Cadallero, your mother.  And she is again

13   speaking to the time that you've been in prison.

14   She is speaking to the home, the house, the

15   extra room that she has available for you.  And

16   "my son is needed to come back and find a job.

17   He has friends that can help him get a job and

18   with the job search.  I hope that he will come

19   home soon."  March 24, 2006, and it is typed and

20   signed, and this is from Naomi, N-A-O-M-I,

21   Navarro, N-A-V-A-R-R-O, with an address in San

22   Jose.  She is a sister-in-law.  "He was married

23   to my sister Olga, and the father of my nephews

24   Gary and Manual.  I've known him since '83.  He

25   resided with my sister and parents until his

26   incarceration.  I've kept in contact with him

27   despite the mistake that he made with that

40

1  person. And I know that my parents and I will
2  assist with finding housing and employment. He
3  always worked as a landscaper and paid his
4  (indiscernible) sister. He is presently
5  involved in the (indiscernible) at the
6  institution." A letter from Homero,
7  H-O-M-E-R-O, Fuentes, F-U-E-N-T-E-S, a address
8  in San Jose, typed and signed, dated April 26th.
9  "I'm writing this letter on behalf of Gerardo
10  Menchaca. I've known him for many years and
11  have worked with him. I have my own landscaping
12  company and am willing to hire him at any time
13  at a salary of $10 per hour." And there is a
14  telephone number provided. The next one is
15  April 26, 2006, typed and signed and it's from
16  Francisco Garcia, and it has an address in San
17  Jose, "I'm writing in regards to Gerardo. I've
18  been a part of his family for over 30 years. He
19  is a young man. I'm willing to give him a
20  change. I'll give him room and board and
21  clothing whatever he needs to get back on his
22  feet." And he hopes that you is given a chance
23  to (indiscernible) with his family. The last is
24  on the letterhead from Centerforce,
25  C-E-N-T-E-R-F-O-R-C-E, an organization that is
26  located -- they have offices throughout the
27  Northern California area. And this is from

41

1    Lilly, L-I-L-L-Y, Harvey [phonetic], a No More

2    Tears Coordinator.  "We demonstrate our support

3    for Mr. Menchaca."  She speaks to the programs

4    that you've been involved in, the 80-hour of

5    English-Spanish Helper Information Training.

6    And that you have always been reliable and an

7    important presence in supporting their important

8    program.  Are those the ones that we were

9    missing?

10        INMATE MENCHACA:  There was one from the

11    National Trust.  I don't know if it's in there.

12    I had it put in there.  There should have been

13    some more that should have been here already,

14    but I guess they're not sent in.

15        PRESIDING COMMISSIONER GARNER:  All

16    right, so we now do have the support letters

17    that are in the Board packets and that were

18    provided to me, but also Commissioner Smith has

19    reviewed the Central File and the ones that are

20    here we have read into the record.  And I've

21    also made the notations on the 3042s.  So at

22    this time I'm going to ask you to direct your

23    attention over to Commissioner Smith.

24        DEPUTY COMMISSIONER SMITH:  Mr. Menchaca,

25    according to the C-File you were received by the

26    Department of Corrections on February 18, 1992.

27    You were received here at San Quentin on

42

1    February 6, 2002.  You have a classification

2    score of 19, which is the lowest classification

3    score that a life prisoner can attain.  Your

4    last Hearing, which was your Initial Hearing,

5    was held on August 27, 2001, and you received a

6    three-year denial at that time.  You have had

7    three other Hearings scheduled:  one October of

8    2004, and that was postponed at your request,

9    you wanted to a psychological evaluation; the

10   next Hearing was scheduled for March 2005 and

11   that Hearing was postponed as a result of your

12   attorney being ill and not being present.  It

13   was then reschedule for June 30, 2005, and that

14   was postponed again at your request for a new

15   psychological evaluation.  And that brings up to

16   today's date.  Since you have been incarcerated

17   you have received five CDC 128As, the last one

18   being since your last Hearing, October 2001, and

19   that was for refusing to be interviewed by your

20   correctional counselor regarding Northern

21   affiliated inmates.  Why did you refuse that

22   interview?

23          INMATE MENCHACA:  Well for my safety.

24   Nobody was interviewing and I didn't want to be

25   the only one going out.

26          DEPUTY COMMISSIONER SMITH:  You've also

27   received four CDC 115's.  You have had three

43

1  since your last Hearing.  You had one October of

2  2003 for possession of a hypodermic syringe.

3  And through your Counselor you have provided us

4  with a letter from inmate Mendez, dated June 28,

5  2005, who takes responsibility for the syringe.

6  Is that right?

7          INMATE MENCHACA:  Yes.

8          DEPUTY COMMISSIONER SMITH:  I'm not quite

9  sure --

10          INMATE MENCHACA:  He's my cellmate.

11          DEPUTY COMMISSIONER SMITH:  Okay.  But

12  I'm not quite sure what the point of his letter

13  is.

14          ATTORNEY STRINGER:  He's currently in

15  Court contesting both of the 115s, the 2003 and

16  the 2005.

17          DEPUTY COMMISSIONER SMITH:  Okay.

18          ATTORNEY STRINGER:  And he wants the

19  Board to know that they are being contested and

20  the Court has not ruled yet.

21          DEPUTY COMMISSIONER SMITH:  But CDC found

22  you guilty?

23          INMATE MENCHACA:  Yes.

24          DEPUTY COMMISSIONER SMITH:  Okay.

25          DEPUTY DISTRICT ATTORNEY RICO:  And I'm

26  sorry, Commissioner.  Just so the record is

27  clear, Counsel said that he is contesting the

44

1   two 115s, the '03 and the 2005.   There were two

2   of them in 2005, which one?

3          ATTORNEY STRINGER:   Both of them.

4          DEPUTY COMMISSIONER SMITH:   That's both.

5   So they are contesting all three.

6          DEPUTY DISTRICT ATTORNEY RICO:   Thank

7   you.

8          DEPUTY COMMISSIONER SMITH:   The next 115

9   is dated January 2005 and that was for

10   possession of methanphetamine.   And then the

11   most recent is November 2005, and that was also

12   for possession of methanphetamine.   And again

13   through counsel you have provided me with a lab

14   report from the National Toxicology Lab and

15   that's dated November 2005, indicating a

16   positive test for methanphetamine.   Again, I'm a

17   little confused as to --

18          ATTORNEY STRINGER:   It's just part of the

19   record.   He's challenging the validity of that

20   test.   There was -- his position is that there

21   either was a mix-up in the sample that was taken

22   or it was contaminated in the lab.

23          DEPUTY COMMISSIONER SMITH:   You were

24   found guilty of both of the 115s, January of '05

25   and November of '05 by the Department of

26   Corrections, correct?

27          INMATE MENCHACA:   Yes.

45

1          **DEPUTY COMMISSIONER SMITH:**  All right,

2     then let me return those.   In addition we have a

3     general chrono from a correctional officer of

4     the Investigative Services Unit.   It's dated

5     March 23, 2006, and it indicates "that on that

6     date a search of a cell done that was occupied

7     by inmate Mitchell and yourself and that during

8     search there was a drawing that was found in

9     inmate's Mitchell's control, and it describes it

10    as a drawing of a woman wearing a Huelga bird,"

11    I many be mispronouncing that, it's H-U-E-L-G-A,

12    "around her neck with a Huelga bird on the flag

13    behind here and the name Menchaca is written

14    across the top.   I know through my training

15    experience that the Huelga bird is a symbol used

16    by members of the Northern Structure Prison

17    Gang."   And the writer concludes that your

18    behavior should be closely monitored for gang

19    activity.   And of course that handwritten

20    drawing is attached to the general chrono.

21          **INMATE MENCHACA:**  Can I say something

22    about that report?

23          **DEPUTY COMMISSIONER SMITH:**  Sure.

24          **INMATE MENCHACA:**  ISU did come to our

25    house, to our cell on the month whatever date

26    that was.   They came in and they took all my

27    cellies property, everything he owned, that's

46

1    all they took.  And I said that drawing was

2    found in his locker not in mine.  I knew he was

3    drawing me a drawing but I didn't know that he

4    had put all that other stuff on it.  And I just

5    wanted to let that be known.

6         **DEPUTY COMMISSIONER SMITH:**  Sure.  With

7    the exception of the 115s here, your adjustment

8    since your Initial Hearing, you know, has been

9    very positive, you know, and you certainly been

10   very active in a number of different programs.

11   And I'm going to refer to the Board Report with

12   regard to the various programs that you have

13   been involved in.  And I'll go through somewhat

14   slowly, because it's fairly extensive I want to

15   make sure that I don't overlook anything.  You

16   completed the Anger Management program that you

17   were taking from November 5th through

18   January 6th, and you have provided me with a

19   copy of the certificate for your role as a

20   facilitator in the Trust Program, T-R-U-S-T, and

21   that's dated April 2006.  And in addition to

22   that certificate you have also received 13

23   laudatory chronos from February 2003 through

24   December 2005 for your participation in the

25   various chapters and elements of that Trust

26   Program.  So you're still participating in the

27   Trust Program but now it's as a facilitator?

47

1      **INMATE MENCHACA:**  Well, I've always been

2  -- when it started I just happened to be one of

3  the ones that was a starter member.  And we have

4  a curriculum with 25 different sessions and

5  every member tries to be a facilitator for that

6  program and we all take turns facilitator

7  different programs, different parts of the

8  program.  And we just completed the curriculum

9  and that's why I was awarded that certificate.

10      **DEPUTY COMMISSIONER SMITH:**  So the

11  facilitator -- so I understand the facilitator

12  role kind of moves around with all the

13  participants.

14      **INMATE MENCHACA:**  Yes, the facilitator

15  class, a workshop, once a week, on every

16  Thursday, we hold workshops in (indiscernible)

17  Chapel.  And depending on what the topic might

18  be is going to depend on who facilitates that

19  class at that date.

20      **DEPUTY COMMISSIONER SMITH:**  So you are

21  either participating or a facilitator depending

22  on the class?

23      **INMATE MENCHACA:**  Well, as a member I'm a

24  facilitator.

25      **DEPUTY COMMISSIONER SMITH:**  Okay.

26      **INMATE MENCHACA:**  I'm not participating,

27  I'm a trained facilitator for that program.

48

1        **DEPUTY COMMISSIONER SMITH:** Okay.

2        **INMATE MENCHACA:** But I don't facilitate

3    every workshop. There are 30 of us and we all

4    take turns, you know.

5        **DEPUTY COMMISSIONER SMITH:** Okay, I

6    appreciate the explanation. The Board Report

7    indicates that from May of '97 through December

8    of 2004 that you were an active participant in

9    Alcoholics Anonymous. Are you still active?

10        **INMATE MENCHACA:** I go when I can

11    depending on what I'm doing as far as school and

12    other programs.

13        **DEPUTY COMMISSIONER SMITH:** So, it's --

14        **INMATE MENCHACA:** I go --

15        **DEPUTY COMMISSIONER SMITH:** -- somewhat

16    sporadic?

17        **INMATE MENCHACA:** I go --

18        **DEPUTY COMMISSIONER SMITH:** In other

19    words, you're not going to every --

20        **INMATE MENCHACA:** Meeting.

21        **DEPUTY COMMISSIONER SMITH:** -- meeting?

22        **INMATE MENCHACA:** No, I'm not.

23        **DEPUTY COMMISSIONER SMITH:** Okay. You

24    participated in the first quarter of the Over-

25    Comers Outreach, which is a 12-Step program, and

26    you did that in February 2005. In January 2002

27    you received a self-help chrono for your

49

1  involvement in psychiatric studies.  February of

2  2003 you participated in the San Quentin College

3  Program and you received seven laudatory chronos

4  for completion of a number of courses within

5  that program, including:  Spanish, history,

6  English, sociology, psychology, and philosophy.

7  In October 2003 you participated in the Ciro

8  [phonetic] Men's Retreat?

9       INMATE MENCHACA:  Yes.

10       DEPUTY COMMISSIONER SMITH:  And you

11  completed a 16-week impact workshop on

12  addiction, and that was from January through

13  March of 2005.  In October 2004 you completed a

14  12-Step recovery program through the Over-Comers

15  Outreach, and that's a different program than

16  the one that I have already mentioned.  Correct?

17       INMATE MENCHACA:  Right.

18       DEPUTY COMMISSIONER SMITH:  And it

19  indicates that we have discussed that you

20  completed the Trust Workshop, which is teaching

21  responsibility by utilizing sociological

22  training, and that was a 14-day program covering

23  self-esteem, self-image, male-female

24  relationships, work ethics, health care issues,

25  independence, and responsibility.  And that was

26  from March through April 2005.  You participated

27  in the No More Tears Employability Workshop, and

50

1    the Response to Violence Workshop, and that was

2    in April and July 2005. You completed another

3    16-week impact workshop on relationships, and

4    that was from May through September 2005. And

5    you completed the Changing Your Mindset Workshop

6    and that was in September 2005. And in

7    September of 2005, in addition, you also

8    attended the Comprehensive Association Hustling

9    and Crime Workshop, given through Trust Program.

10   And as I indicated, you participated and

11   completed the ten sessions of Anger Management.

12   Any other activities -- this, you know, is a

13   fairly substantial list, but are there any other

14   activities that you've been involved in that I

15   haven't addressed that we should be aware of?

16       **INMATE MENCHACA:** Well, what I don't have

17   is I have another completion of certificate but

18   I wasn't able to make a copy of it for No More

19   Tears; I'm a member of that organization also

20   and a facilitator. And that pertains to curbing

21   violence and detrimental behavior. And that is

22   set up almost like -- I can explain various ways

23   of the Trust workshop, the different

24   facilitator. I just want to make sure that I

25   complete that; I've completed that cycle, that

26   curriculum, No More Tears, also, and I was

27   awarded a certificate of completion and I just

1    wasn't able to run a copy for (indiscernible).

2         **DEPUTY COMMISSIONER SMITH:**   Okay.   And I

3    did address the No More Tears Program, but you

4    now have a certificate of completion?

5         **INMATE MENCHACA:**   Yeah.   And I'm also a

6    member and a facilitator for that.

7         **DEPUTY COMMISSIONER SMITH:**   Okay.

8    Anything else that we should be aware of?

9         **INMATE MENCHACA:**   I think you've covered

10   that.

11        **DEPUTY COMMISSIONER SMITH:**   Okay.   I'm

12   going to refer to the psychological evaluation.

13   It's dated April 2006, prepared by Dr. Inaba,

14   I-N-A-B-A.   And there is an addendum that is

15   dated May 2006.   And she indicates that -- the

16   first sentence on page one, section one, should

17   read as follows, and I'll quote:   "Mr. Menchaca

18   is a 41 year old Latino male who is serving a 16

19   year life sentence for second-degree murder.

20   Mr. Menchaca received a one-year enhancement for

21   Penal Code Section 3058.8, I believe that's the

22   reference, having a prior prison term.   Also,

23   Mr. Menchaca would like to have it stated that

24   he does consider himself to be an alcoholic and

25   that he never has intended to deny the fact that

26   he's an alcoholic."   And that's to an extend

27   somewhat a correction --

52

1          INMATE MENCHACA:  Yes.

2          DEPUTY COMMISSIONER SMITH:  -- with part

3  of the report that I will also so address.  But

4  I wanted to put that in first so that that was

5  clear.

6          ATTORNEY STRINGER:  Commissioner, in the

7  first sentence of that report it indicates that

8  "Mr. Menchaca is a 41 year old Latino male who

9  is serving a 16 year to life sentence for

10 second-degree murder with a weapon."  That's

11 incorrect.

12         DEPUTY DISTRICT ATTORNEY RICO:  But I

13 think that what you read into the record

14 indicating the one-year enhancement was for the

15 prior term resolves that.

16         DEPUTY COMMISSIONER SMITH:  All right, I

17 think we are clear on the commitment offense and

18 the basis and violation.

19         ATTORNEY STRINGER:  There was no weapon.

20         DEPUTY COMMISSIONER SMITH:  Correct.

21         ATTORNEY STRINGER:  There was no weapon

22 charged --

23         DEPUTY COMMISSIONER SMITH:  With

24 the--

25         ATTORNEY STRINGER:  -- to Mr. Menchaca.

26         DEPUTY COMMISSIONER SMITH:  -- the life-

27 crime.

53

1          ATTORNEY STRINGER:  Yes.

2          DEPUTY COMMISSIONER SMITH:  Yes.   I

3    believe that we are on firm ground with that.

4          ATTORNEY STRINGER:  They other thing that

5    I wanted to mention about the psychological

6    report is that I believe that this is the same

7    as Mr. M [phonetic].  The reason I say that is

8    that because there is one line in this report

9    that I clearly recall from a previous report.

10   Now I don't know if that means this report is

11   also tainted or not.

12         PRESIDING COMMISSIONER GARNER:  Let me

13   ask:  Have you reviewed this report?

14         INMATE MENCHACA:  Yes.  I sent it back to

15   her.

16         PRESIDING COMMISSIONER GARNER:  Does the

17   report other than the corrections that have

18   already been read into the record fairly reflect

19   your recollections from the interview with the

20   doctor?

21         INMATE MENCHACA:  Yes.  It only indicates

22   -- what she changed on this -- what you just

23   read out was per my request.  I just wanted to

24   make sure that I was never convicted of

25   murdering anybody with a weapon.

26         PRESIDING COMMISSIONER GARNER:  Let me

27   for the record take Mr. Stinger's comments one

54

1  just second further from the previous Hearing

2  this week. We had a psychological report

3  wherein the risk assessment, it appears, that

4  the risk assessments have been commingled

5  between two different inmates. Thereby leading

6  us to be some concern with respect to the

7  accuracy of the assessment, whether it was for

8  the inmate that was being interviewed at the

9  time or someone that we had no (indiscernible)

10  on. I guess what I'm interested in is if we've

11  had an adequate review where we think that the

12  famous Mr. M as discussed may or may not be you,

13  but I'm more concerned that some other inmate's

14  findings and conclusions are his.

15           ATTORNEY STRINGER: Well, there is one

16  sentence here "that's given the above factors,

17  Mr. Menchaca's violence risk will never be as

18  low as an average member of the non-incarcerated

19  population." That is a direct quote from

20  Mr. Buorlens [phonetic] psychological

21  evaluation. Now whether that's appropriate to

22  Mr. Menchaca, I don't know. But it raises

23  concerns is as (indiscernible).

24           PRESIDING COMMISSIONER GARNER: I don't

25  have the same recollection, but (indiscernible).

26           ATTORNEY STRINGER: I guess what I'm

27  asking is -- I guess it would go to the weight

55

1  of your --

2      **PRESIDING COMMISSIONER GARNER:**  Well, the

3  concern is that it's a fairly (indiscernible)

4  statement.  With respect to Mr. Menchaca there

5  is some concern with our history of fairly

6  significant flaws that have been identified

7  earlier in the week as to what the remedy

8  (indiscernible).

9      **DEPUTY DISTRICT ATTORNEY RICO:**  If I

10  might, Commissioner?  If Counsel is referring to

11  that sentence at page five, under Section C.  Is

12  that correct?

13      **DEPUTY COMMISSIONER SMITH:**  Yes.

14      **ATTORNEY STRINGER:**  Yes.

15      **DEPUTY DISTRICT ATTORNEY RICO:**  And it

16  would appear to me that just prior to that

17  statement the author of the report is listing

18  generic factors, which statistically increase or

19  decrease the risk of future violence.  And they

20  seem to be categories that I have seen listed

21  that are generic in nature and it's talking

22  about the fact that apparently Mr. Menchaca's

23  situation fits into those specific categories.

24  So I'm not sure that it's mixing apples and

25  oranges, but it's talking factors that

26  historically or generically have been determined

27  to either increase or decrease risk of violence.

56

1   And then it goes into matters that are more

2   specific to Mr. Menchaca.   That's how I read it.

3       **ATTORNEY STRINGER:**   Well, there is a

4   previous report now.   It's not -- it doesn't

5   have Mr. Menchaca's name in it, but it's just

6   listed as a Mr. M.   And it has this same

7   sentence.   And it's hard to know what the doctor

8   is referring to.

9       **DEPUTY COMMISSIONER SMITH:**   Well,

10  Counsel, I would want to mention for the record

11  anyway that as we go through the report and it

12  talks about some of the positive aspects of

13  Mr. Menchaca in terms of his adjustment, that

14  seems to be extremely accurate with the

15  information that was contained in the Board

16  Report and also came from my review of the C-

17  File.   So my feeling is that wherein there maybe

18  some question about whether or not there was a

19  boilerplate sentence used, if the question has

20  to do with whether or not this report seems to

21  accurately reflect Mr. Menchaca as opposed to

22  having been intermingles or commingled with some

23  other inmates, it appears to me that based on

24  that level, anyway, that it's accurate for

25  Mr. Menchaca.

26      **ATTORNEY STRINGER:**   But that one

27  sentence, "Mr. Menchaca's violence risk will

57

1   never be as low as an average member of the non-
2   incarcerated population." That's nonsense.
3   Certainly, age, there are many, many factors
4   that I could cite that would belie that
5   particular sentence. I mean I'll let it pass
6   that Dr. Inaba always says that males, for some
7   reason, are going to run ramped in the street.
8   She concludes that in ever single report that
9   she ever writes. And I've always believed that
10  her reports are suspect. But this sentence is
11  so all-inclusive and sweeping that it would mean
12  that Mr. Menchaca would be foreclosed forever
13  for receiving a date for the Board if you were
14  to rely on that particular evaluation. So I
15  think -- it's of great concern to me as to
16  whether or not this sentence applies to
17  Mr. Menchaca or applies to some other inmate.
18       **DEPUTY COMMISSIONER SMITH:** Well let me
19  say that you and I have seen enough
20  psychological evaluation over the years that run
21  the full gamut and we could have a lengthy
22  conversation on the credibility and value of
23  psychological evaluation, either positive or
24  negative. You know, I will certain, during our
25  deliberations, weigh this evaluation in what I
26  will consider to be an appropriate manner, quite
27  candidly as I weigh most psychological

58

1   evaluations.  Which is, I will take the

2   information that is present but it will

3   certainly not be information that will establish

4   a decision solely based on that information.

5        ATTORNEY STRINGER:  I don't want to

6   belabor this, but how do we know that when the

7   doctor makes this statement that she's actually

8   talking about my client, because she has already

9   made that exact same statement.  We can get the

10  C-File and I can show it to you, Mr. Buorlens,

11  with a Mr. Hamlin [phonetic].

12       DEPUTY COMMISSIONER SMITH:  I don't have

13  anyway of making a response as to whether that's

14  a boilerplate statement that would appear in any

15  number of her evaluations where she came up with

16  that finding or not.  As Commissioner Garner

17  asked with regard to remedy, I think we are both

18  interested to hearing any remedy that you might

19  want to suggest.

20       ATTORNEY STRINGER:  I could just see if

21  Mr. Menchaca ever got a date.  And certainly

22  it's in there now and the district attorney can

23  argue it and if it went to the Governor's

24  office, the Governor could hold this up and say:

25  "The psych evaluation says he's never going to

26  be suitable."

27       PRESIDING COMMISSIONER GARNER:  Let me

59

1   get it on record, because one of the

2   difficulties is that Commissioner Smith just

3   joined us today and wasn't present at the

4   previous Hearings.  I was, when we had the

5   difficulty with the previous psych, this was not

6   what I would characterize as a insignificant

7   kind of error.  This was a very substantial one.

8   Two inmates were commingled into one report.

9   And it's in the most critical area that we have

10  and that's our risk assessment.  We rely on the

11  risk assessment significant in making decisions.

12  We have before us now another risk assessment

13  with the same issue as present and we have the

14  same question with respect to reliability.  So

15  I'm adding that only because I was present with

16  Mr. Stringer earlier in week when we had this

17  same dilemma.  So once again I'll ask

18  Mr. Stinger:  Do we have a solution for this?

19         ATTORNEY STRINGER:  Well, I don't know

20  how we can strike the psych report from the

21  record.  I mean certainly we could ask -- I mean

22  it's not in a court where we could do that.

23  It's there and I don't want it to be part of the

24  record.  I question to Dr. Inaba's

25  professionalism in this and we have the right to

26  do that given the last reports.  So --

27         DEPUTY COMMISSIONER SMITH:  You can

60

1    certainly address those issues in detail in your

2    closing.

3         ATTORNEY STRINGER:  But it doesn't help

4    my client.

5         DEPUTY COMMISSIONER SMITH:  And ask us

6    to, you know, consider your statements in

7    closing as you would ask us to do --

8         ATTORNEY STRINGER:  Sure, if he comes

9    back in whatever times he comes back, that's

10   going to be there and some other Commissioner is

11   going to take a look at that.  Because I've seen

12   these things happen over the years.  Some other

13   Commissioner is going to take a look at that and

14   there you go, it never gets corrected.

15        PRESIDING COMMISSIONER GARNER:  I guess

16   we could consider the options of -- I agree with

17   you, but this is on the record.  This report is

18   a permanent part of Mr. Menchaca's file.  It's

19   going to be considered by future Panels until

20   such time as a date is offered.  And I also

21   can't speculate as to how other review

22   authorities would do it, but it is certainly

23   going to be here.  So that's why I say that

24   based on our experience earlier in the week

25   where we had a significant error in the most

26   critical assessment that we as Panel members

27   need, I guess the options that are going to my

61

1   head is that there is the option to appeal the

2   psych, if he chooses to do that.  I don't know

3   if that's anything that he's considered or if

4   you've had an opportunity to discuss that with

5   him.  We want to go off record for a minute and

6   consult with your client for a decision?

7         ATTORNEY STRINGER:  I don't know if the

8   Board is entertaining the options on this.  I

9   mean it's going to be obviously in the

10   transcript.  But it is my concern that this

11   false, because I look at his juvenile record and

12   there are other juvenile records that come

13   before this court and it's not that, for a lack

14   of a better word, outstanding.  So I don't know

15   where that conclusion would come from.  That's

16   what bothers me.

17         DEPUTY COMMISSIONER SMITH:  Perhaps I

18   can, if not do anything more than further muddy

19   the water a little, but if you refer to the

20   prior psychological evaluation that was prepared

21   by a different psychiatrist an Adam Goldyne,

22   G-O-L-D-Y-N-E, on page seven, and I'll give you

23   a chance to find that.

24         ATTORNEY STRINGER:  Is that the 9/25/00?

25         DEPUTY COMMISSIONER SMITH:  January 21,

26   2004.

27         ATTORNEY STRINGER:  I don't seem to have

62

1   my finger on the one from Dr. Goldyne, although

2   I'm intimate with Dr. Goldyne's report.

3          DEPUTY COMMISSIONER SMITH:   In that

4   report the doctor uses the same or a similar

5   list, not the same, but a similar list of

6   factors that would either increase or decrease

7   the risk of violence.   And the doctor concludes

8   in that report "that given the above risk

9   factors, Mr. Menchaca's violence risk will never

10  be considered as low as an average member of the

11  non-incarcerated population."  Which is the same

12  wording that Dr. Inaba uses.

13         ATTORNEY STRINGER:   Well, that in my

14  opinion makes it worse, because Dr. Inaba uses

15  that as if it's her own conclusion and it's --

16  could we go off the record for a minute?

17         PRESIDING COMMISSIONER GARNER:   Yes.

18                  (Off record)

19             (TAPE 1, SIDE A, ENDS)

20             (TAPE 1, SIDE B, BEGINS)

21         DEPUTY COMMISSIONER SMITH:   We're back on

22  the record.   Everyone that was previously

23  identified is back in the Hearing room and we

24  have Mr. Rico also back present via video.

25         PRESIDING COMMISSIONER GARNER:   All

26  right, for the record, the time is 12:00 Noon.

27  Mr. Stinger, what we are going to do today is

1  that we are going to go forward with the

2  Hearing.  We are not going to use nor will we

3  consider the Dr. Inaba's report in any aspect of

4  the decision today.  This will allow

5  Mr. Menchaca, should he chose to 602 the report,

6  he will have the opportunity to do that, and we

7  will also order a new psych exam to be conducted.

8  before the next Hearing.  Again, for the record

9  the reason that we are not considering

10  Dr. Inaba's May 2006 report is because of

11  previous serious discrepancies in a report of

12  another inmate and that there are indications

13  that that may be present today with

14  Mr. Menchaca's report.

15        DEPUTY COMMISSIONER SMITH:  And that

16  would be applicable only if Mr. Menchaca's is

17  not granted a date and we are some away from

18  making that decision.

19        ATTORNEY STRINGER:  Thank you.

20        PRESIDING COMMISSIONER GARNER:  Okay.  So

21  we are back on record.

22        DEPUTY COMMISSIONER SMITH:  And we opted

23  because of the issue regarding the psychological

24  evaluation I'm not going to address it for the

25  record.  We are simply going to proceed as

26  though that evaluation is not present.  So it's

27  back to you.

64

1       **PRESIDING COMMISSIONER GARNER:**  I don't

2  have any additional questions.  Do you have any

3  follow up questions that you would like to ask?

4       **DEPUTY COMMISSIONER SMITH:**  I've got a

5  couple of questions.  Mr. Menchaca, you

6  indicated that when you were back at the

7  residence with the other individual that the

8  vehicle containing the victim and the others

9  stopped and a female got out and made some

10  disparaging derogatory comments.  Is that right?

11       **INMATE MENCHACA:**  Yes.

12       **DEPUTY COMMISSIONER SMITH:**  And then they

13  drove off?

14       **INMATE MENCHACA:**  Yes.

15       **DEPUTY COMMISSIONER SMITH:**  And at that

16  point you and one other person --

17       **INMATE MENCHACA:**  Yes, sir.

18       **DEPUTY COMMISSIONER SMITH:**  -- got in the

19  vehicle and went after them?

20       **INMATE MENCHACA:**  I wouldn't say go after

21  them, but I followed them, yes.

22       **DEPUTY COMMISSIONER SMITH:**  My question

23  is:  why did you do that?

24       **INMATE MENCHACA:**  Well, when the lady got

25  out of the car she said:  "Now I know where you

26  guys live at and I'm going to get my 45 and come

27  back and blow your Mexican fucking head off."  I

65

1    go, Man. And she jumped in her car, got in her

2    car and left. And well, I decided to follow her

3    and find out where she lives at. Hoping that

4    that would just like, well now I know where you

5    live at and that would be the end of it.

6        **DEPUTY COMMISSIONER SMITH:** So you didn't

7    see that -- that decision-making, that behavior

8    as escalating a situation and what was likely to

9    be concluded?

10        **INMATE MENCHACA:** I didn't think what

11    happened was going to happen. If I did I

12    wouldn't have followed that car. But my

13    intentions that night were to, under the

14    conditions that were there, was that since she

15    knows where she thought I lived at, because of

16    what she said, because it came out of her mouth,

17    is that well why shouldn't I know where she

18    lives at. And then I can say the same thing to

19    her. And that would be the end of that.

20        **DEPUTY COMMISSIONER SMITH:** You indicated

21    that when you had the confrontation that when

22    the fight occurred between Mr. Figueroa and your

23    crime partner that it lasted just a moment and

24    that you had gotten in between the two of them,

25    suffered an injury and that you both got back in

26    the car. It was just -- the event just took a

27    moment in the span of time. Is that right?

66

1          INMATE MENCHACA:  If it took 30 seconds I

2     think it was too much.

3          DEPUTY COMMISSIONER SMITH:  Do you have

4     an explanation for the number of injuries that

5     the victim suffered?

6          INMATE MENCHACA:  Do I have an

7     explanation?

8          DEPUTY COMMISSIONER SMITH:  Uh huh.

9          INMATE MENCHACA:  To how --

10         DEPUTY COMMISSIONER SMITH:  How that many

11    injuries could have occurred in such a short

12    period of time?

13         INMATE MENCHACA:  No.  But my co-

14    defendant has an answer to that.

15         DEPUTY COMMISSIONER SMITH:  And yet you

16    were present right between your co-defendant and

17    the victim, correct?

18         INMATE MENCHACA:  Right.

19         DEPUTY COMMISSIONER SMITH:  You never saw

20    a weapon?

21         INMATE MENCHACA:  No.

22         DEPUTY COMMISSIONER SMITH:  You know the

23    victim was stabbed some 23 times.

24         INMATE MENCHACA:  Uh huh.

25         DEPUTY COMMISSIONER SMITH:  And in the

26    course of that you never saw a weapon?

27         INMATE MENCHACA:  No.

67

1      **DEPUTY COMMISSIONER SMITH:**  The other

2   question that I have is that you indicated that

3   your parole plans had changed and that your

4   plans are to reside with your mother.

5      **INMATE MENCHACA:**  Yes.

6      **DEPUTY COMMISSIONER SMITH:**  Why not

7   reside with your wife?

8      **INMATE MENCHACA:**  My wife is a drug

9   counselor.  She's a house manager to a program

10  that houses women with children.  Being a house

11  manager of that house she has to live there.

12  Now the last address that you have was for my

13  last parole  -- when I was going to Board for my

14  parole last time she would have gotten an

15  apartment.  She left that manager job to get an

16  apartment to have somewhere for me to parole to.

17  But this time I'm not going to put her through

18  this because of the nature of the situation, the

19  115s and everything.  I told her not to go out

20  and get another apartment or anything.  So I'll

21  just use my mother's address for now.  And my

22  mother is willing to take me in.

23     **DEPUTY COMMISSIONER SMITH:**  All right,

24  thank you.  No other questions.

25     **PRESIDING COMMISSIONER GARNER:**  Mr. Rico?

26     **INTERPRETER ALENID:**  Yes, Commissioner.

27  And I will address the questions to the Chair.

68

1    First of all, I know that there has been a

2    reference to Mr. Menchaca's prior driving under

3    the influence hit-and-run with a death.  Could

4    Mr. Menchaca indicate for the record the

5    circumstances involved in that?  How did that

6    incident occur?

7            **DEPUTY COMMISSIONER SMITH:**  Do you

8    understand the question?

9            **INMATE MENCHACA:**  Yes.

10           **DEPUTY COMMISSIONER SMITH:**  Go ahead and

11   answer, sir.

12           **PRESIDING COMMISSIONER GARNER:**  Address

13   your answers to us.

14           **DEPUTY COMMISSIONER SMITH:**  Yes, to us.

15           **INMATE MENCHACA:**  This was in 1981.  I

16   took my mother's car and went to a friend's, to

17   a party.  It was a Sunday night, I remember

18   clearly because I had to go to the dentist

19   Monday morning.  And I took about four or five

20   of my friends with me, they were all my age, and

21   on the way back down from the party I lost

22   control of the car, wrecked it, flipped it, and

23   one of the person's in the car died.

24           **DEPUTY DISTRICT ATTORNEY RICO:**  And the

25   hit-and-run, did Mr. Menchaca flee the scene

26   leaving the victim inside the car?

27           **INMATE MENCHACA:**  I walked away from the

69

1    scene.  I feel and they woke me up.

2        DEPUTY DISTRICT ATTORNEY RICO:   And how

3    intoxicated does Mr. Menchaca think that he was

4    in that situation?

5        INMATE MENCHACA:   I wasn't, I had to go

6    to the dentist the next day.

7        DEPUTY DISTRICT ATTORNEY RICO:   So moving

8    ahead in time to the time of the life-crime, I

9    was looking back through the probation report

10   and it would appear that Mr. Menchaca had

11   indicated at one point that he was under the

12   influence before he ever left home that evening.

13   Is that correct?

14       INMATE MENCHACA:   I was drinking at home.

15       DEPUTY DISTRICT ATTORNEY RICO:   And

16   nevertheless, Mr. Menchaca chose to drive to

17   another location to drink.  Is that correct?

18       INMATE MENCHACA:   Yes.

19       DEPUTY DISTRICT ATTORNEY RICO:   Did

20   Mr. Menchaca learn anything from the prior

21   incident where he had been driving under the

22   influence and killed someone?

23       INMATE MENCHACA:   At that time, no.

24       DEPUTY DISTRICT ATTORNEY RICO:   So in

25   terms of the life-crime, Mr. Menchaca was

26   present during the trial and testimony by

27   witnesses.  Isn't that true?

70

1          INMATE MENCHACA:  Yes.

2          DEPUTY DISTRICT ATTORNEY RICO:  And does

3    Mr. Menchaca have any recollection of being in

4    his vehicle that night when the passenger pulled

5    along side the other car and formed a gun with

6    his forefinger and thumb curling up his other

7    fingers?  Does Mr. Menchaca remember that?

8          INMATE MENCHACA:  I don't remember that

9    happening.

10          DEPUTY DISTRICT ATTORNEY RICO:  Does he

11    remember to hear testimony to that effect?

12          INMATE MENCHACA:  Yes.

13          DEPUTY DISTRICT ATTORNEY RICO:  And does

14    Mr. Menchaca have any recollection of anyone in

15    the car, the passenger or himself, displaying

16    some type of a knife to the occupants of the

17    other vehicle?

18          INMATE MENCHACA:  No.

19          DEPUTY DISTRICT ATTORNEY RICO:  Does

20    Mr. Menchaca remember there being testimony to

21    that effect during the trial?

22          INMATE MENCHACA:  Yes.

23          DEPUTY DISTRICT ATTORNEY RICO:  And

24    Mr. Menchaca denies pursuing the vehicle at

25    first.  Is that accurate?

26          INMATE MENCHACA:  From where it started?

27          DEPUTY DISTRICT ATTORNEY RICO:  I'll

71

1   withdraw that and ask it a different way.    I

2   though I heard Mr. Menchaca earlier when asked

3   by the Commissioner, when there was the initial

4   meeting of the two vehicles -- let me ask it

5   this way:   I heard Mr. Menchaca earlier deny or

6   at least say that he didn't remember recognizing

7   or thinking that he recognized someone in the

8   other car as someone that he had had a problem

9   with.   Is that accurate?

10          **INMATE MENCHACA:**   Yes.

11          **DEPUTY DISTRICT ATTORNEY RICO:**   But in

12   the probation report it would appear that

13   Mr. Menchaca told his wife at some point after

14   the offense that he had thought that someone in

15   the other car was someone that he had had

16   problems with.   Does Mr. Menchaca remember

17   telling his wife that?

18          **ATTORNEY STRINGER:**   Can we get a

19   reference on the probation report?

20          **DEPUTY DISTRICT ATTORNEY RICO:**   Page

21   four, the first large paragraph on that page.

22   Where it says that Menchaca told his wife that

23   he had initially thought that the guy was

24   someone else that he didn't get along with and

25   that words and gestures were exchanged.   Does he

26   recall telling his wife that?

27          **INMATE MENCHACA:**   I don't remember.

72

1      **DEPUTY DISTRICT ATTORNEY RICO:**    Okay, all

2    right.   And Mr. Menchaca has indicated that the

3    circumstances of the other car stopping and the

4    lady getting out and he has given his version of

5    what she said.   Isn't it true that the other car

6    had stopped one time prior to that during the

7    back and forth between the vehicles?

8      **INMATE MENCHACA:**    At the initial

9    incident.

10      **DEPUTY DISTRICT ATTORNEY RICO:**    All

11    right.   I guess what I'm talking about is:   Does

12    Mr. Menchaca remember during the trial there

13    being testimony that Ms. Douglas had turned

14    right off Southside onto a dead end street and

15    made a u-turn and came back and on the way back

16    she heard two loud thumps striking the rear of

17    the driver's side, so she pulled over to find

18    out what had happened.   Does he recall that

19    testimony?

20      **INMATE MENCHACA:**   Yes, I do.

21      **DEPUTY DISTRICT ATTORNEY RICO:**    And did -

22    - had Mr. Menchaca and Mr. Oroteza followed the

23    car and then when it did that action throw

24    something at the other vehicle to stop it and to

25    get the occupants out of the vehicle?

26      **INMATE MENCHACA:**   No, nothing was thrown

27    at that vehicle with intention to stop them.

73

1    **PRESIDING COMMISSIONER GARNER:**    Was

2    anything thrown at the vehicle?

3    **INMATE MENCHACA:**    Yes.

4    **PRESIDING COMMISSIONER GARNER:**    What was

5    thrown?

6    **DEPUTY DISTRICT ATTORNEY RICO:**    Can

7    Mr. Menchaca tell us about that, because I don't

8    recall hearing that during the Hearing?

9    **INMATE MENCHACA:**    When we drove to my

10    friend's Dan [phonetic] Novineta's [phonetic]

11    house, we got out of the car and we were going

12    up to his house, that's when the other car went

13    up and I guess hit the dead end and turned back

14    around and stopped in front of, on the side of

15    my car.  That's when we picked up a rock or some

16    piece of brick or something and threw it at the

17    car.

18    **DEPUTY DISTRICT ATTORNEY RICO:**    And could

19    Mr. Menchaca explain why he thought it necessary

20    to pick up a rock or a brick or something and

21    throw it at the other car, if he wasn't trying

22    to provoke a situation?

23    **INMATE MENCHACA:**    No, I can't.

24    **DEPUTY DISTRICT ATTORNEY RICO:**    Okay.

25    And would this have been prior to his alleged

26    version that the woman got out and -- let me

27    rephrase it.  After that incident, after

74

1   Mr. Menchaca threw the item at the car, did the

2   occupants of the other car get out?

3       **INMATE MENCHACA:**  I don't remember if it

4   was before or after but it was at the same time.

5       **DEPUTY DISTRICT ATTORNEY RICO:**  But did

6   the occupants get out and was there a

7   confrontation at that point?

8       **INMATE MENCHACA:**  No, just when the lady

9   got out there and said what she said.

10      **DEPUTY DISTRICT ATTORNEY RICO:**  All

11  right.  I guess I'm confused and if you will

12  bear with me.  I've hear Mr. Menchaca say that

13  he drove home after the confrontation and the

14  lady pulled up and got out of the car and made

15  the threatening words about going to get her 45.

16  But that seems to be that he is saying that she

17  followed him and there was that confrontation.

18  Where does this incident come in that the car

19  had turned around and he throws the rock at her?

20  Was it before or after that?

21      **ATTORNEY STRINGER:**  Can I state the

22  obvious for the record, and that is that my

23  client sits here convicted.  We have stipulated

24  to the facts.

25      **DEPUTY DISTRICT ATTORNEY RICO:**  I

26  understand.

27      **ATTORNEY STRINGER:**  We are not going to

75

1  retry it before the Board.

2      **DEPUTY DISTRICT ATTORNEY RICO:**  And I'm

3  not trying to retry it, but I'm inquiring about

4  insight and coming to terms with what it is that

5  he did.  That's the only question that I have

6  here.

7      **ATTORNEY STRINGER:**  Well, I guess my

8  concern is here that we have the objects being

9  thrown at the vehicle.  And he indicated that he

10  threw a rock at the victim.

11      **INMATE MENCHACA:**  Yes.

12      **ATTORNEY STRINGER:**  And let's just move

13  on.  And did that occur before or after the lady

14  got out and made the comments that you said?

15      **INMATE MENCHACA:**  I don't recall if it

16  was before or after.

17      **DEPUTY DISTRICT ATTORNEY RICO:**  All

18  right.  And I guess with the original

19  confrontation between the two vehicles I think

20  that Mr. Menchaca has conceded that he may have

21  done something by cutting off a vehicle that

22  caused the other occupants to be upset.  Is that

23  accurate?

24      **INMATE MENCHACA:**  I tried going to make —

25  — I tried going to the u-turn lane and I believe

26  it's at that time when I cut that car off by

27  accident.

76

1        **DEPUTY DISTRICT ATTORNEY RICO:**  So does

2  Mr. Menchaca concede that because he was driving

3  the car apparently under the influence of

4  alcohol that maybe he was in the wrong in that

5  regard?

6        **INMATE MENCHACA:**  As far as cutting that

7  car off?

8        **DEPUTY DISTRICT ATTORNEY RICO:**  Yes.

9        **PRESIDING COMMISSIONER GARNER:**  While

10  driving under the influence.

11        **INMATE MENCHACA:**  Yes.

12        **DEPUTY DISTRICT ATTORNEY RICO:**  So after,

13  under Mr. Menchaca's version, when he got home

14  or when he got to the other house and he stopped

15  his car and then he says the second vehicle

16  pulled up and the woman got out and made those

17  comments he alleges that she made, whey didn't

18  he just take down a license number and call the

19  police?

20        **INMATE MENCHACA:**  I have no idea --

21        **DEPUTY DISTRICT ATTORNEY RICO:**  Why did

22  he think --

23        **INMATE MENCHACA:**  -- why I did.

24        **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.

25  And in terms of that prior assault on the police

26  officer, I heard Mr. Menchaca explain those

27  circumstances and I heard him say that there was

77

1  a driving under the influence and he tried to

2  flee and two officers, I think in his words, he

3  got his ass whopped, I think he said something

4  to that effect, and he wound up with a charge.

5  Did Mr. Menchaca, does he concede he did

6  anything to assault the officers?

7          INMATE MENCHACA:  No.

8          DEPUTY DISTRICT ATTORNEY RICO:  Does

9  Mr. Menchaca think he did anything wrong that

10 night or that he's just a victim?

11         INMATE MENCHACA:  I understand that I was

12 driving under the influence, and I understand

13 that's wrong.

14         DEPUTY DISTRICT ATTORNEY RICO:  All

15 right.  And was that the same driving under the

16 influence where the young man died?

17         INMATE MENCHACA:  No.

18         DEPUTY DISTRICT ATTORNEY RICO:  Does

19 Mr. Menchaca think that he is still a risk if he

20 were to be released because of his problem with

21 alcohol and vehicles?

22         INMATE MENCHACA:  Only if I was to drink

23 and drive.

24         DEPUTY DISTRICT ATTORNEY RICO:  What was

25 Mr. Menchaca plan, if he is to be released, in

26 terms of getting around to wherever he's

27 working?

78

1     **INMATE MENCHACA:** Well for that plan is

2 to go get a driver's license, get a job, and my

3 brother has a car for me if I want it for

4 transportation to work and back or meeting or

5 wherever I have to go.

6     **DEPUTY DISTRICT ATTORNEY RICO:** And

7 Mr. Menchaca, as he sits there today, denies

8 these current most recent 115s, which involve

9 unlawful substances in prison. Is that correct?

10     **INMATE MENCHACA:** Yes.

11     **DEPUTY DISTRICT ATTORNEY RICO:** And the

12 last question is: How Mr. Menchaca feel that he

13 is different sitting there today than he was at

14 the time of this life-crime?

15     **INMATE MENCHACA:** Well for sure I'm 15

16 years older than I was then when the incident

17 happened. And a lot of changed in my life ever

18 since. When this things happened not only did

19 one family, the victim's family get hurt but so

20 did mine. I have children of my own, I have

21 children that are suffering out there, hurting,

22 going through struggles and I feel bad that I

23 can't be there for them. And that's why I do

24 the things that I do today to try to have an

25 impact on somebody because if I can't have an

26 impact on my own children I want to try to help

27 somebody else. But I want to be out there to

79

1   help my kids the most.  They are really

2   struggling with some of the problems that

3   they're going through today in life.

4        DEPUTY DISTRICT ATTORNEY RICO:  I would

5   have nothing further.

6        PRESIDING COMMISSIONER GARNER:  Thank

7   you, Mr. Rico.  Mr. Stinger?

8        ATTORNEY STRINGER:  Thank you,

9   Commissioner.  Mr. Menchaca, if the Board was to

10  grant you a date and impose a number of

11  conditions upon that date, including mandatory

12  attendance at AA, mandatory drug testing,

13  perhaps a residence in a halfway house, would

14  you comply with each and everyone of those

15  rules?

16       INMATE MENCHACA:  Yes.

17       ATTORNEY STRINGER:  And would you

18  consider obtaining -- obtaining sponsor once you

19  were released?

20       INMATE MENCHACA:  Yes.

21       ATTORNEY STRINGER:  And you plan to get a

22  list of the local AA meetings and attend those?

23       INMATE MENCHACA:  Yes, I have them.

24       ATTORNEY STRINGER:  I noticed from the

25  most current Board Report that you do have

26  marketable skills in roofing, landscaping, and

27  vocational print shop.  Is that right?

80

1      INMATE MENCHACA:  Yes, I do.

2      ATTORNEY STRINGER:  Are those skills up

3  to date to the point that you could get a job in

4  any one of those fields upon your release?

5      INMATE MENCHACA:  I have a job waiting

6  for me right now in landscaping.

7      ATTORNEY STRINGER:  And what is Local

8  271?

9      INMATE MENCHACA:  A local union; a

10  laborers' union.

11      ATTORNEY STRINGER:  And could you join or

12  re-join that union upon your release?

13      INMATE MENCHACA:  Yes.

14      ATTORNEY STRINGER:  And you are how old

15  now?

16      INMATE MENCHACA:  Forty-one.

17      ATTORNEY STRINGER:  And how old were you

18  when you came in to the institutions?

19      INMATE MENCHACA:  Twenty-six.

20      ATTORNEY STRINGER:  Do you know why the

21  First Step of AA is that you are powerless over

22  alcohol and cannot manage (indiscernible) in

23  your life?  Do you believe that?

24      INMATE MENCHACA:  Yes.

25      ATTORNEY STRINGER:  Do you know that you

26  can never drink again?

27      INMATE MENCHACA:  I do now.

81

1      **ATTORNEY STRINGER:**  If the Board was to

2  require, if you were given a date, and the

3  Parole Board was to require that you take a new

4  form of medication that prevents you from

5  abiding alcohol, would you consent to that?

6      **INMATE MENCHACA:**  Sure.

7      **ATTORNEY STRINGER:**  So you would do

8  anything the Board asked to monitor the

9  possibility that you might drink again?

10      **INMATE MENCHACA:**  Yes.

11      **ATTORNEY STRINGER:**  Okay.  And what if

12  the Board mandated that you couldn't drive for

13  the five years that you were on parole.  Would

14  you comply with that?

15      **INMATE MENCHACA:**  I wouldn't have any

16  problems with that at all.

17      **ATTORNEY STRINGER:**  Thank you.

18      **PRESIDING COMMISSIONER GARNER:**  Okay,

19  Mr. Rico, are you ready to close?

20      **DEPUTY DISTRICT ATTORNEY RICO:**  Yes, I

21  am, Commissioner.  Well, there has been -- it's

22  clear what the life-crime involved.  We have a

23  situation where according to all of the facts in

24  the record that on March 2, 1991, Mr. Menchaca

25  and his co-defendant Mr. Oroteza go out for an

26  evening of entertainment.  Now Mr. Menchaca has

27  indicated, and I think it's important to

82

1    consider this, Mr. Menchaca has been using

2    illegal substances from a young age, drugs as

3    well as alcohol.  On the night -- prior to the

4    night in question, going back to other times

5    when he has gone out, there was the situation

6    where was driving the car under the influence

7    and there was an accident and a 16-year old

8    passenger died as a result, and then

9    Mr. Menchaca fled the scene.  That doesn't seem

10   to have left much of a lasting impression for

11   Mr. Menchaca, because there was at least one

12   other episode where he was driving under the

13   influence.  And that seems to be the situation

14   where he not only with that charge and hit-and-

15   run or fleeing the police, but an assault on

16   police officers.  And I heard Mr. Menchaca

17   describe the circumstances of the driving under

18   the influence with a death, and the way that I

19   heard it, it sounded almost like an unfortunate

20   accident as driving the car, lost control and

21   somebody died and he walked away.  But somebody

22   is dead there.  And then as far as the situation

23   with the police officers, he is driving under

24   the influence and tries to flee and as he put

25   it, he gets his ass kicked or whopped and he

26   didn't do anything to the police officers.  And

27   he recognizes, "yeah, he was wrong, because he

83

1   shouldn't have been driving under the

2   influence." But he sounded when he originally

3   indicated that he was a victim of sorts in that

4   crime. And it would appear to be the absolute

5   opposite that he hasn't come to terms with it.

6   Then we have the night of the life-crime, where

7   Mr. Menchaca has indicated that he was drinking

8   and he had been drinking at the house before he

9   even left. Nevertheless, he goes out and he

10  gets behind the wheel of a car again and drives

11  off with friends and they go out, they bowling

12  and drinking some more until closing time. Then

13  they leave and apparently along the way back,

14  with Mr. Menchaca no doubt quite intoxicated yet

15  driving a vehicle on the public highways and

16  streets. Along the way they encounter an

17  innocent victim who is in the wrong place at the

18  wrong time who just happens to be out on the

19  same streets that Mr. Menchaca is choosing to

20  drive on. And it would appear that in the past

21  that Mr. Menchaca has indicated that he thought

22  someone, he recognized someone in the car as an

23  enemy or someone that he had had problems with.

24  He seems to either deny that or say I don't

25  remember saying that, but he does concede that

26  maybe he did something, you know, that he

27  shouldn't have by cutting somebody off

84

1  unintentionally.  Again, he makes it sound like
2  an unfortunate incident, that he's just out
3  driving and unfortunately cut someone off.  He's
4  driving drunk.  And apparently quite drunk and
5  does this and I --- if his version is accurate
6  at the time, there are words and gestures that
7  are exchanged.  And I'm not saying that road-
8  rage is ever a good thing or for people to
9  respond to appropriately, but if an individual
10  is driving down the street and somebody was
11  drunk and cuts them off, it's easy to see why
12  somebody would be upset at the drunk driving.
13  So in any event there was a confrontation that
14  occurred.  Now, that's where the facts differ,
15  because all of the facts in the packet seem to
16  indicate that Mr. Menchaca then pursued the
17  vehicle; he's denying that.  He is indicating
18  that somehow he just drove away from the
19  situation and that it was the other car, the
20  woman that comes driving up, jumps out and
21  apparently threatens to go get a 45 and blow his
22  head off, which doesn't fit any of the facts
23  that appear to be in the file.  And, again,
24  seems to be Mr. Menchaca turning himself into a
25  victim.  But then he says that he chose to
26  follow her at that point, which again flies in
27  the face of common sense and reason.  Even if

85

1   his version were accurate, that someone he

2   doesn't know comes up and says I'm going to go

3   my 45 and blow your head off, why would anyone

4   get in the car and say, "Oh, I'm going to follow

5   this person." And the other thing that doesn't

6   make sense is his final admission here that

7   there was at some point him and his co-defendant

8   stopping and chucking a brick or a rock at the

9   car of the occupants. Which seems to be clear

10  that there was a confrontation trying to be

11  provoked or that you were trying to stop the

12  vehicle so that they could get the people out of

13  the car and there could be a physical

14  confrontation. In any event the packet

15  indicates that when the victim's car got home

16  that Mr. Menchaca drove up and blocked it from

17  being able to retreat, and that's when the

18  confrontation took place. The facts suggest

19  that the victim, that the victim in this case

20  got out of the car without a weapon. Richard

21  Figueroa got out of the car without a weapon and

22  the facts indicate that he proceeded to the rear

23  of his vehicle with his hands up indicating,

24  "hey, what's the problem here," trying to be the

25  peacemaker. And that's when he was set upon.

26  And it would appear that he was set upon by two

27  people, Mr. Oroteza and Mr. Menchaca. I

86

1  recognize that Mr. Menchaca is maintaining that

2  he did not do any of the stabbing.  He is even

3  maintaining that he didn't see a knife, which

4  flies in the face of reason.  But I think it's

5  important and I would ask that the Panel during

6  deliberations review the materials in the file.

7  Dr. Osoa [phonetic] testified at the trial that

8  in addition to there being 23 wounds, 23 wounds

9  on the victim, Dr. Osoa, who performed the

10  autopsy, testified that the wounds had two

11  different patterns, and that this difference in

12  patterns was consistent with the possibility

13  that there were two assailants using similar

14  weapons.  Now, Mr. Menchaca again portrays

15  himself of some type of a victim in this case

16  saying that he was trying to step in and somehow

17  break-it up and he was stabbed.  I submit that

18  the evidence shows that he was stabbed during

19  the flurry of blows that were being

20  administered, and that he was an active and

21  willing participant on the assault on the

22  vulnerable victim, who was killed in this case.

23  I think that this is a vicious, senseless murder

24  of an innocent vulnerable victim by Mr. Menchaca

25  and his co-defendant and that Mr. Menchaca is in

26  serious denial about this.  If the Panel is not

27  going to refer to the current psych evaluation,

87

1    I understand that, I would ask that they look at

2    the previous psych evaluations, the '04 psych

3    eval, pages two, three and six. I submit that

4    Mr. Menchaca clearly hasn't come to terms with

5    what it is that he did and that he is still --

6    and there is a difference between him today, and

7    that is that he is appropriately 15-years older.

8    He has been found guilty of three 115s, serious

9    115s, serious drug related 115s since 2003, one

10   after the last postponement. I recognize that

11   his Counsel has submitted today a declaration or

12   affidavit from somebody who says: "Gee, it was

13   my needle." And I understand that Mr. Menchaca

14   is contesting the other 115s, again portraying

15   himself somehow as a victim of either a lab that

16   has tainted the material that was found or mixed

17   up its records somehow. And either he is one of

18   the unluckiest people that walks this planet,

19   with everything going wrong for him, none of

20   which is his fault, or he is clearly not coming

21   to terms with his culpability, responsibility

22   and presents just as much of a significant risk

23   if he is to be released. There are a lot of

24   stressors waiting on the outside. And if he

25   goes back, I submit that the evidence shows that

26   he is not strong enough at this point to avoid

27   the drugs, to avoid the alcohol, either for a

88

1   vehicular risk or a risk of bad judgment,

2   exercising violence on citizens who have not yet

3   had the opportunity to encounter him on the

4   outside.  And I ask that he be denied at this

5   time.  I ask that it be a significant multi-year

6   denial, by talking into account all of the

7   factors including the life-crime as well as the

8   recent disciplinary history.  Thank you.

9        **DEPUTY COMMISSIONER SMITH:**  Thank you.

10       **COMMISSIONER GARNER:**  Thank you.

11   Mr. Stinger?

12       **ATTORNEY STRINGER:**  Thank you,

13   Commissioner.  I want to point out in the

14   Information Summary, dated July 29, 1991, from

15   the Santa Clara Court, initiated by David

16   N. [phonetic] Davies [phonetic], the Deputy

17   District Attorney, that my client is charged

18   with one count of Penal Code Section 187, with

19   special allegations of Prop [phonetic] 115.

20   However, Hector Oroteza, his co-defendant, was

21   charged with not only one count of Penal Code

22   Section 187, but also 12022 and 1203, which are

23   the weapons charges, which are the special

24   allegations.  Mr. Menchaca was never charged by

25   the District Attorney's Office with a weapons

26   offense.  I also want to quote from the

27   probation officer's report at page three, which

89

1   indicates, quote: "Mr. Menchaca's sister-in-law
2   overhead Oroteza state, quote: 'I think I hurt
3   you, referring to Menchaca's stab wounds.  He
4   also stated: I think I killed him, referring to
5   someone else.'"  As the Board knows the factors
6   of the life-crime will never change and the
7   courts have ruled that over time varying
8   versions can occur as to the life-crime and
9   that's not to be held against a candidate for
10  parole.  The standard that the Board must use
11  when evaluating anyone that comes before the
12  Board is:  does that person present an
13  unreasonable risk of danger to society and a
14  threat to public safety as he sits before you
15  now, not as he was 15 years prior.  Now
16  certainly it is my client's position that the
17  language of Penal Code Section 3041 poses an
18  affirmative obligation to grant parole on the
19  State and that my client does have a legally and
20  recognizable liberty interest in a parole date
21  and a presumption that release will be granted.
22  So what factors would the Board consider?  Well
23  some of those factors are uniform in principle,
24  in that the Board must set a date pursuant to
25  the principle of uniform terms that defines that
26  crimes of similar gravity and due with regard to
27  the statutory minimum term for the inmate's

90

1   offense.   I would submit to you that this

2   second-degree murder is not any greater or any

3   less than any other second-degree murder that

4   comes before the Board, and that there is

5   significant evidence in the file that would

6   demonstrate that Mr. Menchaca was not the

7   principle perpetrator of this crime, and that it

8   was clearly his crime partner, who in fact was

9   charged as such.   While Mr. Menchaca has been

10  incarcerated within the various institutions he

11  has taken of the many and varying programs that

12  are available and, of course, some programs are

13  available at some institutions and some are not.

14  But generally he has participated in Alcoholics

15  Anonymous, he has participated in Over-Comers

16  Outreach, and he has participated in Impact, as

17  well as many other programs.   He has been an

18  outstanding worker in the institutions, as

19  evidenced by a letter dated April 27, 2004,

20  authored by Anita Brown, who is an Industrial

21  Supervisor.   Ms. Brown states: "Although I only

22  recently transferred to the Mattress

23  Refurbishing Department, I have been impressed

24  with Mr. Menchaca's productive work performance.

25  He's (indiscernible) machine operator.   He has

26  demonstrated his diligent and dependable work

27  habits on many occasions.   Working on that

91

1    particular machine is can sometimes be

2    overwhelming, yet he discharges his duties in a

3    meticulous manner while still be attentive to

4    detail.   These qualities are especially valuable

5    during partial lockdowns when there is a

6    shortage of workers causing everyone that's

7    present to take on additional duties in order

8    for the shop to meet the production schedule.

9    Another admirable quality that Mr. Menchaca

10   displays is his ability to keep his co-workers

11   feeling energetic and motivated.   I believe this

12   partly because he doesn't take work related

13   issues as personal, although (indiscernible)

14   professional and respectful attitude toward all

15   staff is consist."   Mr. Menchaca has testified

16   before this Board that he would comply with each

17   and every condition that the Parole Authority

18   would impose on him if he was granted a date.

19   His parole period would be for appropriately

20   five years.   The State of California would have

21   complete control over him during that five-year

22   period.   They could require that he be tested

23   daily for substance abuse, that he enter a

24   halfway program, that he attend AA on a daily

25   basis.   Any of these violations would cause an

26   immediate return to the prison system.   So for

27   those five years the Board would know where

92

1   Mr. Menchaca was, what Mr. Menchaca was doing,

2   and whether or not Mr. Menchaca was sober.

3   These safeguards are all set up within the

4   parole system.  He certainly has marketable

5   skills.  He could rejoin Local 270 as a

6   construction worker.  He does have skills in

7   working in landscaping and a vocational print

8   shop, but principally landscaping, which I

9   believe he performed before he came into the

10  institutions.  He has outstanding family

11  support, people that want him back, people that

12  love him, people that want him again to be out

13  in society and a part of their lives.  He also

14  has good employment offers.  Certainly all of

15  this can be checked out by the Parole

16  Department.  They can send investigators over to

17  check out his residence.  They can send

18  investigators over to check out his employers.

19  I think recently in the United States District

20  Court, the Central District of California of

21  Western Division System, authored by Senior

22  United States District Judge Terry Haddock,

23  Junior, in the *Confluer E. Warden Case*, the

24  Judge opined that a continued reliance on

25  commitment offense undermines the use of prison

26  as a rehabilitative tool.  Now, I will grant you

27  that Mr. Menchaca comes before this Board with a

93

1    115 in 2003 and two 115s in 2005.  Those are

2    under appeal in the Federal Courts.  I would

3    profess for the record that if those appeals

4    turn out in favor of my client that whatever the

5    Board does be contingent upon that and that he

6    possible be brought back sooner for another

7    Subsequent Hearing, if in fact those are

8    resolved in his favor.  I would also remind the

9    Board that while it is certainly is fair for the

10   district attorney to quote the doctor at trial,

11   that that doctor's report is nothing more than

12   his opinion and we don't know here in this

13   setting if it was countered by a defense experts

14   or other testimony.  But I am sure that the

15   District Attorney's Office, being very competent

16   in that particular county, if they had any

17   inkling at all that Mr. Menchaca was somewhat

18   involved in the actual death of this gentlemen

19   that he would have been charged with a weapons

20   enhancement, and they chose not to do so.  And

21   as I said, the uncontroverter testimony of his

22   sister-in-law in the probation report is that

23   Mr. Oroteza indicates:  "I think I killed him."

24   Therefore, Mr. Menchaca has done what the Board

25   has requested that he do.  He has changed within

26   the prison system.  He knows that he can't drink

27   anymore.  If the Board imposed a condition on

94

1  him that he not drive, he would comply with

2  that.  So I would ask that the Board seriously

3  consider him for a date.  Thank you.

4       **DEPUTY COMMISSIONER SMITH:**  Thank you.

5       **PRESIDING COMMISSIONER GARNER:**  Okay,

6  Mr. Menchaca, this is your opportunity if you

7  wish to address the Panel regarding your

8  suitability for parole.

9       **INMATE MENCHACA:**  Can I say a thing

10  concerned to what the D.A. say as far as his

11  closing?

12       **DEPUTY COMMISSIONER SMITH:**  No.  This is

13  an opportunity for you to tell us why you think

14  you are suitable.

15       **INMATE MENCHACA:**  Well, first of all,

16  when this incident happened I was a lot younger.

17  I don't (indiscernible) turning myself into

18  being the victim in the situation as it was said

19  to be here.  I take full responsibility for my

20  part in what happened to this man.  And I'm

21  sorry it happened to him.  I'm sorry that his

22  family has to suffer for this.  And like I said

23  earlier, you know, you're not the only one

24  suffering, I suffer, my family suffer, my

25  children suffer, as well as the victim's family

26  does.  You know, I've done everything that I

27  could since I've been here to change my life in

95

1  different ways. You know, I go to school, I've

2  taken these self-help programs. I don't have no

3  desire to use drugs or drink anymore, I don't

4  want it. I want to go out, to get out someday

5  and be with my family. I have a 19-year old

6  boy. I left when he was a kid and he's all

7  messed up out there on drugs. I can't take

8  control of him. I've got a 15-year old son that

9  was born two months after I was arrested. He's

10  without a father and he's going through changes

11  himself. You know, I want to take the chance

12  for what I've learned here today in San Quentin,

13  to take out to the street to be able to try to

14  help somebody else. You know, there's a lot of

15  people out there that make bad choices and

16  decisions, which was my problem. I made a lot

17  of bad choices and I made a lot of bad decisions

18  in my life. You know, it's sad that it took me

19  longer than others to realize that or understand

20  that, but I understand that today. And I know

21  that I was no angle out there and I take full

22  responsibility for my part in it. You know, and

23  I'll say here today that I did not take part in

24  stabbing this man. Yes, I was the driver of the

25  car. Yes, if I didn't follow that car this

26  wouldn't have happened. But I did and I take

27  responsibility for what I did, and that would be

1  the driver of that car. If I would have known

2  this was going to happen to that man, I wouldn't

3  have drove, I wouldn't have followed that car,

4  but I did. You know, I just want to be given an

5  opportunity at life in society and give back if

6  I can.

7          **DEPUTY COMMISSIONER SMITH:** Thank you.

8          **PRESIDING COMMISSIONER GARNER:** Okay, Mr.

9  and Ms. Figueroa, in accordance with Penal Code

10  Section 3043 you have the right to

11  (indiscernible) reasonably express your views

12  concerning the crime. Are both of you

13  (indiscernible).

14          **DAVE FIGUEROA:** Yes, sir.

15          **PRESIDING COMMISSIONER GARNER:** Well hear

16  from (indiscernible).

17          **DEPUTY COMMISSIONER SMITH:** Since it's

18  been a while since you originally identified

19  yourselves, would you mind doing it again for

20  the record, please?

21          **CYNTHIA FIGUEROA:** Yes. My name is

22  Cynthia Figueroa, F-I-G-U-E-R-O-A, and I'm the

23  victim's sister. It seems like it's been three

24  years to me, it doesn't seem like 15 years. It

25  is just a big nightmare. I feel sorry for my

26  father and my mother. My father is in a wheel

27  chair, he is paralyzed on the right side. My

97

1   mother is in very, very bad health and she

2   misses her son deeply.  We have Mother's Day,

3   which is Sunday, and unfortunately he's not

4   going to be here to share that day with us.  I

5   remember the two were arrested, I went down to

6   the San Jose Police Department, and they showed

7   me a picture and they said that they thought

8   that this is the guy that they thought my

9   brother was, that it was a mistake of identity.

10  And I saw the picture and who they thought my

11  brother looked like.  And they said when it was

12  dark, it was at night and it was, you know, 1:30

13  in the morning, and they thought my brother was

14  somebody else.  It is a clear case of mistaken

15  identity.  And it's just been a nightmare of all

16  of us.  My brother was stabbed 23 times.  He was

17  stabbed in the heart.  He was stabbed in his

18  privates.  He was stabbed in his hands.  I saw

19  his hands when he was in the coffin.  It was

20  horrible.  And I remember about six months

21  before he died that he came to visit me and we

22  were in the car and he said:  "Cindy," he says:

23  "I sure hope when my time comes it's not

24  painful."  He says:  "I hope I die in my sleep."

25  And to know that my brother was stabbed 23 times

26  and I seen the photo in the courtroom by mistake

27  and the look and the pain on his face and how he

98

1  suffered.  And he had not one person stabbing

2  there, but he had two people he had to fight.

3  And I was in the courtroom, too, and he was the

4  only one who got out of the car.  He opened up

5  the seat to let the guy out, which the guy

6  didn't get out because the car drove up.  And my

7  brother was at the back of the car and he had

8  both of his hands up and he says:  "hey guys,

9  what seems to be the problem."  And he was

10  attacked.  I think this is the perfect place for

11  Mr. Menchaca and he should be residing here with

12  Mr. Cary Stinger and Mr. Scott Peterson.  And

13  he's lucky to have a home and that they give him

14  three meals a day and a bed to sleep on.  So I

15  would like to see him stay here for the

16  remainder of his life.  Thank you.

17          **PRESIDING COMMISSIONER GARNER:**  Thank

18  you.

19          **DAVE FIGUEROA:**  My dad's (indiscernible).

20  But, you know, like she said it just seems like

21  it was yesterday.  But 15 years in prison will

22  definitely age you, like dog years, you know.

23  The whole swearing in thing seem to me kind of

24  like, you know, swear to tell the truth, the

25  whole truth and nothing but the truth seems kind

26  of blank and (indiscernible) kind of inadequate.

27  But inmate he's keeping the paper mills in

99

1    business.  It's the thickest file that I've ever

2    seen.  If I had a neighborhood coming in with a

3    file like that guarantee you I would put my

4    house up for sale the very next day.  He is

5    lucky that he's not on a polygraph machine to

6    decide his fate whether he is released or stays.

7    You know, the whole thing of the meth and the

8    needles and, you know, the art work that his,

9    you know, his roommate drew, it just seems --

10   you know, just listening to him, you know, it's

11   just hard to listen to somebody defend

12   themselves when you're looking at a file from

13   the age of 13 on up to today.  And, you know, I

14   don't believe that San Quentin supplied his meth

15   and I don't believe that they supply syringes,

16   or not that I'm aware of.  So somehow, some way

17   they got put into the system, into his cell and,

18   you know, he's got his friends and his family

19   support to back him up.  But one of those

20   individual supplied to him.  And so, you know, I

21   feel bad for his family.  Yeah, I feel bad for

22   his two kids.  It's terrible that their dad,

23   their mentor, their supposed mentor is sitting

24   in San Quentin, you know.  But yet on the flip

25   side of that coin is thank God their dad is in

26   here and thank God their dad is not being out

27   there to be a mentor so they can end up being in

100

1   here and incarcerated the same exact way. You
2   know, his kids are having problems, sure. But,
3   you know, what their problems are nothing
4   compared to what he put himself through and what
5   he put himself into in this type of situation.
6   And, you know, it's just unbelievable. So then
7   to have the two murders, I mean two people have
8   died and, you know, when you just walk away, you
9   know, from the car wreck and knowing that
10  somebody is dying and knowing that you just hit
11  somebody, a hit-and-run, and then just -- and
12  then several years later at age 26 to get
13  involved in a violent crime like he was in. And
14  you don't have knives in your car unless you
15  intend to use them, not butcher knives. And,
16  you know, it's like, you know, if you put on a
17  condemn you're using it because you want to take
18  care of business. You have knives in your car
19  he had them to take care of business. And the
20  scariest part about that knife is one was my
21  uncle [sic] getting murdered, but two we don't
22  know if anybody else got murdered before my
23  uncle [sic], besides the individual in that car.
24  And so it's like it's the crimes that we don't
25  catch, you know, that we don't know that are out
26  there. And you don't murder somebody they way
27  they murdered my uncle [sic] and call that the

101

1   first time.  There's no way, it just doesn't

2   happen.  You know, it's a pretty scary

3   situation.  And, you know, you two as

4   Commissioners I give you a lot of respect

5   because there is no way I could have your job,

6   because the amount of stress you got to, I mean

7   you've got to look at a file like that and

8   determine:  okay, from age 13 to know, you know,

9   to evaluate that file and to listen to the

10  victims and to listen to what he's saying and to

11  see everything on writing has got to be

12  astronomical course or decision to make.  To set

13  somebody free knowing that they can do it again.

14  And, you know, great he hasn't -- he's in AA and

15  he hasn't had a drink in 15 years.  Well, I

16  guarantee you that if you put a night bar down

17  the street and down in San Quentin on the first

18  floor, he would be the first one to belly up to

19  the bar.  And so it's, you know, it's just --

20  I've made, I've made a decision since my brother

21  was murdered I made the decision that I would

22  have to live his life, you know, I'm living his

23  life.  And I have the life that he always

24  wanted, you know, the beautiful home, a great

25  job, and kids.  You know, its great that I'm

26  able to get out there and have the freedom and

27  do what I want to do.  And, you know, his life

102

1  is a nightmare. I couldn't imagine being in

2  prison. I could even fathom it. My life is a

3  dream. I have almost everything I want right

4  now and I've still got a bright future, because

5  I never made a decision to commit crimes when I

6  was a kid and also as an adult. Hey, we all

7  make mistakes when were kids, but, you know, he

8  made a decision at age 26 to take a life. You

9  know, whether he says he was physically involved

10  in the actual stabbing or not, the bottom line

11  is that my uncle is dead -- my bother is dead.

12  And it's, you know, it's just amazing. It's

13  just amazing. You know, I don't have much more

14  to say. I think that kind of sums it all up. I

15  wish you guys a lot of luck on making a

16  decision.

17        DEPUTY COMMISSIONER SMITH:  Thank you.

18        PRESIDING COMMISSIONER GARNER:  All

19  right, it is now 12:58 P.M., and we will recess

20  for deliberations.

21                    R E C E S S

22                    --oOo--

23

24

25

26

27

103

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                      **D E C I S I O N**

3          **DEPUTY COMMISSIONER SMITH:**  We're back on

4    the record.  And everyone previously identified

5    is in the Hearing room, with the exception of

6    Mr. Rico who is on video and can hear us at this

7    time.

8          **PRESIDING COMMISSIONER GARNER:**  All

9    right, it is now 1:31 P.M., in the matter of

10   Gerardo Menchaca, D, like David, 87412.

11   Mr. Menchaca, the Panel has reviewed all

12   information received from the public and relied

13   on the following circumstances in concluding

14   that you are not suitable for parole and would

15   pose an unreasonable risk of danger to society

16   or a threat to public safety if released from

17   prison.  We considered many factors and as

18   always we start with the commitment offense and

19   the Panel noted that the offense was carried out

20   in an especially cruel and callous manner.  The

21   victim Richard Figueroa was 33 years of age, he

22   received 23 wounds, 15 actual stab wounds and

23   there was some indication the stab wounds were

24   as deep as four and a half inches.  The offense

25   was carried out in a very dispassionate and

26   calculated manner.  The victim was no threat,

27   **GERARDO MENCHACA D-87412 DECISION PAGE 1 5/12/06**

104

1    actually he was trying to deescalate a

2    situation. The offense was carried out in a

3    manner that demonstrate an exceptionally callous

4    disregard for human suffering and again the

5    victim suffered knife wounds to the chest, right

6    and left lung, the liver, colon, and basically

7    made his way back to the vehicle and collapsed

8    on the pavement. The motive for this crime, the

9    motive certainly is trivial compared to the loss

10   of a human life. And the Panel determined that

11   the closest thing we can come up with is that

12   this is a situation where it started with road-

13   rage and that there were many opportunities

14   where there were chances to disengage from the

15   situation. These conclusions were drawn from

16   the Statement of Facts that were taken from the

17   May 2006 Board Report in that on May 1, 1991, at

18   appropriately 10:00 P.M., Gerardo Menchaca and

19   Hector Oroteza and another friend went bowling.

20   They consumed some alcohol while bowling and

21   then left. While eastbound on the Capital

22   Expressway, Butler's vehicle, which was the

23   vehicle that the victim was in, and Menchaca's

24   vehicle apparently came along side of each

25   other. Menchaca later reported to police that

26   he believed at the time that he recognized one

27   **GERARDO MENCHACA D-87412 DECISION PAGE 2 5/12/06**

105

1  of the males in Butler's vehicle as an

2  individual with whom he had previously had

3  problems with.  Testimony in this case also

4  indicates that there may have been some type of

5  near-miss accident caused by Menchaca.  What did

6  happen, however, was that words and gestures

7  were exchanged between the occupants of both

8  vehicles.  And I believe I made mention that the

9  victim was in the Butler vehicle and that's an

10 error.  Menchaca began to pursue Butler.  More

11 words were exchanged between the occupants of

12 the vehicles.  At some point in time Figueroa

13 exited the vehicle and was reportedly in the

14 process of moving the passenger seat forward to

15 allow a passenger to exit when Menchaca pulled

16 up behind the vehicle blocking it.  Oroteza and

17 Menchaca both exited their vehicle and rushed

18 toward Figueroa.  After one or two minutes of

19 blows, Oroteza and Menchaca fled back to their

20 vehicle and drove off, leaving Menchaca's red

21 baseball cap with the logo, quote, "San Jose Bad

22 Boys" lying under Douglas's car, where it had

23 fallen during the assault.  Figueroa got back

24 into Douglas's car and they noticed that his

25 white sweater had many slits in it and that he

26 was bleeding.  He tried to get out of the car

27 **GERARDO MENCHACA D-87412 DECISION PAGE 3 5/12/06**

106

1   and collapsed to the pavement.    So far as your

2   previous record, the Panel noted that you did

3   have a record of violence and assaultive

4   behavior.    There was an escalating pattern of

5   criminal conduct and that you had failed

6   previous grants of probation and parole and

7   cannot be counted upon to avoid criminality.

8   That you have also failed from society's

9   previous attempts to correct your criminality.

10  Those attempts included some time at the Boys

11  Ranch on the CYA commitment, a prior prison

12  term, adult probation and parole.    As far as

13  your prior criminality it includes battery,

14  Health and Safety Code violations, and battery

15  on a police officer.    And there was also the

16  situation with the driving under the influence

17  that resulted in the death of an individual.    So

18  far as your institutional behavior and

19  programming, the Panel noted that you haven't

20  sufficiently participated in beneficial self-

21  help programs and that principally that your

22  attendance at AA is sporadic and it needs to be

23  sustained, particularly in light of the

24  influence that alcohol has played in not just

25  one death but two.    So far as your 115s, you

26  have had three 115s, and they have all occurred

27  **GERARDO MENCHACA D-87412 DECISION PAGE 4 5/12/06**

107

1   since your last Hearing.   They are serious 115s,

2   the first one being October 20, 2003, and this

3   was for possession of a hypodermic needle,

4   January 1, 2005 and November 23, 2005, for

5   possession of controlled substances.   You have

6   had five 128s, the last one being October 2001

7   and this was for refusing to be interviewed by a

8   correctional counselor.   The Panel did not

9   consider the report dated April 7, 2006, by

10  Dr. Inaba, and that was not considered in the

11  decision because of significant errors that were

12  noted in an earlier report prepared this week

13  for another inmate.   And the difficulty that the

14  Panel had is that there was some very serious

15  and similar comments that were in the risk

16  assessment portion of the report that appeared

17  to be almost exact in the nature of the

18  language.   We will put it on the record now that

19  we have requested that a new psych exam be

20  conducted and for the record that Dr. Inaba not

21  perform the exam.   So far as parole plans, the

22  Panel noted that you do have offers of housing

23  and you have offers of a job, and also that you

24  do have employable skills, you have marketable

25  skills.   The Panel also noted, it was said

26  verbally today that we found nothing in the file

27  **GERARDO MENCHACA D-87412 DECISION PAGE 5 5/12/06**

108

1  that would verify the contacts with AA with

2  respect to vocations and programs or the

3  possibility of a sponsor.  And again because of

4  the sporadic AA, NA this takes on greater

5  significance.  So far as the 3042 Notices, you

6  were here and you heard the comments made by the

7  District Attorney's representative from Santa

8  Clara County opposing the granting of parole.

9  The Panel did consider a 2005 letter from the

10  San Jose Police Department, also indicating

11  opposition for parole.  The Panel made the

12  following findings:  Your gains are recent and

13  you are going to have demonstrate an ability to

14  maintain the gains over an extended period of

15  time.  We want to complement you on completing

16  the Trust Program, it is worthwhile and it is of

17  value.  And in a separate decision, the Hearing

18  Panel finds that you have been convicted of

19  murder, and it is not reasonable to expect

20  parole would be granted at a Hearing during the

21  next four years.  And the specific reasons for

22  these findings are that you committed the

23  offense in an especially cruel manner.

24  Specifically that on March 2, 1991, the victim

25  Richard Figueroa, he was 33, he was acting as a

26  peace maker, and he was assaulted and stabbed 23

27  **GERARDO MENCHACA D-87412 DECISION PAGE 6 5/12/06**

109

1   or more times, resulting in his death.  The

2   offense was carried out in a very dispassionate

3   manner in that the victim was unarmed and that

4   he posed no threat, and that he was stabbed and

5   essentially left.  He did make it back to the

6   vehicle but collapsed on the pavement.  The

7   offense was carried out in a manner that

8   demonstrates an exceptionally callous disregard

9   for human suffering in that that there were

10  multiple wounds to the chest, the lungs, the

11  colon, the intestines, the head, and the

12  abdomen.  And again the victim collapsed as a

13  result of these and subsequently died.  The

14  motive, again in the separate decision the Panel

15  noted that there were opportunities to disengage

16  from the road-rage.  What influence alcohol

17  played in the decision making that evening no

18  one will know.  Again, it at best was a road-

19  rage gone bad.  So far as your prior record,

20  there was the battery, there was the incident of

21  the assault on the peace officer, and also there

22  was the driving under the influence resulting in

23  an automobile accident where one of the

24  passengers in the vehicle died and, as indicated

25  today, you walked away from that.  So far as the

26  recently committed serious violations, the Panel

27  **GERARDO MENCHACA D-87412 DECISION PAGE 7 5/12/06**

110

1   noted in the separate decision that you have

2   three serious disciplines since your last

3   Hearing, the first one being October 20, 2003,

4   and this was for possession of a hypodermic

5   needle, January 1, 2005, and November 23, 2005,

6   for the possession of controlled substances.

7   The Panel also noted in the separate decision

8   that you have not completed the necessary

9   programs that is going to be essential to your

10  adjustment and that you need additional time to

11  gain such programming.  And again this is to

12  have a sustained participation in AA or NA.

13  Therefore, a longer period of observation and

14  evaluation is going to be required before the

15  Board can find that you are suitable for parole.

16  We are going to encourage that you become

17  disciplinary free, that you get yourself into AA

18  and have a very sustained and demonstrated

19  pattern of participation in the program, and

20  most importantly that you remain disciplinary

21  free.  You took a big step backwards.  And the

22  Panel realizes that you have these things on

23  appeal, but the record before us is what we have

24  to operate from today.  Commissioner, do you

25  have additional comments at this time?

26          DEPUTY COMMISSIONER SMITH:  Just to

27  GERARDO MENCHACA D-87412 DECISION PAGE 8 5/12/06

111

1   follow up with what you are saying, Commissioner

2   Garner.  If we see someone before us that can't

3   abide by the rules of the institution when they

4   are under seven days a week, 24-hour a day

5   supervision, there is absolutely no reason why

6   we are going to think or draw the conclusion

7   that the person can function appropriately in

8   the community on parole under a much less degree

9   of supervision.  I don't know what to tell you

10  other than one way or the other you have to get

11  over and around those 115s.  I wish you well.

12          PRESIDING COMMISSIONER GARNER:  Thank

13  you.  It is now 1:42 P.M. and that completes

14  this Hearing.  Good luck to you, sir.

15                      --oOo--

16

17

18

19

20

21

22                                      SEP  9 2006

23  PAROLE DENIED FOUR YEARS

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  GERARDO MENCHACA D-87412 DECISION PAGE 9 5/12/06

112

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, J. FARNCOMB, a duly designated transcriber,
PETERS SHORTHAND REPORTING, do hereby declare and
certify under penalty of perjury that I have
transcribed tape(s) which total One in number and
cover a total of pages numbered 1 - 111, and which
recording was duly recorded at SAN QUENTIN STATE
PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of GERARDO
MENCHACA, CDC NO. D-87412, on MAY 12, 2006, and that
the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated July 21, 2006, at Sacramento, California.


J. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**