# EXHIBIT 8
# Part 1 of 2

MC-275

Name  GERARDO JERRY MENCHACA

Address  SAN QUENTIN STATE PRISON

SAN QUENTIN, CA 94974

# FILED

DEC 13 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara

CDC or ID Number  D-87412

By _____ Deputy

S. Chua

### CALIFORNIA SUPERIOR COURT

### IN AND FOR THE COUNTY OF SANTA CLARA

*(Court)*

| | |
|---|---|
| GERARDO JERRY MENCHACA | |
| Petitioner | |
| vs. | |
| ROBERT AYERS, WARDEN | |
| Respondent | |

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _148873_

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. January 1, 1999)

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See INSERT A through INSERT D for Grounds 1 through 5 attached pages 1-30

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

## Ground 1

THE BOARD OF PAROLE HEARING'S FINDINGS THAT PETITIONER POSES A CURRENT UNREASONABLE RISK OF DANGER TO SOCIETY OR THREAT TO PUBLIC SAFETY IF RELEASED FROM PRISON IS BASED ON UNRELIABLE INFORMATION AND IS NOT SUPPORTED BY "SOME EVIDENCE" AND THEREFORE IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL (14th Amendment) DUE PROCESS.

On May 12, 2006, Gerardo Menchaca ("Petitioner") appeared before the Board of Parole Hearings ("Board") for his subsequent hearing. The Board found petitioner poses an reasonable risk of danger to society or a threat to public safety if released from prison. The record (Exhibit A, Board Hearing Transcripts ("BT")) shows that the Board based its decision on an unreliable probation report that derived from a pretrial hearing, and unchanging factors of the crime and precommitment behavior, which were: 1) already used in formulating the guidelines for setting terms; 2) had not been found true by a jury or court; 3) already been used at the sentencing hearing by the trial judge; and 4) used to deny Petitioner parole at his initial parole consideration hearing (See Exhibit B, "Initial" Parole Consideration Hearing, Decision portion of transcripts). The Board also relied on unreliable information of prison misconduct that is being challenged and under review in the Northern District Court. The record also indicates that the Board failed to give proper consideration of petitioner's post-commitment offense factors that indicate remorse, rehabilitation, and suitability for parole. The Board stated reasons to deny parole, in pertinent part are:

1. [T]he offense was carried out in an especially cruel and callous manner. The victim Richard Figueroa was 33 years of age, he received 23 wounds, 15 actual stab wounds and there was indication the stab wounds were as deep as four and a half inches. The was carried out in a very dispassionate and calculated manner. The victim was no threat, actually he was trying to deescalate a situation. The offense was carried out in a manner that demonstrate an exceptionally callous disregard for human suffering and again the victim suffered knife wounds ... The motive for this crime, the motive certainly is trivial compared to the loss of a human life. ... (BT 103-104.)

1.

2.  There was an escalating pattern of criminal conduct and that you had failed previous grants of probation and parole and cannot be counted upon to avoid criminality. Those attempts included some time at the Boys Ranch on the CYA commitment, a prior prison term, adult probation and parole. As far as your prior criminality it includes battery, Health and Safety Code violations, and battery on a police officer. And there was also the situation with the driving under the influence that resulted in the death of an individual.

3.  So far as your institutional behavior and programming, the Panel noted that you haven't sufficiently participated in beneficial self-help programs and that principally that your attendance at AA is sporadic and it needs to be sustained, particularly in light of the influence that alcohol has played in not just one death but two.

4.  So for as your 115s, you have had three 115s, and they have all occurred since your last Hearing. They are serious 115s, the first one being October 20, 2003, and this was for possession of a hypodermic needle, January 1, 2005 and November 23, 2005, for possession of controlled substances. You had five 128s, the last one being October 2001 and this was for refusing to be interviewed by a correctional counselor.

5.  The Panel also noted, it was said verbally today that we found nothing in the file that would verify the contacts with AA with respect to vocations and programs or the possibility of a sponsor. And again because of the sporadic AA, NA this takes on greater significance.

6.  So far as the 3042 Notices, you were here and you heard the comments made by the District Attorney's representative from Santa Clara County opposing of parole. The Panel did consider a 2005 letter from the San Jose Police Department, also indicating opposition for parole.

(Exhibit A, BT at 103-104, 106-108) The record shows that the Board ignored the avalanche of appositive evidence that supports a finding of suitability and instead continued to rely on the unchangeable factor or the commitment offense. "THe Hearing Panel finds that [Petitioner] have been convicted of murder, and it is not reasonable to expect that parole would be granted at a Hearing during the next four years." (BT 103.)

The Board's reason[s] to deny parole must be supported by "some evidence" pertinent to the "relevant standards" promulgated by the Board

2.

INSERT A

to comply with constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp. 657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071, 1084, 1095, fn. 16.) This requires a Board panel's decision to deny parole to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590, fn. 6.) As the administrative record of the Board's review and consideration of the pleadings make clear, there simply is no such rational basis supporting the Board's decision to deny Petitioner parole.

This is another case which demonstrates the Board's continued reliance on the severity of the offense to deny parole, which not only contravenes the discretionary scheme mandated by statute, but also effectively constitutes an unauthorized resentencing of the Petitioner. Putting aside the pre-commitment factors, which are now over 16 years old and will never change, and commitment offense, "all other factors indicate [Petitioner] is suitable for release on parole." (Scott II, supra, 133 Cal.App.4th at 594.)

The Rosenkrantz Court, citing Minnis, reaffirmed the principle that:

> [E]ven before factors relevant to parole decisions had been set forth expressively by the statute and by regulation, we concluded that "[a]ny official or board vested with discretion is under an obligation to consider all relevant factors [citation], and the [official or Board] cannot, consistently with its obligation, ignore post-conviction factors unless directed to do so by the Legislature."

In re Rosenkrantz (2002) 29 Cal.4th 616, 656 (quoting Minnis, 7 Cal.3d at 645.)

1. THE FACTS OF THE COMMITMENT OFFENSE DO NOT PROVIDE A REASONABLE BASIS TO DENY PAROLE.

As brutal as Petitioner's homicidal conduct may have been, it did not go beyond what caused that conduct to constitute a second degree murder, he did nothing beyond what accomplished the killing to "cruelly or callously

INSERT A

exacerbate[] the victim's suffering." Parole authorities may use the factors

in Petitioner's case, driving co-defendant to the scene of the crime, trying

to break up the fight, and then driving away from the scene, to aggravate

his term, but that manner of death does not disqualify a prisoner from

parole. Petitioner "was not charged and admitted being, or was found to

have been armed with a deadly weapon at the time of commission of the

offense, or concealed deadly weapon at the time of his[] arrest within the

meaning of Penal Code Section 969c and 3024. [Petitioner] was not adjudged

a habitual criminal within the meaning of [] Section 644 of the Penal Code;

and the [Petitioner] is not a habitual criminal in accordance with

Sub-division (c)..." (See Exhibit C, Abstract of Judgment.) As the California

Court of Appeals (1st Appellate District) noted, the Board's observation

that "[t]he offense itself is of sufficient severity for the denial, could

be repeated annually until [Petitioner] dies or is rendered helpless by

the infirmities of sickness or age." (Scott II, supra, 133 Cal.App.4th at

p. 595.) The manner in which Petitioner and co-defendant reacted to the

threats of the victim and his party is not atypical for a murder case, and

hardly acts to "distinguish this crime from ... murders as exceptionally

callous." (In re Smith, supra, 114 Cal.App.4th at p. 367.) As the California

Supreme Court has noted on more than a score of occasions, "murder is seldom

pretty." (See, e.g., People v. Hinton (2006) 37 Cal.4th 839, 896.) Eye

witnesses testified that they saw the victim approach the defendant and

started fighting with him. Other witnesses of the victim's party testified

of making threats to blow the Petitioner's and his co-defendant's "fucking

head[s] off" with a ".45." (See Exhibit D, Letter from Jana J. Clark and

Exhibit E, Declaration from Jana J. Clark, Officer of the Court.) The Board's

denial of parole to such murders is contrary to the statute.

4.

In In re Scott II, supra, the California Court of Appeals cautioned the Governor about reversing a grant of parole based solely on the commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the [Board] "did not fulfill" the requirement "to consider all other relevant factors," the decision cannot stand. (Id. at p. 595.) Such is the case here.

Second degree murder is not a crime automatically deemed unsuitable for parole. Under California Penal Code § 190.2, for a first degree murderer to be deemed unparoleable ("Death penalty or life imprisonment without parole") a jury or court, must find at least one of the twenty-two "special circumstances" described in Cal. Penal Code § 190.2 to be true. One of these special circumstance, § 190.2 (14), is that "[t]he murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase 'especially heinous, atrocious, or cruel, manifesting exceptional depravity' means a conscienceless or pitiless crime that is unnecessarily torturous to the victim." The Board may not relitigate the Petitioner's commitment offense in order to used it as a reason to deny parole. Nor may the Board use a factor that was not either submitted to a jury or rejected by the jury (not found true beyond a reasonable doubt.) (See e.g. United States Constitution, Fifth Amendment (double jeopardy);

and <u>Apprendi v. New Jersey</u>, 120 S.Ct. 2348, 147 L.Ed.2d 435.) The Board's own Matrix recognize that Petitioner's commitment offense falls under one that does not preclude a finding of suitability. (Cal. Code of Regs. tit. 15 ("CCR-15") § 2403 (c), Matrix guidelines.)

Pursuant to Cal. Penal Code § 3041(b), the Board has established criteria for setting parole release dates (CCR-15 § 2402.)

CCR-15, § 2403, states, in pertinent part that:

> (a) General. The panel shall set a base term for each life prisoner who is found suitable. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. ...
> The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation. ...

If the Board finds circumstances in aggravation of the base term the "panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances." (CCR-15 § 2404.) Circumstances in aggravation of the base term includes, in pertinent part:

> (1) The crime involved some factors described in the appropriate matrix in a category higher on either axis that the categories chosen as most closely related to the crime;
> ...
> (17) The prisoner has a history of criminal behavior for which the term is not being enhanced under Section 2407;
> (18) The prisoner has engaged in other reliably documented criminal conduct which was an integral part of the crime for which the prisoner is currently committed to prison;
> (19) The prisoner was on probation or parole or was in custody of had escaped from custody at the time the crime was committed;
> (20) Any circumstances in aggravation including those listed in the Sentencing Rules for the superior Court.

CCR-15 § 2405 describes "Circumstances in Mitigation for the Base Term," which include, in pertinent part:

(1) The crime involved some factors described in the appropriate matrix in a category lower on either axis than the categories chosen as most closely related to the crime;

...

(6) The crime was committed during or due to an unusual situation, unlikely to reoccur;

(7) The crime was committed during a brief period of extreme mental or emotional trauma;

...

(9) Any Sentencing Rules for Superior Courts.

The record shows that the Board based its decision to deny parole on the same factors that went into creating the guidelines and matrix in the first place. This violates due process and makes the regulations to be used for determining suitability and setting prison terms unconstitutionally vague and meaningless. The Board used factors that may be used to impose the upper base term as reasons to deny parole, and totally ignored the mitigating circumstance that may be used to lower the base term.

In Little v. Hadden, 504 F.Supp. 558, 561, a federal court addressed the same type of abuse that is present here:

> [I]t is unreasonable and impermissible for the Commission to base a decision to continue beyond the guidelines on the same factors that went into formulating the guidelines in the first place. No one disputes that this was a serious crime, but the factors of seriousness indicated by the this record are included in the guidelines themselves. ... It is clear to the Court from the record in this case that the Commission has attempted to continue Little in custody beyond the guidelines because of its ad hoc decision regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in formulating the guidelines. ... In short, the Commission's decision is arbitrary and capricious because it is not based on anything in the record before it. Moreover, it reflects an abuse of discretion because it attempts to continue Little's confinement beyond the guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

The Board failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the Board's finding

of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a second degree murder. He did not torture Mr. Figueroa, or lie in wait for him; he did not prolong his suffering, or kill him in order to rob him or incite a race war. His crime, while terrible, does not rise to the level of callousness present in Dannenberg, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or Rosenkrantz, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for 24 days; or Van Houten, where defendant assisted with multiple stabbings of the victim with a knife and bayonet, after the victim witnessed her husband receiving the same fate, all an effort to incite a race war. See Van Houten, 116 Cal.App.4th at 365. (See Exhibit A, BT 18-28.)

Not only does Petitioner's crime fail on its own to constitute "some evidence" that he is a continuing threat to public safety, but the Board erred by failing to consider all of the factors required by the regulations.

2. PETITIONER'S PREVIOUS JUVENILE AND OVER 18 YEAR OLD PRIOR MISCONDUCT AND DISMISSED CHARGES DOES NOT CONSTITUTE "SOME EVIDENCE" THAT PETITIONER IS A CURRENT UNREASONABLE THREAT TO PUBLIC SAFETY.

The Board also pointed to Petitioner's precommitment offense behavior as "some evidence" that he would pose an unreasonable threat to public safety if released from prison. "And you got three years probation, a year in jail, and a fine of $750. And on July 25, 1987, you were arrested by San Jose P.D. for battery on a police officer, possession of PCP for sale, possession of controlled substance, obstruction, and resisting a police office[r]. In the Court the charges were dismissed; however, the original probation was revoked and you were sent back to CDC for a three-year term. You paroled from CDC

8.

INSERT A

in November of '89." (BT 30.) Petitioner's driving under the influence which resulted in the death of his best friend occurred when Ray, the victim of the DUI incident, and two other friends kept horse-playing with Petitioner while he was driving. Petitioner crashed and flipped the car. Petitioner panicked and ran away from the scene. These charges do not rise to the level anticipated in the Regulations which define "Previous Record of Violence" as "previous occasions [prisoner] inflicted or attempted to inflict serious injury on a victim." CCR-15 § 2402(b)(2); see also Van Houten, 116 Cal.App.4th at 353. Possession of a control substance or sells, are not assaults and Petitioner's adult probation was not an attempt to inflict injury, of any severity, on anyone. Nor may the Board use dismissed charges as "some evidence" to deny parole. No reasonable interpretation (Rosenkrantz, 29 Cal.4th at 680) of these facts can transform them into becoming "some evidence" of "Previous Record of Violence." (CCR-15 § 2402(b).)

Courts have also made clear that the evidence cited by the Executive must be **relevant** and **probative** to the factors that such evidence is being used to support. For instance, in Smith, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." Smith, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry -- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its matter, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

(Id. at 368.)

INSERT A

California statute and regulations provide that an offense, or pervious offenses, must be committed in an exceptionally callous or particularly egregious manner for an inmate's offense to justify a determination that he is unsuitable for parole. By the Board's own Matrix guidelines for setting term, unusual violence describes the circumstance of an offense wherein the inmate acted to torture the victim over a period of time or intentionally made the victim endure great pain and suffering. However, even those circumstances do not necessarily qualify as one that prohibits parole. (CCR-15 § 2403 (b).) Also, the inmate must constitute a present danger to society at the time of the suitability hearing. While the "gravity of the commitment offense or offenses alone may be a sufficient basis for denying a parole application," that can only be the case where there is "some evidence that the particular circumstances of the prisoner's crime - circumstance beyond the minimum element of his conviction - indicated exceptional callousness and cruelty with trivial provocation." (In re Scott (2005) 133 Cal.App.4th 573, 598 [hereafter "Scott II"], citing In re Dannenberg, supra, 34 Cal.4th at p. 1098; see also Rosenkrantz, supra, 29 Cal.4th at pp. 680, 683, and Scott I, supra, 119 Cal.App.4th at p. 889.) In this regard, the crime must be "especially heinous, atrocious or cruel" within the meaning of the parole regulations. (See CCR-15 § 2402 (c)(1).) Which must also be found true by a jury or court. Petitioner was not found to have had a weapon or used a weapon at the time of his offense. (See Exhibit C.)

As a comparison, the present case is far less serious than that of In re Ernest Smith (2003) 114 Cal.App.4th 343, 366, where the petitioner was found guilty of second degree murder when he shot his wife in the head three times at point blank range while her parents were in the next room.

INSERT A

Yet, in that case the court found it arbitrary to rely on it to deny parole. The court explained there was no evidence that the petitioner "tormented, terrorized, or injured [his victim].. or that he gratuitously increased or unnecessarily prolonged her pain or suffering." (<u>Id</u>. at p. 367.) In assessing the commitment offense, the court concluded:

> Was the crime callous? Yes. However, are the facts of the crime some evidence that [he] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No.

(<u>Ibid</u>.)

Petitioner possesses a short criminal record that persisted into his early twenties. The question is, however, whether that criminal history in conjunction with the life offense and Petitioner's fifteen-year post-conviction history reasonably supports the conclusion that Petitioner constitutes an unreasonable risk of danger to the public if released at the present time? (See, e.g., § 3041.)

"A continued reliance ... on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment [to deny parole], runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (<u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.3d at p. 917.) Thus, the Board's denial of parole to a prisoner based primarily on his commitment offense and prior record, despite many years of rehabilitation, violates due process. (See, e.g., <u>Irons v. Warden of California State Prison Solano</u> (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 ("<u>Irons</u>").)

California cases have endorsed precisely these principles, citing both <u>Biggs</u> and <u>Irons</u>. (See <u>Scott II</u>, <u>supra</u>, 133 Cal.App.4th at p. 595; see also <u>In re Smith</u>, <u>supra</u>, 114 Cal.App.4th at p. 372 [rejecting ability of

11.

INSERT A

California's parole board to deny paroel forever based on immutable factors without regard to or consideration of subsequent circumstances or evidence indicating little risk of current danger if released].)

Petitioner does have a juvenile and adult criminal record pre-dating the commitment offense. However, Petitioner received a one year enhancement for his prior adult offenses. The Board is not allowed to violate the Double Jeopardy Clause by continuing to deny parole based on his prior offense. Furthermore, some of Petitioner's juvenile and adult record consists of some charges that were dismissed but still used by the Board to deny parole. His worse pre-commitment offense occurred when his friends were horseplaying in the car he was driving. Petitioner flipped his car, and walked away from the scene. His friend died as a result of the accident. Based on his juvenile record, Petitioner never "demonstrated serious assualtive behavior at an early age." (CCR-15 2288(c)(2).)

Petitioner's adult criminal record cover the period prior to the life crime also lacks any violent history. In Biggs v. Terhune, the Ninth Circuit Court of Appeals held the Board's continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs v. Terhune, 334 F.3d 910, 917 (2003). The 2006 hearing was Petitioner's third parole suitability hearing since his commitment to the California Department of Corrections in 1992. As occurred in two previous parole suability hearings, this most recent Board panel maintained a pattern of relying on the "unchanging factors" of Petitioner's crime, prior criminal record, and social history to deny Petitioner a parole release date. Petitioner can do nothing to change the circumstances of his crime or his social history prior to coming

INSERT A

to prison. In addition, since his incarceration Petitioner has demonstrated exemplary behavior and evidence of rehabilitation. Therefore, the Board's continued reliance on the "unchanging" aspects of Petitioner's case in the presence of evidence that Petitioner has "demonstrated exemplary behavior and evidence of rehabilitation," converts Petitioner's sentence of life with the possibility of parole into "de facto life imprisonment without the possibility of parole" thereby violating Petitioner's due process rights. Iron v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (2005).

3, 4,    PETITIONER'S INSTITUTIONAL BEHAVIOR DOES NOT CONTAIN ANY
         VIOLENT OR ASSAULTIVE BEHAVIOR, THE BOARD'S DECISION TO DENY
& 5.     PAROLE BASED ON DISCIPLINARY ACTIONS THAT ARE NOT RELIABLE
         OR HAVE ALREADY BEEN USED TO PUNISH PETITIONER BY DEDUCTING
         GOOD TIME CREDIT VIOLATES DUE PROCESS. (See Ground 3.)

The Board violated Petitioner's due process rights by failing to consider relevant reliable information that Petitioner's post-conviction record lacked violent or assaultive behavior. CCR-15 § 2281(b). The Board further violated Petitioner's due process rights by failing to apply two factors from the regulations tending to demonstrate parole suitability to Petitioner's case. The Board's failure to consider substantial evidence that Petitioner was suitable for release violates Petitioner's due process rights. (In re Scott, 119 Cal.App.4th at 899.)

While the regulations allow the Board to consider Petitioner's prison disciplinary record in its parole suitability determinations, the evidence cited to deny parole must provide evidence as to Petitioner's current or "present" dangerousness. In re Dannenberg, 34 Cal.4th at 1079-1080. In re Ernest Smith, 114 Cal.App.4th at 370. All other evidence would be irrelevant in the context of parole suitability determinations.

Two of CDC-115s relied on are being reviewed in the United States

13.

District Court, Northern District Court. The reliability of the Disciplinary
Reports are suspect because they were based on contaminated evidence and
administrative failure to follow its own guidelines when processing urine
samples. The third CDC-115 relied by the Board was also not violent and did
not receive a final disposition by the Board. Nevertheless it was used against
Petitioner along with the other non-violent CDC-115s. While these non-violent
CDC-115s may be an indication that Petitioner at times fails to follow
institutional rules where no physical harm occurs, they do **not** provide
reliable evidence that Petitioner would pose an unreasonable risk of danger
to society or a threat to public safety if released. Khalifah E.D. Saif'ullah
v. Carey, 2005 WL 1555389, 15 (E.D. Cal.) (2005). Furthermore, this portion
of Petitioner's disciplinary record does not demonstrate Petitioner is
incapable of adjusting to parole release. Id. On the contrary, the extent
of Petitioner's support from family members and friends, the job offer and
housing offers he has received, his participation in college courses and
marketable skills, and self-help accomplishments while incarcerated all serve
as substantial evidence of Petitioner's ability to adjust to parole release
quite successfully. Because these CDC-115s are not "serious disciplinary
infraction[s] of violent nature," the Board cannot use them to substantiate
a parole denial. Kalifah E.D. Saif'ullah v. Carey, 2005 WL 1555389 at 18.
See also In re Irons, 358 F.Supp.2d 936, 949 (2005).

6.   THE BOARD'S RELIANCE ON THE DISTRICT ATTORNEY'S REPRESENTATIVE
     AND SAN JOSE POLICE DEPARTMENT'S OPPOSITION TO PAROLE VIOLATES
     PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL HEARING AND STATE
     AND FEDERAL DUE PROCESS.

     The Board is giving the District Attorney's Office and San Jose
Police Department authority that they do not possess, prohibiting parole.
Public outcry cannot be used to determine whether an inmate is suitable for
parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139

INSERT A

Cal.App.3d 295.) Furthermore, because Petitioner had no notice that this factor would be used against him, this factor is unconstitutionally vague. (<u>United States v. Doremus</u>, 888 F.2d 630, 634 (9th Cir. 1989) [A statute (or regulation) is void for vagueness: if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.].) This factor clearly invites discriminatory enforcement since it illegally allows the Board to deny parole if a certain state agency opposes parole. Furthermore, the District Attorney, Police Department, and victim's next of kin's statements were considered at Petitioner's sentencing hearing and to continue to allow their statements to influence Petitioner's sentence by adding years to it each time they oppose parole violates state and federal due process.

For the foregoing reasons, this Court should grant the petitioner's petition for writ of habeas corpus and order the Board to set his term. If any credit goes beyond the term set forth in the Matrix, the Board should calculate the remaining credit toward Petitioner's parole period, which means that Petitioner can be discharged after serving five years without violating parole.

GROUND 2

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S LIBERTY
INTEREST TO BE RELEASED ON PAROLE. UNDER CALIFORNIA'S PAROLE
SCHEME PETITIONER HAS A CONSTITUTIONALLY PROTECTED LIBERTY
INTEREST IN RELEASE ON PAROLE. THE BOARD IS REQUIRED TO NORMALLY
SET A PAROLE RELEASE DATE PURSUANT TO PENAL CODE § 3041 AND
CAL. CODE REGS, TIT. 15 § 2401 UNLESS THE BOARD FINDS PETITIONER
POSES A CURRENT DANGER TO SOCIETY.

Under the "clearly established" framework set forth by the United
State Supreme Court in Greenholtz v. Inmate of Nebraska Penal and Board of
Pardons v. Allen, when a state's statutory scheme uses mandatory language
that "creates a presumption that parole release will be granted," unless
certain statutorily defined determinations are met, that gives rise to a
constitutionally protected liberty interest in release on parole. Greenholtz
v. Inmate of Nebraska Penal, 442 U.S. 1, 12 (1979); Board of Pardons v. Allen,
482 U.S. 369, 377-378 (1987).

In McQuillion v. Duncan, the Ninth Circuit Court of Appeals held
California's parole scheme, as codified in Penal Code § 3041, largely
parallels the schemes used in Greenholtz and Allen and therefore gives rise
to a cognizable liberty interest in release on parole. McQuillion v. Duncan,
306 F.3d 895, 901 (9th Cir. 2002). See also Biggs v. Terhune, 334 F.3d 910,
914 (2003) ("Section 3041 of the California Penal Code creates in every inmate
a cognizable liberty interest in parole which is protected by the procedural
safeguards of the Due Process Clause.") While McQuillion involved a Board-
granted parole release date that the Governor subsequently rescinded, the
McQuillion Court concluded California's parole scheme created a general
expectation in parole to all life-term inmates, not only to those who have
or previously had a parole release date. McQuillion v. Duncan, 306 F.3d at
903. This point was further clarified by the Ninth Circuit Court of Appeals
in Biggs v. Terhune, supra. There the Court concluded the liberty interest
in parole was created upon the incarceration of the inmate and not upon the

16.

grant of a parole release date. Biggs, 334 F.3d at 915. However, a prisoner such as McQuillion who had previously been granted a parole release date has a heightened liberty interest in release on parole. McQuillion, 306 F.3d at 903. In the instant case petitioner's crime does not of the gravity that prevents parole. The Board has failed to "normally grant parole" at his initial hearing, first subsequent hearing, and second subsequent hearing and continues to rely on the pre-commitment offense behavior, and commitment offense, which by its own Matrix and guidelines provides a term somewhere in the area of 17-20 years, which with post conviction credit as provided in CCR 15 § 2290, may be reduced by one-third. (CCR 15 § 2403(c).) Petitioner therefore had a specific expectation of release on parole. (Id.)

In reviewing the applicable statutory law and Board regulations, the California Supreme Court has determined life prisoners such as petitioner have an expectation of release upon parole. In In re Rosenkrantz, the Supreme Court concluded "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." In re Rosenkrantz, 29 Cal.4th 616, 654 (2002). The Rosenkrantz Court further concluded this "expectation" is a liberty interest protected by due process of law. (Id. at 659-661.)

For the foregoing reasons, the Court should grant the petition and declare the rights of petitioner having a protected liberty interest in parole. The Court should order the Board to follow its own guidelines and California law.

17.

## GROUND 3

THE BOARD OF PAROLE HEARINGS' FAILURE TO CONSIDER ALL RELEVANT
FACTORS AND IGNORING POST-CONVICTION FACTORS IN PETITIONER'S
PAROLE SUITABILITY DETERMINATION VIOLATED PETITIONER'S RIGHTS
TO A FAIR AND MEANINGFUL HEARING IN VIOLATIONS OF STATE AND
FEDERAL DUE PROCESS.

The California Supreme Court has consistently held the Board "is under
an obligation to consider all relevant factors" and may not ignore
post-conviction factors in its parole suitability determinations. In re
Rosenkrantz, 29 Cal.4th at 655 (citing In re Minnis, 7 Cal.3d. 639, 645
(1972)). Despite this mandate, the Board has inexplicable and unjustifiably
ignored abundant, undisputed evidence contained in petitioner's
post-conviction record showing petitioner is suitable for release on parole.
In re Scott, 119 Cal.App.4th 871, 899 (2004).

First, although the Board noted that petitioner has been involved
in many programs when it stated: "With the exception of the 115s here, your
adjustment since your Initial Hearing, you know, has been very positive,
you know, has been very active in a number of different programs[]" (Exhibit
A, BT 46), the Board failed to mention consideration of evidence that
petitioner has demonstrated signs of remorse as a factor indicating parole
suitability. 15 CCR § 2402(d)(3) ("[T]he prisoner has given indications that
he understands the nature and magnitude of the offense.") Petitioner's "Board
Report" provided the Board with a "fairly extensive" list of programs and
acts which tend to indicate the presence of remorse[,]" and has involved
himself in institutional activities that enhance his ability to function
within the law upon release. (15 CCR § 2403(d)(8), Exhibit A, BT 46-47.)
Petitioner acknowledge his responsibility for the crime and expressed his
remorse. (BT 94.) Furthermore, at the May 2006 hearing the Board failed to
consider the mitigating circumstances : "The crime was committed during or
due to an unusual situation unlikely to reoccur[.]" (CCR 15 § 2405(a)(6).

18.

The Board also failed to mention consideration of petitioner's advancing age which is yet another factor set forth in the regulations tending to demonstrate parole suitability: "The prisoner's present age reduces the probability of recidivism." 15 CCR 2402(d)(7). Petitioner was 26 years old at the time he was involved with the life crime. When petitioner appeared before the 2006 hearing panel, petitioner was 41 years old. Fifteen-years have transpired since the commission of the crime during which time petitioner has aged, matured and experienced numerous accomplishments.

The Board ignored the evidence cited above and provided by petitioner and "Board Report" as to the above two factors tending to demonstrate parole suitability. This resulted in the Board violating petitioner's due process rights by ignoring relevant, reliable information (CCR 15 § 2402(b)) and failing to apply two parole suitability factors which are relevant to petitioner's case. In re Rosenkrantz, 29 Cal.4th at 655.

Based on the record, petitioner has clearly participated in beneficial self-help programs; however, the Board fails to articulate a reason why it believes petitioner's participation is insufficient. In fact, the Board contradicts itself when it stated: "With the exception of the 115s here, your adjustment since you Initial Hearing, you know, has been very positive[.]" (Exhibit A, BT 46.) The Board's failure to consider this "very positive" programming violates due process. Furthermore, lay persons such as the Board of Parole Hearings Commissioners have no training in the field of psychology and predictions of human behavior. They are unequipped to assess whether an individual "could benefit from" or need self-help programs. As such, their conclusion should be viewed as no more than mere speculation. Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (2005).

INSERT C

The Board's determination that petitioner "has not sufficiently participated in beneficial self-help programs" is a determination unrelated to the issue of petitioner's dangerousness to the public and unrelated to any of the authorized factors tending to show suitability or unsuitability. In fact, the regulations do not set forth "self-help participation" as a factor tending to indicate either suitability or unsuitability. Thus, even if the Board thinks that more self-help programming would be beneficial to petitioner, it was wrong for the Board to deny parole to petitioner based on such an unauthorized factor.

For the foregoing reasons, the Court should grant the petition and order the Board to release petitioner on parole, or set his term within the Matrix guidelines for second degree murder.

20.

Ground 4

THE BOARD OF PAROLE HEARINGS HAS ILLEGALLY DENIED PAROLE
BASED ON AND ILLEGAL POLICY OF RETRYING THE CASE IN ORDER
TO SUPPORT THEIR FINDINGS OF UNSUITABILITY FOR PAROLE. THE
BOARD IS "NORMALLY" DENYING PAROLE TO TERM-TO-LIFE PRISONERS
AND THUS VIOLATING DUE PROCESS AND EQUAL PROTECTION AND IS
AN UNCONSTITUTIONAL EX POST FACTO ENHANCEMENT OF THE
INDETERMINATE SENTENCES IMPOSED BY THE SENTENCING COURT.

Gerardo Jerry Menchaca ("Petitioner"), is a prisoner in the custody

of the California State Department of Corrections and Rehabilitation ("CDCR")

at the San Quentin State Prison. Petitioner is serving a sentence of 16 years

to life pursuant to his 1991 commitment offense of murder in the second

degree, Cal. Penal Code § 187 and prior prison enhancement. On May 12, 2006,

Petitioner was denied parole release for his third time. This adverse

determination of the Board of Parole Hearings reads as follows:

> [T]he offense was carried out in an especially cruel and
> callous manner, The victim Richard Figueroa was 33 years
> of age, he received 23 wounds, 15 actual stab wounds and
> there was indication the stab wounds were as deep as four
> and a half inches. The offense was carried out in a very
> dispassionate and calculated manner, The victim was no threat,
> actually he was trying to deescalate a situation. The offense
> was carried out in a manner that demonstrate an exceptionally
> callous disregard for human suffering and again the victim
> suffered knife wounds ... The motive for this crime, the
> motive certainly is trivial compared to the loss of a human
> life. ... (Exhibit A, 103-104.)

The record shows that the Board did in fact retried the case and

totally ignored the trial evidence and sentencing court's findings, and thus

did not give proper consideration to any other relevant or statutorily

mandated factors. Petitioner was not found guilty of using a weapon. He was

found not guilty of first degree murder. Furthermore, if the Board is allowed

to retry the case, Petitioner should be allowed to call witnesses and

reexamine the actually wounds. Petitioner asserts that many of the wounds

were in fact a result of incisions made during surgery when a "Heart and

Lung" machine was attached to Richard Figueroa, victim, during the two hour

open heart surgery. Petitioner further asserts that eye witnesses that were

not involved in the altercation testified that Richard Figueroa approached one person and started to argue and then a fight occurred between the two individuals. Petitioner should be allowed to present expert testimony that may show that many of the wounds were a result of the surgery, or due to the lack of intent to kill. Instead of striking at the upper body first, the trail evidence shows that Petitioner's co-defendant stabbed at the victim's legs in an attempt to get the victim off of him. Petitioner could and would provide evidence that indicates the pattern of wounds on the victim are typical in wounds that occur during surgery.

The Board's illegal policy violates the express mandates of Cal. Penal Code § 3041(b), which provides that parole release "normally" be granted. This policy also violates state statutory law and the United States Supreme Court holdings that every element of the commitment offense be found true by the jury. (Cal. Penal Code § 190.2.(a); <u>Apprendi v. New Jersey</u>, 120 S.Ct. 2348, 147 L.Ed.2d 435.)

The Board's findings that was especially cruel and callous and carried out in a calculated manner violates the statutory law that unequivocally mandates that:

> The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true.

> (14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase "especially heinous, atrocious, or cruel, manifesting exceptional depravity" means a conscienceless or pitiless crime that is unnecessarily tortuous to the victim.

The Board unauthorized retrying the offense and resentencing based on this retrial violates state and federal due process.

By providing for parole eligibility after a period ranging from ten

INSERT D

(10) years for second degree murderers, to sixteen years-eight months (16.66 years) for first degree murderers. The Legislature made a determination that there is nothing about the release of a murderer within that range, in and of itself, which necessarily depreciate[s] the seriousness of the crime. Thus, when the Board repeatedly retries the commitment offense in order to deny parole, without any meaningful or intelligent bases for distinguishing the subject murders from any of the others, and in the face of the other suitable factors calling for release, it is, in reality, substituting its view of a proper sentencing scheme for that of the Legislature's.

All murders are by nature violent, horrific, abhorrent and morally repugnant. But the Legislature decided that murder, **per se**, is not a sufficient basis for denying parole. There has to be something more. Otherwise the statutory provision for indeterminate sentences would make no sense, as every parole release of a murderer would then deprecate the seriousness of the crime. If the seriousness of [the Petitioner's] crime had been intended as the sole criteria by which release was to be measured, there would have been no reason for Petitioner's original sentence to be anything but "Life in Prison." Clearly the laws of California did not contemplate this scenario.

"Parole eligibility is a facet of a criminal sentence ... and thus the statutes and regulations governing parole eligibility are considered to be part of the law annexed to a crime when it is committed." Warden v. Marrero, 417 U.S. 653, 661-664 (1974) and Weaver v. Graham, 450 U.S. 24, 32-33 (1981). "[T]he Ex Post Facto Clauses provide a means of assuring that an individual receives fair warning of criminal statutes and the punishments they carry." Weaver, 450 U.S. at 28-30.

In Garner v. Jones, 529 U.S. 244, 250 (2000), the "Supreme Court held that the Ex Post Facto Clause is violated when a parole authority adopts

23.

a retroactive procedural change that creates 'a sufficient risk of increasing
the measure of punishment attached to covering crime.'" <u>California Dep't
of Corrections v. Morales</u>, 514 U.S. 499, 509 (1995). "If the inmate shows
that application of the new rule will result in a longer period of
incarceration than under the previous rule, the Ex Post Facto Clause is
implicated." <u>Garner</u>, 529 U.S. at 255, 120 S.Ct. 1362. "To determine whether
there is in fact a 'significant risk of increased punishment' ... the
reviewing court may consider policy statement and evidence of the actual
practice of the parole board." <u>Garner</u>, 529 U.S. at 256.

A prisoner may be entitled to Ex Post Facto relief if he can establish
that a revision in parole regulations "was motivated by a punitive desire
to extend the incarceration of a particular category of inmates." <u>Miller
v. Florida</u>, 482 U.S. 423, 433-34 (1987) (holding that a statute whose "sole
reason" was to "punish sex offenders more heavily" violated the Ex Post Facto
Clause). The danger that vindictiveness will cause disfavor of certain persons
after-the-fact is present in the parole context. <u>Garner</u>, 529 U.S. at 253.

Petitioner asserts that the Board's illegal underground policy of
retrying murder cases is based upon impermissible political and economic
factors, and has brought about an ex post facto enhancement of the punishments
imposed upon the Petitioner and members of the prospective class at their
respective sentencings.

The adverse parole decision in this case shows that Petitioner is
being denied parole largely in part due to the retrying and recharacterization
of the commitment offense. The fact that the decisions in all three parole
consideration hearings routinely contain boilerplate that Petitioner's crime
was "especially cruel" or "callous" does not alter the fact that the **stated**
reason for all denials by the Board is one and the same – the inmate committed

a murder.

Petitioner does not minimize the inherent seriousness of his offense. But the inherent seriousness of his offense is not enough to deny parole. The Board must still be able to point to some non-arbitrary, distinguishing feature of the offense that was found true and explain why that feature has some bearing on the question of whether the prisoner is ready to be released. This is especially critical when each of the other statutorily mandated release standards point to release.

"[I]n a system which is premised on the hope and possibility of rehabilitation, and a statutory system which mandates a serious, rational, and meaningful evaluation of the statutory criteria, we must allow an individual who has taken advantage of opportunities to rehabilitate himself to move beyond a horrific act of many years ago and to rejoin society to contribute accordingly to his ability." Cappiello, 2004 WL 3112629, at **5-6.

For the foregoing reasons, the Court should grant the petition and find that the Board is violating the Ex Post Facto Clauses by implementing an illegal policy of retrying murder cases. The Court should order the Board set Petitioner's term within the Matrix for second degree murders.

## Ground 5

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S RIGHT
TO A FAIR AND LAWFUL HEARING AND STATE FEDERAL DUE PROCESS
WHEN IT ALLOWED THE NEPHEW OF THE VICTIM TO TESTIFY AS A
NEXT TO KIN IN ORDER TO GIVE FALSE EVIDENCE OF PETITIONER'S
UNSUITABILITY FOR PAROLE. THE BOARD HAS A DUTY TO FOLLOW
THE LAW AND PROTECT PETITIONER'S DUE PROCESS.

At the May 12, 2006 parole hearing, Dave Figueroa, identified himself

as the victim's brother. At prior hearings, Dave Figueroa has identified

himself as the victim's nephew. The Board illegally allowed Dave Figueroa

to participate and give testimony without any cross-examination. The Board

has then used his testimony as some evidence to support a finding of

unsuitability. This illegal practice is now under review in Oropeza v.

Woodford, Case No. CV-03-1373 RMW (PR) and Oropeza v. Stokes, CV-05-3089

RMW (PR), co-defendant of Petitioner who is challenging Dave Figueroa's

participation in the parole hearings. Since then, Dave Figueroa has identified

himself as the brother of the victim, this is indication that he has been

made aware of the law and instead of following it has perjured himself in

order to give false information.

California Penal Code § 3043. states that:

The victim , next of kin, or two members of the victim's
immediate family have the right to appear, personally or
by counsel, at the hearing and to adequately and reasonably
express his or her views concerning the crime and the person
responsible. The board, in deciding whether to release the
person on parole, shall consider the statements of victim,
next of kin, and immediate family members of the victim made
pursuant to this section and shall include in its report
a statement of whether the person would pose a threat to
public safety if released on parole. ...

Penal Code § 3043.3 defines Immediate family as:

As used in Section 3043, 3043.1, and 3043.2, the term
"immediate family" shall include the victim's spouse, parent,
grandparent, brother, sister, and children or grandchildren
who are related by blood, marriage, or adoption.

During his testimony, Dave Figueroa stated:

My dad's (indiscernible). But, you know, like she said it

26.

INSERT E

>is just seem like it was yesterday. But 15 years in prison
>will definitely age you, like dog years, you know. The whole
>swearing in thing seem to me kind of like, you know, swear
>to tell the truth, the whole truth and nothing but the truth
>seems kind of blank and (indiscrenible) kind of inadequate.
>But inmate he's keeping the paper mills in business. It's
>the thickest file that I've ever seen. If I had a neighborhood
>coming in with a file like that guarantee you I would put
>my house up for sale the very next day. He is lucky that
>he's not on a polygraph machine to decide his fate whether
>he is released or stays. ... (BT 98) And you don't murder
>somebody they way they murdered my uncle [sic] and call that
>the first time. ... (BT 100) I've made a decision since my
>brother was murdered I made the decision that I would have
>to live his life, ... (BT 101) You know, whether he says
>he was physically involved in the actual stabbing or not,
>the bottom line is that my uncle is dead -- my brother is
>dead. (BT 102).

The record clearly shows a conscience decision to contaminate the
parole consideration hearing by falsifying the identification in order to
participate in the hearing and influence the decision-makers.

In light of the perjury shown here, Petitioner's petition should
be granted. The decision to deny parole was partly based on perjury. The
Court should find that the victim's next of kin should be allowed to
participate at the "Initial" parole consideration hearings but not at
subsequent hearings. This process is unfair and violates Petitioner's right
to a fair and impartial hearing. Petitioner further wishes to exhaust and
preserve this issue for further litigation in a federal lawsuit of violation
of his civil rights by Dave Figueroa.

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   court of appeals, 6th district

   b. Result:  DENIED                                         c. Date of decision:  1993

   d. Case number or citation of opinion, if known:  H009479

   e. Issues raised: (1)  (1) 16-DAY BREAK IN DELIBERATIONS VIOLATED DUE PROCESS.

      (2)  (2) COURT FAILED TO GIVE PROPER JURY INSTRUCTIONS. (3) FAILED TO INCLUDE

      (3)  INSTRUCTIONS OF INVOLUNTARY MANSLAUGHTER; AND OTHER DUE VIOLATIONS

   f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

   BRUCE ERIC, COHEN, 1442-A WALNUT STREET, BERKELEY, CA 94709

9. Did you seek review in the California Supreme Court?  ☒ Yes.  ☐ No.  If yes, give the following information:

   a. Result:  DENIED                                         b. Date of decision:  1994

   c. Case number or citation of opinion, if known:

   d. Issues raised: (1)  SAME AS ABOVE

      (2)

      (3)

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:




11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhau administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   No Administrative Appeals available for parole suitability hearings.








   b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
      *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1)  Name of court: _____

      (2)  Nature of proceeding (for example, "habeas corpus petition"): _____

      (3)  Issues raised:  (a)  _____

                          (b)  _____

      (4)  Result (Attach order or explain why unavailable): _____

      (5)  Date of decision: _____

   b. (1)  Name of court: _____

      (2)  Nature of proceeding: _____

      (3)  Issues raised:  (a)  _____

                          (b)  _____

      (4)  Result (Attach order or explain why unavailable): _____

      (5)  Date of decision: _____

   c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

_____

_____

16. Are you presently represented by counsel?  ☒ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☒ Yes. ☐ No. If yes, explain:
    Two petitions for writ of habeas corpus challenging prison disciplinary action
    pending in United States District Court, Northern District.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 12, 10, 2006

▶ _Gerardo Menchaca_
                                    (SIGNATURE OF PETITIONER)

E X H I B I T   A

MAY 12, 2006 BOARD HEARING TRANSCRIPTS

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )            CDC Number D-87412
)
GERARDO MENCHACA )
)
_____)

INMATE COPY

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MAY 12, 2006

10:31 A.M.

PANEL PRESENT:

Mr. Jack Garner, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner

OTHERS PRESENT:
Mr. Gerardo Menchaca, Inmate
Mr. John Stringer, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney, Santa
Clara County (Video)
Ms. Cynthia Figueroa, Victim's family
Mr. Dave Figueroa, Victim's family
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum

J. Farncomb                Peters Shorthand Reporting

## INDEX

|                              | PAGE |
|------------------------------|------|
| Proceedings                  | 1    |
| Case Factors                 | 12   |
| Pre-Commitment Factors       | 29   |
| Post-Commitment Factors      | 41   |
| Parole Plans                 | 34   |
| Closing Statements           | 81   |
| Recess                       | 102  |
| Decision                     | 103  |
| Adjournment                  | 111  |
| Transcriber Certification    | 112  |

--oOo--

1

1      P R O C E E D I N G S

2          DEPUTY COMMISSIONER SMITH:   We're on the

3   record.

4          PRESIDING COMMISSIONER GARNER:   All

5   right, this is a Subsequent Parole Consideration

6   Hearing for Gerardo, G-E-R-A-R-D-O, Menchaca,

7   M-E-N-C-H-A-C-A, CDC number D, like David,

8   87412.   The date today is May 12, 2006.   It is

9   now 10:31 A.M., and we are located at San

10  Quentin State Prison.   The inmate was received

11  on February 18, 1992, and that's the date the

12  life-term started.   He was received from Santa

13  Clara County.   The offense was murder in the

14  second-degree with Penal Code 667.5.   The case

15  number is 148873.   Count number one is P.C. 187

16  in the second with a prior term.   The term is 16

17  years to life, and the minimum eligible parole

18  date is April 30, 2002.   This Hearing is going

19  to be tape-recorded and for purposes of voice

20  identification each of us at the table is going

21  to be required to give our first name, last

22  name, spelling the last name.   And when we get

23  to you, Mr. Menchaca, if you would also give us

24  your CDC number.   I'll start and go to my right,

25  I'm Jack Garner, G-A-R-N-E-R, Commissioner.

26          DEPUTY COMMISSIONER SMITH:   My name is

27  Dennis Smith, S-M-I-T-H, Deputy Commissioner.

1        INMATE MENCHACA:  I'm inmate Menchaca,

2    M-E-N-C-H-A-C-A, D-87412.

3        PRESIDING COMMISSIONER GARNER:  Okay.

4        ATTORNEY STRINGER:  John Stringer,

5    S-T-R-I-N-G-E-R, attorney for Mr. Menchaca.

6        CYNTHIA FIGUEROA:  Cynthia Figueroa,

7    F-I-G-U-E-R-O-A, victim's sister.

8        DAVE FIGUEROA:  Dave Figueroa,

9    F-I-G-U-E-R-O-A, victim's brother.

10        PRESIDING COMMISSIONER GARNER:  Ron?

11        DEPUTY DISTRICT ATTORNEY RICO:  Ronald

12    Rico, R-I-C-O, Deputy District Attorney, Santa

13    Clara County, by way of videoconference.

14        DEPUTY COMMISSIONER SMITH:  Thank you.

15        PRESIDING COMMISSIONER GARNER:  Thank

16    you, Mr. Rico.  Also for the record, we do have

17    two correctional peace officers in the room for

18    purposes of security.  Okay, Mr. Menchaca and

19    Mr. Stinger, I have an BPT 1073, this is the

20    Reasonable Accommodation for ADA, and there is

21    an indication that as of April 19, 2006, that

22    Mr. Menchaca indicated that the didn't any

23    assistance for the Hearing other than legal

24    representation and that no disabilities were

25    identified in the file.  So let me ask for the

26    record, sir, is there anything that has occurred

27    since April of 2006 that we need to provide an

3

```
 1   accommodation for today?

 2           INMATE MENCHACA:   No.

 3           PRESIDING COMMISSIONER GARNER:   The

 4   glasses that you are wearing for reading?

 5           INMATE MENCHACA:   No.

 6           PRESIDING COMMISSIONER GARNER:   Okay.

 7   And are you on any medications, sir?

 8           INMATE MENCHACA:   No.

 9           PRESIDING COMMISSIONER GARNER:   No

10   medications.  Are you satisfied, Mr. Stinger?

11           ATTORNEY STRINGER:   I am.

12           PRESIDING COMMISSIONER GARNER:   All

13   right, this Hearing is being conducted pursuant

14   to Penal Code Sections 3041 and 3042, and the

15   Rules and Regulations of the Board of Parole

16   Hearings governing Parole Consideration Hearings

17   for life inmates.  The purpose of today's

18   Hearing is to consider your suitability for

19   parole.  In doing so we will consider the number

20   and nature of the crimes that you were committed

21   for, your prior criminal and social history and

22   your behavior and programming since your

23   commitment.  We have had the opportunity to

24   review your Central File and your prior Hearing

25   transcript.  You will be given an opportunity to

26   correct or clarify the record.  We will consider

27   your progress since your commitment and since
```

4

 1   your last Hearing, your updated counselor's

 2   report and psychological report will also be

 3   considered.  And any change in your parole plans

 4   should be brought to our attention.  We will

 5   reach a decision today and inform you whether or

 6   not we find you suitable for parole and the

 7   reason for our decision.  If you are found

 8   suitable for parole the length of your

 9   confinement will be explained to you.  This

10   Hearing is going to be conducted in two phases:

11   I will discuss with you the crime that you were

12   committed for, your prior criminal and social

13   history, your parole plans and any letters of

14   support or opposition that may be in the file.

15   Commissioner Smith will discuss with you your

16   progress since your commitment, your counselor's

17   report and your psychological evaluation.  Once

18   that is concluded the Commissioners, the

19   District Attorney and your Attorney will be

20   given an opportunity to ask you questions.  The

21   questions from the District Attorney will be

22   asked through the Chair, and you should direct

23   your answers back to the Panel.  Before we

24   recess for deliberation, the District Attorney,

25   your Attorney and you will be given an

26   opportunity to make a final statement regarding

27   your parole suitability.  Your statement should

1    be directed to why you feel that you are

2    suitable for parole. The victim's next-of-kin

3    or representatives will then have the

4    opportunity to give a statement regarding the

5    crime and your responsibility. We will then

6    recess, clear the room and deliberation. Once

7    we have completed our deliberations we will

8    resume the Hearing and announce our decisions.

9    The California Code of Regulations states that

10   regardless of time served, a life inmate shall

11   be found unsuitable for and denied parole if, in

12   the judgment of the Panel, the inmate would pose

13   an unreasonable risk of danger to society if

14   released from prison. Mr. Menchaca, you have

15   certain rights. They include: the right to a

16   timely notice of this Hearing; the right to

17   review your Central File; and a right to present

18   relevant documents. And I'm going to ask you at

19   this time: Have those rights been met?

20          INMATE MENCHACA:   Yes.

21          PRESIDING COMMISSIONER GARNER:   You also

22   have the right to be heard by an impartial

23   Panel. Today your Panel will consist of myself

24   and Commissioner Smith. Any objections to the

25   Panel?

26          INMATE MENCHACA:   No.

27          PRESIDING COMMISSIONER GARNER:   You will

6

1    receive a written copy of our written tentative

2    decision today.  That decision becomes effective

3    within 120 days.  It is also subject to review

4    by the Governor.  And a copy of the tentative

5    decision and a copy of the transcript will be

6    sent to you and you.  You may recall from your

7    Initial Hearing that in May 2004 the appeal

8    procedures changed, and any appeal now must go

9    through the courts.  Are you aware of that?

10        INMATE MENCHACA:  Yes.

11        PRESIDING COMMISSIONER GARNER:  You are

12   not required to admit your offense or discuss

13   your offense if you do not wish to do so.

14   However, this Panel does accept as true the

15   findings of the Court.  And you are invited to

16   discuss the facts and circumstances of the

17   offense if you desire.  The Board will review

18   and consider any prior statements that you have

19   made regarding the offense in determining your

20   suitability for parole.  At this time I will ask

21   Commissioner Smith if there is any confidential

22   material in your file and if we will be using it

23   today?

24        DEPUTY COMMISSIONER SMITH:  There is

25   confidential information and it will be used.

26        PRESIDING COMMISSIONER GARNER:  Okay.

27        ATTORNEY STRINGER:  May I inquire about

1    that, Commissioner?  Is that information from

2    outside the institution or is that information

3    developed in the institution?

4         DEPUTY COMMISSIONER SMITH:  From outside

5    the institution.

6         ATTORNEY STRINGER:  Outside.

7         PRESIDING COMMISSIONER GARNER:

8    Mr. Stinger, I'm not finding the Hearing

9    checklist in my packet.  I don't know if you

10   have one in yours?  Do you have one in yours?

11        ATTORNEY STRINGER:  The defendant has

12   these documents, Commissioner.

13        PRESIDING COMMISSIONER GARNER:  Mr. Rico?

14        DEPUTY DISTRICT ATTORNEY RICO:  I did not

15   receive a checklist with my packet.  However,

16   I'm assuming that I have all the necessary

17   documents.  And I'm ready to proceed this

18   morning.

19        PRESIDING COMMISSIONER GARNER:  Thank

20   you.  If we refer to something that you don't

21   have, let us know and we'll make sure that we

22   get that part on the record.

23        DEPUTY DISTRICT ATTORNEY RICO:  Thank

24   you.

25        PRESIDING COMMISSIONER GARNER:  Okay,

26   Mr. Stinger, do you have any additional

27   documents?

8

1          ATTORNEY STRINGER:  We do, Commissioner.

2    We have an abstract of a judgment from the

3    Superior Court of the County of Santa Clara that

4    we would like to have entered into the record.

5    If there are any questions about why my client

6    is here relative to the offense.

7          PRESIDING COMMISSIONER GARNER:  Okay.

8          ATTORNEY STRINGER:  I also have a copy of

9    a test from the National Toxicology Lab in

10   Bakersfield, that's going to be relevant to one

11   of the 115s.  Also a declaration from Damien

12   [phonetic] Rodriquez, talking responsibility for

13   the recent 115s.  We have some certificates of

14   completion.  And a letter from Christina,

15   Sinclaire, a support letter.  I know also that

16   in the file there is an addendum to a

17   psychological report signed by Dr. Inaba.  I

18   don't know if Mr. Rico has that or not.

19         DEPUTY DISTRICT ATTORNEY RICO:  I do not.

20         PRESIDING COMMISSIONER GARNER:  When we

21   do the psych report portion we will make sure

22   that we read it into the record to get it for

23   you.  It's dated May 3rd for the record.

24         DEPUTY DISTRICT ATTORNEY RICO:  Thank

25   you.

26         ATTORNEY STRINGER:  And finally I

27   received a packet, given to me this morning, a

9

1  letter from Robert Davis, Chief of Police, from

2  San Jose. Although it is dated April 13th, it

3  was just provided to the defendant about an hour

4  ago. So I would invoke the ten-day rule under

5  CCR 2030 and ask that it not be entered.

6           **DEPUTY DISTRICT ATTORNEY RICO:**

7  Commissioner, if I might. I have some

8  difficulty when materials are furnished to San

9  Quentin or any other facility in a timely

10  fashion and for whatever reasons the prison

11  decides not to forward them on to defendant

12  Counsel. It seems to me that it is wrong to

13  somehow penalize the submitter of those

14  documents for the actions of the institution.

15  Secondly, if the Panel were to consider honoring

16  Mr. Stinger's request, I would ask that the C-

17  File be examined to see if the police department

18  has in the past submitted opposition letters and

19  that that be taken into account in determining

20  the Department's position. Thank you.

21           **PRESIDING COMMISSIONER GARNER:** Thank you

22  for your comment. Mr. Stinger, there is a

23  letter from the San Jose Police Department dated

24  April 13th. Is that the one that you are

25  referring to?

26           **ATTORNEY STRINGER:** Yes.

27           **PRESIDING COMMISSIONER GARNER:** That's in

10

1  my Board packet.  I am wondering if the one that

2  you are addressing --

3          ATTORNEY STRINGER:  I'll double check.

4          PRESIDING COMMISSIONER GARNER:  -- is a

5  duplicate.  It's in my Board packet as the first

6  letter under Notices and Responses.

7          ATTORNEY STRINGER:  I think the

8  difficulty is your files are put together after

9  ours are already mailed, because my last one is

10  January 10, 2005.  Is that the same one you guys

11  are seeing?

12          PRESIDING COMMISSIONER GARNER:  Is that

13  the same one you have, Mr. Stinger?

14          ATTORNEY STRINGER:  Commissioner, I do

15  have and it's mixed in with the notices.

16          PRESIDING COMMISSIONER GARNER:  Okay, the

17  one from April 13th?

18          ATTORNEY STRINGER:  I do.

19          PRESIDING COMMISSIONER GARNER:  Okay.

20          ATTORNEY STRINGER:  No, I'll take that

21  back.  This one is January 10, 2005.

22          DEPUTY COMMISSIONER SMITH:  Well, we can

23  use that one because that letter has not been

24  used at a prior Hearing.

25          PRESIDING COMMISSIONER GARNER:  All

26  right.  Mr. Rico, did you hear that discussion?

27          DEPUTY DISTRICT ATTORNEY RICO:  Yes, I

11

1    did.  I note that it has not been used at the

2    prior Hearing.  There was the June 30, 2005, but

3    there was a Stip in that regard.

4         PRESIDING COMMISSIONER GARNER:  All

5    right, thank you.  All right.  Mr. Stinger, any

6    other preliminary objections?

7         ATTORNEY STRINGER:  I'm ready to proceed.

8         PRESIDING COMMISSIONER GARNER:  Will

9    Mr. Menchaca be speaking with the Panel?

10         ATTORNEY STRINGER:  Yes.  The facts of

11    the life-crime are well known and Mr. Menchaca

12    has agreed to answer any questions about the

13    life-crime, parole plans, and institutional

14    behavior.

15         PRESIDING COMMISSIONER GARNER:  Okay,

16    Mr. Menchaca, will you raise your right hand,

17    please.  Do you solemnly swear or affirm that

18    the testimony you give at this Hearing will be

19    the truth, the whole truth and nothing but the

20    truth?

21         INMATE MENCHACA:  Yes, I do.

22         PRESIDING COMMISSIONER GARNER:  All

23    right, at this time I'm going to read into the

24    record a fairly lengthy summary of the crime

25    offense.  And this was taken from the May 2006

26    Board Report that was prepared by Correctional

27    Counselor, initial K, and the last name

12

```
 1    Hilliard, H-I-L-L-A-R-D, Correctional
 2    Counselor I.
 3              On March 1, 1991, at approximately
 4              10:00 P.M., Jerry, and that's
 5              J-E-R-R-Y, Menchaca, Hector,
 6              H-E-C-T-O-R, Oroteza,
 7              O-R-O-T-E-Z-A, and another friend
 8              went bowling.  They were bowling
 9              and consuming beers until
10              approximately 1:45 A.M. the next
11              morning.  Their friend then drove
12              them back to his house where
13              Menchaca and Oroteza then entered
14              Menchaca's 1978 Silver Honda Civic
15              and reportedly began to drive
16              toward Oroteza's home.  During the
17              same time the victim Richard
18              Figueroa, F-I-G-U-E-R-O-A, age 33,
19              and his brother Dennis had gone to
20              the Cardinal, C-A-R-D-I-N-A-L,
21              where they consumed alcohol and
22              socialized.  While at the bar,
23              Richard Figueroa invited one of
24              the cocktail waitresses, Susan
25              Douglas, D-O-U-G-L-A-S, to join
26              him, his brother and two others.
27              Brenda Butler, B-U-T-L-E-R,
```

13

```
1          age 28, and Dust [phonetic]
2          Tumioh, T-U-M-O-I-H, age 26.
3          After the bar closed, Butler,
4          Tumioh, and Dennis Figueroa left
5          in Butler's vehicle to drive to
6          Butler's condominium where she was
7          going to cook breakfast.  Richard
8          Figueroa went as a passenger with
9          Douglas, who was driving her own
10         vehicle.  While eastbound on
11         Capital Expressway, Butler's
12         vehicle and Menchaca's vehicle
13         apparently came along side of each
14         other.  Menchaca later reported to
15         police that he believed at the
16         time that he recognized one of the
17         males in Butler's vehicle as an
18         individual with whom he had
19         previously had problems with.
20         Testimony in this case also
21         indicates that there may have been
22         some type of near miss accident
23         caused by Menchaca.  What did
24         happen; however was the words and
25         gestures were exchanged between
26         the occupants of both vehicles.
27         Menchaca began to pursue Butler.
```

14

```
1        while all of this was initiated,
2        Douglas and Figueroa were
3        oblivious to the problem.  Butler
4        turned off at the Cloverleaf at
5        Monterey Road, driving north on
6        Monterey Road to Southside Drive.
7        Butler was driving toward home,
8        which was located off Southside
9        Drive, an address is noted on
10       Kenbrook, K-E-N-B-R-O-O-K, Circle.
11       While Butler was pulled over
12       waiting for Douglas and Figueroa
13       to catch up, Menchaca pulled up
14       next to Butler's vehicle.  More
15       words were exchanged between the
16       occupants of both vehicles.  When
17       Douglas stopped behind Butler's
18       vehicle, Tumioh exited Butler's
19       vehicle and ran back to tell
20       Douglas and Figueroa that they
21       were having problems with people
22       in the Honda.  Butler quickly
23       pulled away, chased by Menchaca.
24       Tumioh entered Douglas' vehicle
25       and Douglas followed in the
26       direction that Menchaca and Butler
27       had driven off towards.  Butler
```

15

```
 1          meanwhile had hidden by turning
 2          off her lights and stopping in a
 3          driveway and Menchaca had lost
 4          sight of her.  As Douglas was
 5          driving up the street where
 6          Menchaca was located, something
 7          was thrown from Menchaca's
 8          vehicle, which hit Douglas'
 9          vehicle.  She stopped to check it
10          for damages.  Menchaca then pulled
11          up next to her vehicle and she saw
12          Menchaca and Oroteza, exchanging
13          heated words.  Douglas then saw
14          that Oroteza was brandishing a
15          large hunting-style knife and she
16          returned to her vehicle and
17          accelerated away trying to lose
18          Menchaca and Oroteza.  Douglas
19          returned to the Monterey Road
20          turning right and accelerating.  A
21          short distance away she made a U-
22          turn and drove back down to
23          Southside Drive turning left and
24          driving down to Butler's
25          condominium complex on Kenbrook
26          Circle.  It was the belief of the
27          occupants of her vehicle had
```

16

1        managed to allude Menchaca or

2        Oroteza.  Douglas parked in one of

3        the visitor parking spots near

4        Butler's condominium.  Figueroa

5        exited the car and was reportedly

6        in the process of moving the

7        passenger seat forward to allow

8        Tumioh to exit when Menchaca

9        pulled in behind Butler's vehicle

10       blocking it.  Oroteza and Menchaca

11       both exited their vehicle and

12       walked toward Figueroa.  Douglas

13       and Tumioh sat in the vehicle and

14       watched as Oroteza and Menchaca

15       assaulted Figueroa.  After a one

16       to two minute flurry of blows,

17       Oroteza and Menchaca fled back to

18       their vehicle and drove off

19       leaving Menchaca red baseball cap

20       with the logo, quote, "San Jose

21       Bad Boys," end quote, lying under

22       Douglas' car where it had fallen

23       during the assault.  Figueroa got

24       back into Douglas' car and Douglas

25       noticed that Figueroa's white

26       sweater had many slits in it and

27       that he was bleeding.  Figueroa

17

1        tried to get out of the car but

2        collapsed.  Neighborhoods who

3        heard or witnessed the assault

4        called 911 for assistance.

5        Figueroa was taken to San Jose

6        Hospital (indiscernible) where he

7        died.  The autopsy indicated that

8        Figueroa received 23 wounds to his

9        body; 15 which were actually stab

10       wounds, the others were

11       lacerations or superficial

12       (indiscernible) wounds.

13       (indiscernible) possibility of

14       more than one weapon had been

15       used.  The stab wounds include

16       four and a half inch deep stab

17       wounds which penetrated Figueroa

18       chest and right lung, two stab

19       wounds to his liver and one to his

20       abdomen and intestines.  Cause of

21       death was listed as stab wounds to

22       the head, chest, and abdomen.

23       There was also indications that

24       there were stab wounds to his left

25       (indiscernible).

26  All right, Mr. Menchaca, let me start by asking:

27  Is that a fairly accurate version of what

18

1   happened that evening?

2        INMATE MENCHACA:   Some of it, yes.

3        PRESIDING COMMISSIONER GARNER:   All

4   right, let's go back and rebuilt it.   Were you

5   and Mr. Oroteza in the San Jose area --

6        INMATE MENCHACA:   Yes.

7        PRESIDING COMMISSIONER GARNER:   --that

8   evening?

9        INMATE MENCHACA:   Yes, we were.

10        PRESIDING COMMISSIONER GARNER:   And had

11   you been drinking?

12        INMATE MENCHACA:   Yes.

13        PRESIDING COMMISSIONER GARNER:   Had you

14   been using anything else?

15        INMATE MENCHACA:   No, not that day.

16        PRESIDING COMMISSIONER GARNER:   And where

17   did -- where had you been let's say before

18   1:35 A.M.?

19        INMATE MENCHACA:   Uh --

20        PRESIDING COMMISSIONER GARNER:   Bowling?

21        INMATE MENCHACA:   That day, yes, we were

22   bowling.

23        PRESIDING COMMISSIONER GARNER:   Okay, and

24   how much alcohol did you consume let's say

25   between 10:00 o'clock and 1:00 A.M.?

26        INMATE MENCHACA:   Maybe four or five at

27   the bowling alley.

19

1          PRESIDING COMMISSIONER GARNER:  And was

2  the 1978 Silver Honda Civic yours?  Did you own

3  it?

4          INMATE MENCHACA:  I owned the blue.

5          PRESIDING COMMISSIONER GARNER:  So the

6  vehicle color was actual blue?

7          INMATE MENCHACA:  Yes.

8          PRESIDING COMMISSIONER GARNER:  Silver is

9  indicated here.  At some point and time did you

10  come into contact with another vehicle on the

11  Capital Expressway?

12          INMATE MENCHACA:  Yes, we did.

13          PRESIDING COMMISSIONER GARNER:  Do you

14  recall the description of that vehicle?

15          INMATE MENCHACA:  No, I don't.

16          PRESIDING COMMISSIONER GARNER:  But you

17  thought you recognized one of the males in the

18  vehicle as an individual that you previously had

19  problems with?

20          INMATE MENCHACA:  I had problems that --

21  was that statement there?

22          PRESIDING COMMISSIONER GARNER:  You had

23  problems with the statement?

24          INMATE MENCHACA:  Yes, I don't remember

25  saying that.

26          PRESIDING COMMISSIONER GARNER:  You don't

27  remember saying that.  Let me just ask you for

20

```
 1   the record today:  Did you recognize anyone in

 2   the other vehicle?

 3          INMATE MENCHACA:  No.

 4          PRESIDING COMMISSIONER GARNER:  And you

 5   were driving the vehicle?

 6          INMATE MENCHACA:  Yes, I was.

 7          PRESIDING COMMISSIONER GARNER:  And at

 8   some point in time did an exchange of words and

 9   gestures occur?

10          INMATE MENCHACA:  Yes, they did.

11          PRESIDING COMMISSIONER GARNER:  Were you

12   -- did you have your driver's window down?

13          INMATE MENCHACA:  Yes.  I was the one

14   that was exchanging the gestures.

15          PRESIDING COMMISSIONER GARNER:  Was the

16   vehicle next to you or was it next to your

17   passenger?

18          INMATE MENCHACA:  Next to the passenger.

19          PRESIDING COMMISSIONER GARNER:  So it was

20   on the passenger side.  Capital Expressway, how

21   many lanes do you recall?  Is it two lanes, or

22   three lanes in each direction?

23          INMATE MENCHACA:  I believe it was three.

24   Two right there in that area.

25          PRESIDING COMMISSIONER GARNER:  So you

26   would have been in the lane closets to the --

27          INMATE MENCHACA:  I was in the --
```

21

1          PRESIDING COMMISSIONER GARNER:    --

2    (indiscernible) road?

3          INMATE MENCHACA:    Yes, because I was

4    trying to make a U-turn.   And in the process of

5    trying to get into the exit lane I might have

6    cut off that other group.

7          PRESIDING COMMISSIONER GARNER:    In any

8    event there were words being exchanged between

9    the two vehicles?

10         INMATE MENCHACA:    Yes.

11         PRESIDING COMMISSIONER GARNER:    Was it

12    your statement that the words coming from your

13    vehicle were coming from Mr. Oroteza?

14         INMATE MENCHACA:    Yes.

15         PRESIDING COMMISSIONER GARNER:    Do you

16    recall the nature of any of these words?

17         INMATE MENCHACA:    Just basically watch

18    where your driving, you this and that.

19         PRESIDING COMMISSIONER GARNER:    And the

20    gestures?

21         INMATE MENCHACA:    Were a bunch of

22    flipping of and calling each other motherfuckers

23    and watch where you're driving and stuff like

24    that.

25         PRESIDING COMMISSIONER GARNER:    And do

26    you have any recollection where the words were

27    being generated from the other vehicle?

24

1    me and Oroteza we thought it was over; I thought

2    it was over. We got down and I'm going to the

3    house and then this car comes, passes us, comes

4    back and a lady gets out of the car and starts

5    telling him about now I know where you live at

6    and I'm going to get my 45 and blow your fucking

7    Mexican heads off and this and that. And she

8    jumped back in the car and she sped away and she

9    left. At that time I jumped in my car and I

10   just followed her. Oroteza jumped in and I

11   jumped in, we got in and we left, drove,

12   followed the car down Garden Avenue, made a

13   right on Southside Drive, made a left into the

14   Kenbrook Apartments. And when the car pulled

15   into the driveway they stopped and I stopped.

16          PRESIDING COMMISSIONER GARNER:  At the

17   time you stopped where was the driver of the

18   vehicle that you followed?

19          INMATE MENCHACA:  They were already

20   stopping.

21          PRESIDING COMMISSIONER GARNER:  Was the

22   driver still in the vehicle?

23          INMATE MENCHACA:  Yes.

24          PRESIDING COMMISSIONER GARNER:  And this

25   is the same vehicle that you had the initial

26   contact with on the Expressway?

27          INMATE MENCHACA:  Yes.

25

1          PRESIDING COMMISSIONER GARNER:   So who

2    was the first one that exited the vehicle, you

3    or the occupants of the other vehicle?

4          INMATE MENCHACA:   The driver of the

5    vehicle, the lady driving the car.

6          PRESIDING COMMISSIONER GARNER:   The same

7    one that had previously --

8          INMATE MENCHACA:   Got out of the car.

9          PRESIDING COMMISSIONER GARNER:      --

10   contacted you about -- made the comments that

11   you said earlier?

12         INMATE MENCHACA:   Yes.

13         PRESIDING COMMISSIONER GARNER:   She was

14   the first one out of the vehicle.  And then what

15   did she do?

16         INMATE MENCHACA:   She walked to the back

17   of the car and that's when Oroteza got out of

18   the passenger side of my car and they started

19   exchanging words.

20         PRESIDING COMMISSIONER GARNER:   With her?

21         INMATE MENCHACA:   Yes.

22         PRESIDING COMMISSIONER GARNER:   At what

23   point in time did you come in contact with

24   Mr. Figueroa?

25         INMATE MENCHACA:   He got out of the car

26   shortly after that and started taking with

27   Oroteza.  And they started arguing.  And the

26

1  next thing they started fighting and that's when

2  I got into it.

3          PRESIDING COMMISSIONER GARNER:  That's

4  when you go involved.  Is that what you said?

5          INMATE MENCHACA:  That's when I got out

6  of the car?

7          PRESIDING COMMISSIONER GARNER:  You got

8  out of the car.  What did you do?

9          INMATE MENCHACA:  I went -- I came around

10  my car where they were at.  He had Oroteza by

11  the throat and I tried to get in between the

12  middle of it.  And as quick as I got in the

13  middle is as quick as I got out, because I got

14  stuck.

15          PRESIDING COMMISSIONER GARNER:  Were you

16  armed with a weapon or anything?

17          INMATE MENCHACA:  Was I?

18          PRESIDING COMMISSIONER GARNER:  Yes.

19          INMATE MENCHACA:  No.

20          PRESIDING COMMISSIONER GARNER:  Who was

21  it that displayed the weapon earlier in the

22  evening from the vehicle?  The one that was

23  described as hunting-type.

24          INMATE MENCHACA:  I don't recall that

25  happening.

26          PRESIDING COMMISSIONER GARNER:  You don't

27  recall that happening.  Do you recall seeing

27

1    anyone that had a knife between the three

2    individuals that were involved in this dispute,

3    yourself, Mr. Oroteza, Mr. Figueroa?

4         INMATE MENCHACA:  When I got out of the

5    car I didn't see Oroteza stabbing Richard.  I

6    got in the middle.  He had Oroteza by the neck

7    pinned up against the car and I just wanted to

8    try to get in the middle and break it up.  And

9    in the process of doing that I got stabbed in

10   the back.  And that's when I just jumped back

11   into my car and he, Hector Oroteza got into the

12   car and we left.

13        PRESIDING COMMISSIONER GARNER:  Where was

14   the last place that you saw Mr. Figueroa?

15        INMATE MENCHACA:  Standing right there at

16   the car.

17        PRESIDING COMMISSIONER GARNER:  When

18   Mr. Oroteza returned to the vehicle did he have

19   a knife with him?

20        INMATE MENCHACA:  No.

21        PRESIDING COMMISSIONER GARNER:  Did you

22   see a knife on the ground?

23        INMATE MENCHACA:  No.

24        PRESIDING COMMISSIONER GARNER:  Did

25   Mr. Oroteza have any blood on him?

26        INMATE MENCHACA:  No, I didn't see any.

27        PRESIDING COMMISSIONER GARNER:  Where

28

1    were you stabbed?

2            INMATE MENCHACA:    Excuse me?

3            PRESIDING COMMISSIONER GARNER:    Where you

4    stabbed?

5            INMATE MENCHACA:    In the lower back.

6            PRESIDING COMMISSIONER GARNER:    Did you

7    put your hand on the wound at all?

8            INMATE MENCHACA:    Did I?

9            PRESIDING COMMISSIONER GARNER:    Yes.

10           INMATE MENCHACA:    Yes.

11           PRESIDING COMMISSIONER GARNER:    And what

12   did you find on your hand?

13           INMATE MENCHACA:    (indiscernible).

14           PRESIDING COMMISSIONER GARNER:    And where

15   did you go after this happened?

16           INMATE MENCHACA:    I drove to my brother's

17   house and I told him that I got stabbed.    And he

18   said that he would take me to the hospital and

19   that's what happened; that's what he did.

20           PRESIDING COMMISSIONER GARNER:    How long

21   was it after this incident occurred that you

22   were arrested?

23           INMATE MENCHACA:    A couple of months.

24           PRESIDING COMMISSIONER GARNER:    A couple

25   of months.    All right, we'll leave it for the

26   time being, but we may need to come back to it

27   later.    Let's talk a little about your prior

29

1   criminal record.  And it looks like you were

2   first brought to the attention of the

3   authorities on June 2, 1976, for a battery.  And

4   you were sent to the Boys Ranch later after

5   committing a burglary.  You escaped from the

6   Boys Ranch and subsequently sent to the Youth

7   Authority.  Which facility was that?

8           INMATE MENCHACA:  Which facility?

9           PRESIDING COMMISSIONER GARNER:  CYA.

10          INMATE MENCHACA:  Yes.

11          PRESIDING COMMISSIONER GARNER:  What

12  facility did you go to?

13          INMATE MENCHACA:  O.H. [phonetic].

14          PRESIDING COMMISSIONER GARNER:  And you

15  paroled from CYA May 7, 1980, but you were

16  remanded back into their custody in October '71

17  for driving under the influence of liquor or

18  drugs and a hit-and-run that resulted in the

19  death or injury.  I believe I recall reading

20  (indiscernible) like that.  Is that correct?

21          INMATE MENCHACA:  Yes.

22          PRESIDING COMMISSIONER GARNER:  And you

23  were discharged from CYA on August 2, 1985.

24  Your first San Jose P.D. arrest as an adult was

25  in, as indicated here, was July 16, '85 and it

26  was for H and S, controlled substance for sale.

27          INMATE MENCHACA:  Yes.

30

1          PRESIDING COMMISSIONER GARNER:  And you

2    got three years probation, a year in jail, and a

3    fine of $750.  And on July 25, 1987, you were

4    arrested by San Jose P.D. for battery on a

5    police officer, possession of PCP for sale,

6    possession of controlled substance, obstruction,

7    and resisting a police office.  In the Court the

8    charges were dismissed; however, the original

9    probation was revoked and you were sent to CDC

10   for a three-year term.  You paroled from CDC in

11   November of '89.  Is that correct?

12          INMATE MENCHACA:  Yes.

13          PRESIDING COMMISSIONER GARNER:  Where did

14   you do this time?

15          INMATE MENCHACA:  Mule Creek.

16          PRESIDING COMMISSIONER GARNER:  Mule

17   Creek.  And then, of course, on June 1, '99, you

18   were arrested by San Jose P.D. for the

19   commitment offense with a prior felony

20   conviction.  As far as your personal factors, --

21          INMATE MENCHACA:  Excuse me?

22          PRESIDING COMMISSIONER GARNER:  Yes.

23          INMATE MENCHACA:  Can I say something

24   about what you just read off?  When I was

25   arrested in '85 and then re-arrested in '87 for

26   possession, those were the same charges.  I just

27   want to make sure that that's understand.  It

31

1  was the same charges.  I revoked my probation; I

2  violated my probation so I had a three-year

3  prison suspension, that's how I come to prison.

4       PRESIDING COMMISSIONER GARNER:  What was

5  the battery on the peace officer?

6       INMATE MENCHACA:  What was it?

7       PRESIDING COMMISSIONER GARNER:  Yes.

8       INMATE MENCHACA:  They pulled me over for

9  DUI; I tried to run.  I got my ass whopped by

10  two cops.  And that's how I got an assault on a

11  peace officer.

12       PRESIDING COMMISSIONER GARNER:  All

13  right.  So far as your personal factors, you are

14  the second of five children born to Alfonso,

15  A-L-F-O-N-S-O, and Guadalupe Cadallero,

16  C-A-D-A-L-L-E-R-O.  Your parents divorced in '68

17  when you were four years old.  And that you

18  indicated that you had a normal childhood.  Your

19  mother developed a common law marriage with

20  Ramon [phonetic] Castro [phonetic], where she

21  has continued to reside for the last 23 years.

22  Any abuse as you were growing up associated with

23  that relationship?

24       INMATE MENCHACA:  No.

25       PRESIDING COMMISSIONER GARNER:  Any

26  alcohol or drugs a factor of your home when you

27  were growing up?

32

1        INMATE MENCHACA:  Only my mother drank

2    occasionally.

3        PRESIDING COMMISSIONER GARNER:  Did your

4    mother work?

5        INMATE MENCHACA:  Yes.

6        PRESIDING COMMISSIONER GARNER:  What did

7    she do?

8        INMATE MENCHACA:  My mother was a cook,

9    two different jobs.  A cook.

10       PRESIDING COMMISSIONER GARNER:  A cook.

11   And did your stepfather work?

12       INMATE MENCHACA:  Yes, he did.

13       PRESIDING COMMISSIONER GARNER:  It was a

14   common law relationship.

15       INMATE MENCHACA:  I remember that before

16   my mother met Ramon Castro that she worked and

17   she was raising us by herself.

18       PRESIDING COMMISSIONER GARNER:  And you

19   started experimenting with drugs and alcohol

20   when you were 15?

21       INMATE MENCHACA:  Yes.

22       PRESIDING COMMISSIONER GARNER:  What

23   drugs?  What kind of drugs?

24       INMATE MENCHACA:  Just beer.  I tried

25   marijuana when I was young.

26       PRESIDING COMMISSIONER GARNER:  And

27   February of '86 you married Olga [phonetic]

33

1   Menchaca?

2           INMATE MENCHACA:   Yes.

3           PRESIDING COMMISSIONER GARNER:   And that

4   ended in divorce.

5           INMATE MENCHACA:   Yes.

6           PRESIDING COMMISSIONER GARNER:   You have

7   two sons:  Gary and Manuel.  And it looks like

8   recently you married Peggy Ortega,

9   O-R-T-E-G-A, February of 2005?

10          INMATE MENCHACA:   Yes.

11          PRESIDING COMMISSIONER GARNER:   And you

12  went through the twelfth grade, but got your

13  high school diploma while at DeWitt Nelson.  Is

14  that CYA?

15          INMATE MENCHACA:   Yes.

16          PRESIDING COMMISSIONER GARNER:   You

17  worked as a laborer and you were a member of the

18  Laborer's Union.  And, again, no abuse for

19  several years prior to the term of incarcerated

20  including marijuana and then you advanced to the

21  use of PCP and cocaine.  When was the last time

22  prior to this offense that you used any drugs?

23          INMATE MENCHACA:   Prior to the offense?

24          PRESIDING COMMISSIONER GARNER:   Yes.

25          INMATE MENCHACA:   Probably a couple of

26  weeks prior to the offense.

27          PRESIDING COMMISSIONER GARNER:   And any

34

```
 1   time when you were growing up were you ever
 2   hospitalized for injuries or illness?
 3           INMATE MENCHACA:  Just as a little kid.
 4   An electricity box -- I had my hand burned.
 5           PRESIDING COMMISSIONER GARNER:  Okay.  As
 6   far as your parole plans, again this is from the
 7   May 2006 report, that you would like to live
 8   with your wife Peggy at the address noted in San
 9   Jose.  And you would seek employment through the
10   Union Local 270, the Laborer's Union.  Also that
11   it speaks to some other locations which you
12   (indiscernible) while institutionalized.  Let me
13   go ahead and read into the record any letters of
14   support or opposition that are in the file.
15           INMATE MENCHACA:  Can I add something
16   real quick?  As far as the parole plans were,
17   the address, I had tried to change it with my
18   counselor, but I guess she did not change it.  I
19   want to parole to my mother's residence.
20           PRESIDING COMMISSIONER GARNER:  Okay.
21   When we get through reading the letters, I'll
22   ask you about where that is and we will get that
23   on the record as quick as we can.  I didn't ask
24   you earlier if there were any changes in your
25   parole plans.  All right, the first letter that
26   was in the packet was October 10, 2004, and it's
27   a letter from a (indiscernible) Cadallero.  "I'm
```

35

1    writing on behalf of my brother." He expresses

2    concern and "I hope to help my brother. He has

3    only had contact through these letters and phone

4    calls over the years." He says that you have

5    changed that you want to be with family. He

6    speaks with your two sons. He speaks of the

7    programs that you have completed and the college

8    courses that you've taken. And that given a

9    chance to prove to the board that you can change

10   your life for the better and rise beyond this

11   task. It speaks to the support of the family.

12   And again that's dated October 10, 2004. The

13   next letter is April 8, 2004, and it's from a

14   Michael Garewal, G-A-R-E-W-A-L, and it's typed

15   and signed. This is an individual that he was

16   once on CDC parole for numerous years but he

17   never had a life sentence. And he hopes that we

18   will consider releasing you to society. So far

19   as his support and friendship he has offered

20   that he would be willing to do there. He says

21   that upon your release he would do his part to

22   introducing you to the beautiful people that

23   "freely teaching me to live as a part of

24   society." A letter from a Lance Corporal

25   Arndres, A-R-N-D-R-E-S, Aguirre, A-G-U-I-R-R-E,

26   and he's a relative, a nephew, and he's known

27   you all your life. Memories are positive. He

36

 1    talks about the mistake that you made.  And he

 2    speaks to some of the spiritual things that you

 3    are doing know and his support would be to

 4    provide you money, clothing and emotional

 5    support.  He would support you with housing, but

 6    he is at Camp Lejeune [phonetic] at the time

 7    this letter was written, and he would be unable

 8    to do that.  Okay, April 26, 2004, letter from

 9    Peggy Ortega typed and signed.  This one speaks

10    to the fact that you have a -- well, first of

11    all the indication that you were going to marry.

12    And we have already put the fact that you were

13    married on the record.  And that you have a home

14    to come to where there are no drugs or alcohol.

15    All that will be around you are those in NA.

16    And the next letter is from Brian Lopez, and

17    Brian is B-R-I-A-N, Lopez is L-O-P-E-Z.  It is

18    dated August 2, 2004, letter of support.  He is

19    a recovering addict and for many years clean.

20    He was asked by your fiancée at the time if he

21    would be your NA sponsor (indiscernible) through

22    the mail.  Being a sponsor is like a second job,

23    it takes time and energy.  But through the

24    fellowship of NA you will have a support group

25    and this individual will introduce you to the

26    community and support you through your re-

27    integration back into society.  Then from

37

1    Francisco Garcia [phonetic], July 21, 2004, and

2    it's done in a memo form letter.  And he has

3    resided at an address in San Jose for 19 years.

4    He has known you and your family for 25 years.

5    He speaks to the time that you've served that

6    you are ready for another opportunity.  That you

7    regret the mistakes that you have made.  You're

8    ready to have a better life so that you can be

9    there for two teenage boys.  "My wife and I are

10   willing to help in any way to support him and

11   start his own better life if released."

12   Guadalupe Cadallero, it's handwritten, July 13,

13   2004, and it's your mother.  And she believes

14   that you deserve another opportunity in life so

15   that you can be with your teenage boys.  She has

16   a house and you can live with her, that she has

17   an extra room and will give you to support to

18   start over your life.  And the last one that I

19   have is the most recent and it's May 4, 2006,

20   and it's typed and it's from a Christina,

21   C-R-I-S-T-I-N-A, Sinclaire, S-I-N-C-L-A-I-R-E,

22   with an address in San Francisco.  "I'm writing

23   to encourage you to release Mr. Menchaca.  He

24   has spent more than two decades in

25   incarceration.  He has remorse for the crime.

26   He has made efforts to right his wrongs.  He has

27   taken a new path.  He has made every effort of

38

1   self-improvement." And she lists the programs

2   that you have achieved. "And allow him to

3   reunite with his family and fulfill his

4   potential as a valuable resource to the

5   community." Do I have all the support letters

6   that you have?

7          INMATE MENCHACA: No. There was some

8   that was in just this year. My counselor was

9   supposed to have put them in. She had me send

10   them all to her this time around.

11          PRESIDING COMMISSIONER GARNER:

12   Mr. Stinger, do you have any others in your

13   packet?

14          ATTORNEY STRINGER: No, I don't,

15   Commissioner, other than his own letter that we

16   presented at the Hearing.

17          PRESIDING COMMISSIONER GARNER: All

18   right. As I continue I'll ask Commissioner

19   Smith to see if they're in your Central File and

20   they just haven't been provided to us. Let me

21   indicate the whole series of 3042 notices were

22   sent and that in response we do have a

23   representative from the Santa Clara County

24   District Attorney Office who will be speaking

25   later in the Hearing. And we also do have a

26   January 10, 2005, letter from Robert L. Davis,

27   the Chief of Police in the San Jose Police

39

1  Department, indicating opposition to parole.

2  Okay, I've been provided with three additional

3  letters.

4        INMATE MENCHACA:  Yeah.

5        DEPUTY COMMISSIONER SMITH:  There are

6  actually a number of letters, but I went through

7  and found those that are the most current.

8        PRESIDING COMMISSIONER GARNER:  All

9  right.  Let me go ahead and just start while you

10  continue to go through the C-File.  The first is

11  April 9, 2006, and this again is from Guadalupe

12  Cadallero, your mother.  And she is again

13  speaking to the time that you've been in prison.

14  She is speaking to the home, the house, the

15  extra room that she has available for you.  And

16  "my son is needed to come back and find a job.

17  He has friends that can help him get a job and

18  with the job search.  I hope that he will come

19  home soon."  March 24, 2006, and it is typed and

20  signed, and this is from Naomi, N-A-O-M-I,

21  Navarro, N-A-V-A-R-R-O, with an address in San

22  Jose.  She is a sister-in-law.  "He was married

23  to my sister Olga, and the father of my nephews

24  Gary and Manual.  I've known him since '83.  He

25  resided with my sister and parents until his

26  incarceration.  I've kept in contact with him

27  despite the mistake that he made with that

40

```
 1   person.  And I know that my parents and I will
 2   assist with finding housing and employment.  He
 3   always worked as a landscaper and paid his
 4   (indiscernible) sister.  He is presently
 5   involved in the (indiscernible) at the
 6   institution."  A letter from Homero,
 7   H-O-M-E-R-O, Fuentes, F-U-E-N-T-E-S, a address
 8   in San Jose, typed and signed, dated April 26th.
 9   "I'm writing this letter on behalf of Gerardo
10   Menchaca.  I've known him for many years and
11   have worked with him.  I have my own landscaping
12   company and am willing to hire him at any time
13   at a salary of $10 per hour."  And there is a
14   telephone number provided.  The next one is
15   April 26, 2006, typed and signed and it's from
16   Francisco Garcia, and it has an address in San
17   Jose, "I'm writing in regards to Gerardo.  I've
18   been a part of his family for over 30 years.  He
19   is a young man.  I'm willing to give him a
20   change.  I'll give him room and board and
21   clothing whatever he needs to get back on his
22   feet."  And he hopes that you is given a chance
23   to (indiscernible) with his family.  The last is
24   on the letterhead from Centerforce,
25   C-E-N-T-E-R-F-O-R-C-E, an organization that is
26   located -- they have offices throughout the
27   Northern California area.  And this is from
```

41

1    Lilly, L-I-L-L-Y, Harvey [phonetic], a No More

2    Tears Coordinator.  "We demonstrate our support

3    for Mr. Menchaca."  She speaks to the programs

4    that you've been involved in, the 80-hour of

5    English-Spanish Helper Information Training.

6    And that you have always been reliable and an

7    important presence in supporting their important

8    program.  Are those the ones that we were

9    missing?

10            INMATE MENCHACA:  There was one from the

11   National Trust.  I don't know if it's in there.

12   I had it put in there.  There should have been

13   some more that should have been here already,

14   but I guess they're not sent in.

15            PRESIDING COMMISSIONER GARNER:  All

16   right, so we now do have the support letters

17   that are in the Board packets and that were

18   provided to me, but also Commissioner Smith has

19   reviewed the Central File and the ones that are

20   here we have read into the record.  And I've

21   also made the notations on the 3042s.  So at

22   this time I'm going to ask you to direct your

23   attention over to Commissioner Smith.

24            DEPUTY COMMISSIONER SMITH:  Mr. Menchaca,

25   according to the C-File you were received by the

26   Department of Corrections on February 18, 1992.

27   You were received here at San Quentin on

42

1    February 6, 2002.  You have a classification

2    score of 19, which is the lowest classification

3    score that a life prisoner can attain.  Your

4    last Hearing, which was your Initial Hearing,

5    was held on August 27, 2001, and you received a

6    three-year denial at that time.  You have had

7    three other Hearings scheduled:  one October of

8    2004, and that was postponed at your request,

9    you wanted to a psychological evaluation; the

10   next Hearing was scheduled for March 2005 and

11   that Hearing was postponed as a result of your

12   attorney being ill and not being present.  It

13   was then reschedule for June 30, 2005, and that

14   was postponed again at your request for a new

15   psychological evaluation.  And that brings up to

16   today's date.  Since you have been incarcerated

17   you have received five CDC 128As, the last one

18   being since your last Hearing, October 2001, and

19   that was for refusing to be interviewed by your

20   correctional counselor regarding Northern

21   affiliated inmates.  Why did you refuse that

22   interview?

23          INMATE MENCHACA:  Well for my safety.

24   Nobody was interviewing and I didn't want to be

25   the only one going out.

26          DEPUTY COMMISSIONER SMITH:  You've also

27   received four CDC 115s.  You have had three

43

1  since your last Hearing.  You had one October of

2  2003 for possession of a hypodermic syringe.

3  And through your Counselor you have provided us

4  with a letter from inmate Mendez, dated June 28,

5  2005, who takes responsibility for the syringe.

6  Is that right?

7           INMATE MENCHACA:  Yes.

8           DEPUTY COMMISSIONER SMITH:  I'm not quite

9  sure --

10          INMATE MENCHACA:  He's my cellmate.

11          DEPUTY COMMISSIONER SMITH:  Okay.  But

12  I'm not quite sure what the point of his letter

13  is.

14          ATTORNEY STRINGER:  He's currently in

15  Court contesting both of the 115s, the 2003 and

16  the 2005.

17          DEPUTY COMMISSIONER SMITH:  Okay.

18          ATTORNEY STRINGER:  And he wants the

19  Board to know that they are being contested and

20  the Court has not ruled yet.

21          DEPUTY COMMISSIONER SMITH:  But CDC found

22  you guilty?

23          INMATE MENCHACA:  Yes.

24          DEPUTY COMMISSIONER SMITH:  Okay.

25          DEPUTY DISTRICT ATTORNEY RICO:  And I'm

26  sorry, Commissioner.  Just so the record is

27  clear, Counsel said that he is contesting the

44

1    two 115s, the '03 and the 2005.  There were two

2    of them in 2005, which one?

3              ATTORNEY STRINGER:  Both of them.

4              DEPUTY COMMISSIONER SMITH:  That's both.

5    So they are contesting all three.

6              DEPUTY DISTRICT ATTORNEY RICO:  Thank

7    you.

8              DEPUTY COMMISSIONER SMITH:  The next 115

9    is dated January 2005 and that was for

10   possession of methanphetamine.  And then the

11   most recent is November 2005, and that was also

12   for possession of methanphetamine.  And again

13   through counsel you have provided me with a lab

14   report from the National Toxicology Lab and

15   that's dated November 2005, indicating a

16   positive test for methanphetamine.  Again, I'm a

17   little confused as to --

18             ATTORNEY STRINGER:  It's just part of the

19   record.  He's challenging the validity of that

20   test.  There was -- his position is that there

21   either was a mix-up in the sample that was taken

22   or it was contaminated in the lab.

23             DEPUTY COMMISSIONER SMITH:  You were

24   found guilty of both of the 115s, January of '05

25   and November of '05 by the Department of

26   Corrections, correct?

27             INMATE MENCHACA:  Yes.

45

1          DEPUTY COMMISSIONER SMITH:  All right,

2   then let me return those.  In addition we have a

3   general chrono from a correctional officer of

4   the Investigative Services Unit.  It's dated

5   March 23, 2006, and it indicates "that on that

6   date a search of a cell done that was occupied

7   by inmate Mitchell and yourself and that during

8   search there was a drawing that was found in

9   inmate's Mitchell's control, and it describes it

10  as a drawing of a woman wearing a Huelga bird,"

11  I many be mispronouncing that, it's H-U-E-L-G-A,

12  "around her neck with a Huelga bird on the flag

13  behind here and the name Menchaca is written

14  across the top.  I know through my training

15  experience that the Huelga bird is a symbol used

16  by members of the Northern Structure Prison

17  Gang."  And the writer concludes that your

18  behavior should be closely monitored for gang

19  activity.  And of course that handwritten

20  drawing is attached to the general chrono.

21          INMATE MENCHACA:  Can I say something

22  about that report?

23          DEPUTY COMMISSIONER SMITH:  Sure.

24          INMATE MENCHACA:  ISU did come to our

25  house, to our cell on the month whatever date

26  that was.  They came in and they took all my

27  cellies property, everything he owned, that's

47

1          INMATE MENCHACA:  Well, I've always been

2    -- when it started I just happened to be one of

3    the ones that was a starter member.  And we have

4    a curriculum with 25 different sessions and

5    every member tries to be a facilitator for that

6    program and we all take turns facilitator

7    different programs, different parts of the

8    program.  And we just completed the curriculum

9    and that's why I was awarded that certificate.

10          DEPUTY COMMISSIONER SMITH:  So the

11    facilitator -- so I understand the facilitator

12    role kind of moves around with all the

13    participants.

14          INMATE MENCHACA:  Yes, the facilitator

15    class, a workshop, once a week, on every

16    Thursday, we hold workshops in (indiscernible)

17    Chapel.  And depending on what the topic might

18    be is going to depend on who facilitates that

19    class at that date.

20          DEPUTY COMMISSIONER SMITH:  So you are

21    either participating or a facilitator depending

22    on the class?

23          INMATE MENCHACA:  Well, as a member I'm a

24    facilitator.

25          DEPUTY COMMISSIONER SMITH:  Okay.

26          INMATE MENCHACA:  I'm not participating,

27    I'm a trained facilitator for that program.

48

1          DEPUTY COMMISSIONER SMITH:  Okay.

2          INMATE MENCHACA:  But I don't facilitate

3  every workshop.  There are 30 of us and we all

4  take turns, you know.

5          DEPUTY COMMISSIONER SMITH:  Okay, I

6  appreciate the explanation.  The Board Report

7  indicates that from May of '97 through December

8  of 2004 that you were an active participant in

9  Alcoholics Anonymous.  Are you still active?

10         INMATE MENCHACA:  I go when I can

11  depending on what I'm doing as far as school and

12  other programs.

13         DEPUTY COMMISSIONER SMITH:  So, it's --

14         INMATE MENCHACA:  I go --

15         DEPUTY COMMISSIONER SMITH:  -- somewhat

16  sporadic?

17         INMATE MENCHACA:  I go --

18         DEPUTY COMMISSIONER SMITH:  In other

19  words, you're not going to every --

20         INMATE MENCHACA:  Meeting.

21         DEPUTY COMMISSIONER SMITH:  -- meeting?

22         INMATE MENCHACA:  No, I'm not.

23         DEPUTY COMMISSIONER SMITH:  Okay.  You

24  participated in the first quarter of the Over-

25  Comers Outreach, which is a 12-Step program, and

26  you did that in February 2005.  In January 2002

27  you received a self-help chrono for your