# EXHIBIT 8
# Part 2 of 2

49

1    involvement in psychiatric studies.  February of

2    2003 you participated in the San Quentin College

3    Program and you received seven laudatory chronos

4    for completion of a number of courses within

5    that program, including:  Spanish, history,

6    English, sociology, psychology, and philosophy.

7    In October 2003 you participated in the Ciro

8    [phonetic] Men's Retreat?

9        INMATE MENCHACA:  Yes.

10       DEPUTY COMMISSIONER SMITH:  And you

11   completed a 16-week impact workshop on

12   addiction, and that was from January through

13   March of 2005.  In October 2004 you completed a

14   12-Step recovery program through the Over-Comers

15   Outreach, and that's a different program than

16   the one that I have already mentioned.  Correct?

17       INMATE MENCHACA:  Right.

18       DEPUTY COMMISSIONER SMITH:  And it

19   indicates that we have discussed that you

20   completed the Trust Workshop, which is teaching

21   responsibility by utilizing sociological

22   training, and that was a 14-day program covering

23   self-esteem, self-image, male-female

24   relationships, work ethics, health care issues,

25   independence, and responsibility.  And that was

26   from March through April 2005.  You participated

27   in the No More Tears Employability Workshop, and

1    involvement in psychiatric studies.    February of

2    2003 you participated in the San Quentin College

3    Program and you received seven laudatory chronos

4    for completion of a number of courses within

5    that program, including:    Spanish, history,

6    English, sociology, psychology, and philosophy.

7    In October 2003 you participated in the Ciro

8    [phonetic] Men's Retreat?

9         INMATE MENCHACA:    Yes.

10        DEPUTY COMMISSIONER SMITH:    And you

11   completed a 16-week impact workshop on

12   addiction, and that was from January through

13   March of 2005.    In October 2004 you completed a

14   12-Step recovery program through the Over-Comers

15   Outreach, and that's a different program than

16   the one that I have already mentioned.    Correct?

17        INMATE MENCHACA:    Right.

18        DEPUTY COMMISSIONER SMITH:    And it

19   indicates that we have discussed that you

20   completed the Trust Workshop, which is teaching

21   responsibility by utilizing sociological

22   training, and that was a 14-day program covering

23   self-esteem, self-image, male-female

24   relationships, work ethics, health care issues,

25   independence, and responsibility.    And that was

26   from March through April 2005.    You participated

27   in the No More Tears Employability Workshop, and

50

1    the Response to Violence Workshop, and that was

2    in April and July 2005.  You completed another

3    16-week impact workshop on relationships, and

4    that was from May through September 2005.  And

5    you completed the Changing Your Mindset Workshop

6    and that was in September 2005.  And in

7    September of 2005, in addition, you also

8    attended the Comprehensive Association Hustling

9    and Crime Workshop, given through Trust Program.

10   And as I indicated, you participated and

11   completed the ten sessions of Anger Management.

12   Any other activities -- this, you know, is a

13   fairly substantial list, but are there any other

14   activities that you've been involved in that I

15   haven't addressed that we should be aware of?

16          **INMATE MENCHACA:**  Well, what I don't have

17   is I have another completion of certificate but

18   I wasn't able to make a copy of it for No More

19   Tears; I'm a member of that organization also

20   and a facilitator.  And that pertains to curbing

21   violence and detrimental behavior.  And that is

22   set up almost like -- I can explain various ways

23   of the Trust workshop, the different

24   facilitator.  I just want to make sure that I

25   complete that; I've completed that cycle, that

26   curriculum, No More Tears, also, and I was

27   awarded a certificate of completion and I just

51

1    wasn't able to run a copy for (indiscernible).

2         **DEPUTY COMMISSIONER SMITH:**  Okay.  And I

3    did address the No More Tears Program, but you

4    now have a certificate of completion?

5         **INMATE MENCHACA:**  Yeah.  And I'm also a

6    member and a facilitator for that.

7         **DEPUTY COMMISSIONER SMITH:**  Okay.

8    Anything else that we should be aware of?

9         **INMATE MENCHACA:**  I think you've covered

10   that.

11        **DEPUTY COMMISSIONER SMITH:**  Okay.  I'm

12   going to refer to the psychological evaluation.

13   It's dated April 2006, prepared by Dr. Inaba,

14   I-N-A-B-A.  And there is an addendum that is

15   dated May 2006.  And she indicates that -- the

16   first sentence on page one, section one, should

17   read as follows, and I'll quote:  "Mr. Menchaca

18   is a 41 year old Latino male who is serving a 16

19   year life sentence for second-degree murder.

20   Mr. Menchaca received a one-year enhancement for

21   Penal Code Section 3058.8, I believe that's the

22   reference, having a prior prison term.  Also,

23   Mr. Menchaca would like to have it stated that

24   he does consider himself to be an alcoholic and

25   that he never has intended to deny the fact that

26   he's an alcoholic."  And that's to an extend

27   somewhat a correction --

52

1           INMATE MENCHACA:  Yes.

2           DEPUTY COMMISSIONER SMITH:   -- with part

3    of the report that I will also so address.   But

4    I wanted to put that in first so that that was

5    clear.

6           ATTORNEY STRINGER:  Commissioner, in the

7    first sentence of that report it indicates that

8    "Mr. Menchaca is a 41 year old Latino male who

9    is serving a 16 year to life sentence for

10   second-degree murder with a weapon."  That's

11   incorrect.

12          DEPUTY DISTRICT ATTORNEY RICO:  But I

13   think that what you read into the record

14   indicating the one-year enhancement was for the

15   prior term resolves that.

16          DEPUTY COMMISSIONER SMITH:  All right, I

17   think we are clear on the commitment offense and

18   the basis and violation.

19          ATTORNEY STRINGER:  There was no weapon.

20          DEPUTY COMMISSIONER SMITH:  Correct.

21          ATTORNEY STRINGER:  There was no weapon

22   charged --

23          DEPUTY COMMISSIONER SMITH:  With

24   the--

25          ATTORNEY STRINGER:  -- to Mr. Menchaca.

26          DEPUTY COMMISSIONER SMITH:  -- the life-

27   crime.

53

1          ATTORNEY STRINGER:  Yes.

2          DEPUTY COMMISSIONER SMITH:  Yes.  I

3     believe that we are on firm ground with that.

4          ATTORNEY STRINGER:  They other thing that

5     I wanted to mention about the psychological

6     report is that I believe that this is the same

7     as Mr. M [phonetic].  The reason I say that is

8     that because there is one line in this report

9     that I clearly recall from a previous report.

10    Now I don't know if that means this report is

11    also tainted or not.

12         PRESIDING COMMISSIONER GARNER:  Let me

13    ask:  Have you reviewed this report?

14         INMATE MENCHACA:  Yes.  I sent it back to

15    her.

16         PRESIDING COMMISSIONER GARNER:  Does the

17    report other than the corrections that have

18    already been read into the record fairly reflect

19    your recollections from the interview with the

20    doctor?

21         INMATE MENCHACA:  Yes.  It only indicates

22    -- what she changed on this -- what you just

23    read out was per my request.  I just wanted to

24    make sure that I was never convicted of

25    murdering anybody with a weapon.

26         PRESIDING COMMISSIONER GARNER:  Let me

27    for the record take Mr. Stinger's comments one

54

1   just second further from the previous Hearing

2   this week.  We had a psychological report

3   wherein the risk assessment, it appears, that

4   the risk assessments have been commingled

5   between two different inmates.  Thereby leading

6   us to be some concern with respect to the

7   accuracy of the assessment, whether it was for

8   the inmate that was being interviewed at the

9   time or someone that we had no (indiscernible)

10  on.  I guess what I'm interested in is if we've

11  had an adequate review where we think that the

12  famous Mr. M as discussed may or may not be you,

13  but I'm more concerned that some other inmate's

14  findings and conclusions are his.

15       ATTORNEY STRINGER:  Well, there is one

16  sentence here "that's given the above factors,

17  Mr. Menchaca's violence risk will never be as

18  low as an average member of the non-incarcerated

19  population."  That is a direct quote from

20  Mr. Buorlens [phonetic] psychological

21  evaluation.  Now whether that's appropriate to

22  Mr. Menchaca, I don't know.  But it raises

23  concerns is as (indiscernible).

24       PRESIDING COMMISSIONER GARNER:  I don't

25  have the same recollection, but (indiscernible).

26       ATTORNEY STRINGER:  I guess what I'm

27  asking is -- I guess it would go to the weight

55

1   of your --

2           PRESIDING COMMISSIONER GARNER:  Well, the

3   concern is that it's a fairly (indiscernible)

4   statement.  With respect to Mr. Menchaca there

5   is some concern with our history of fairly

6   significant flaws that have been identified

7   earlier in the week as to what the remedy

8   (indiscernible).

9           DEPUTY DISTRICT ATTORNEY RICO:  If I

10  might, Commissioner?  If Counsel is referring to

11  that sentence at page five, under Section C.  Is

12  that correct?

13          DEPUTY COMMISSIONER SMITH:  Yes.

14          ATTORNEY STRINGER:  Yes.

15          DEPUTY DISTRICT ATTORNEY RICO:  And it

16  would appear to me that just prior to that

17  statement the author of the report is listing

18  generic factors, which statistically increase or

19  decrease the risk of future violence.  And they

20  seem to be categories that I have seen listed

21  that are generic in nature and it's talking

22  about the fact that apparently Mr. Menchaca's

23  situation fits into those specific categories.

24  So I'm not sure that it's mixing apples and

25  oranges, but it's talking factors that

26  historically or generically have been determined

27  to either increase or decrease risk of violence.

56

1    And then it goes into matters that are more

2    specific to Mr. Menchaca.   That's how I read it.

3         ATTORNEY STRINGER:   Well, there is a

4    previous report now.   It's not -- it doesn't

5    have Mr. Menchaca's name in it, but it's just

6    listed as a Mr. M.   And it has this same

7    sentence.   And it's hard to know what the doctor

8    is referring to.

9         DEPUTY COMMISSIONER SMITH:   Well,

10   Counsel, I would want to mention for the record

11   anyway that as we go through the report and it

12   talks about some of the positive aspects of

13   Mr. Menchaca in terms of his adjustment, that

14   seems to be extremely accurate with the

15   information that was contained in the Board

16   Report and also came from my review of the C-

17   File.   So my feeling is that wherein there maybe

18   some question about whether or not there was a

19   boilerplate sentence used, if the question has

20   to do with whether or not this report seems to

21   accurately reflect Mr. Menchaca as opposed to

22   having been intermingles or commingled with some

23   other inmates, it appears to me that based on

24   that level, anyway, that it's accurate for

25   Mr. Menchaca.

26        ATTORNEY STRINGER:   But that one

27   sentence, "Mr. Menchaca's violence risk will

57

1    never be as low as an average member of the non-
2    incarcerated population."  That's nonsense.
3    Certainly, age, there are many, many factors
4    that I could cite that would belie that
5    particular sentence.  I mean I'll let it pass
6    that Dr. Inaba always says that males, for some
7    reason, are going to run ramped in the street.
8    She concludes that in ever single report that
9    she ever writes.  And I've always believed that
10   her reports are suspect.  But this sentence is
11   so all-inclusive and sweeping that it would mean
12   that Mr. Menchaca would be foreclosed forever
13   for receiving a date for the Board if you were
14   to rely on that particular evaluation.  So I
15   think -- it's of great concern to me as to
16   whether or not this sentence applies to
17   Mr. Menchaca or applies to some other inmate.
18         **DEPUTY COMMISSIONER SMITH**:  Well let me
19   say that you and I have seen enough
20   psychological evaluation over the years that run
21   the full gamut and we could have a lengthy
22   conversation on the credibility and value of
23   psychological evaluation, either positive or
24   negative.  You know, I will certain, during our
25   deliberations, weigh this evaluation in what I
26   will consider to be an appropriate manner, quite
27   candidly as I weigh most psychological

58

1    evaluations.  Which is, I will take the

2    information that is present but it will

3    certainly not be information that will establish

4    a decision solely based on that information.

5        ATTORNEY STRINGER:  I don't want to

6    belabor this, but how do we know that when the

7    doctor makes this statement that she's actually

8    talking about my client, because she has already

9    made that exact same statement.  We can get the

10   C-File and I can show it to you, Mr. Buorlens,

11   with a Mr. Hamlin [phonetic].

12       DEPUTY COMMISSIONER SMITH:  I don't have

13   anyway of making a response as to whether that's

14   a boilerplate statement that would appear in any

15   number of her evaluations where she came up with

16   that finding or not.  As Commissioner Garner

17   asked with regard to remedy, I think we are both

18   interested to hearing any remedy that you might

19   want to suggest.

20       ATTORNEY STRINGER:  I could just see if

21   Mr. Menchaca ever got a date.  And certainly

22   it's in there now and the district attorney can

23   argue it and if it went to the Governor's

24   office, the Governor could hold this up and say:

25   "The psych evaluation says he's never going to

26   be suitable."

27       PRESIDING COMMISSIONER GARNER:  Let me

```
 1   get it on record, because one of the
 2   difficulties is that Commissioner Smith just
 3   joined us today and wasn't present at the
 4   previous Hearings.  I was, when we had the
 5   difficulty with the previous psych, this was not
 6   what I would characterize as a insignificant
 7   kind of error.  This was a very substantial one.
 8   Two inmates were commingled into one report.
 9   And it's in the most critical area that we have
10   and that's our risk assessment.  We rely on the
11   risk assessment significant in making decisions.
12   We have before us now another risk assessment
13   with the same issue as present and we have the
14   same question with respect to reliability.  So
15   I'm adding that only because I was present with
16   Mr. Stringer earlier in week when we had this
17   same dilemma.  So once again I'll ask
18   Mr. Stinger:  Do we have a solution for this?
19        ATTORNEY STRINGER:  Well, I don't know
20   how we can strike the psych report from the
21   record.  I mean certainly we could ask -- I mean
22   it's not in a court where we could do that.
23   It's there and I don't want it to be part of the
24   record.  I question to Dr. Inaba's
25   professionalism in this and we have the right to
26   do that given the last reports.  So --
27        DEPUTY COMMISSIONER SMITH:  You can
```

60

1   certainly address those issues in detail in your

2   closing.

3        ATTORNEY STRINGER:  But it doesn't help

4   my client.

5        DEPUTY COMMISSIONER SMITH:  And ask us

6   to, you know, consider your statements in

7   closing as you would ask us to do --

8        ATTORNEY STRINGER:  Sure, if he comes

9   back in whatever times he comes back, that's

10  going to be there and some other Commissioner is

11  going to take a look at that.  Because I've seen

12  these things happen over the years.  Some other

13  Commissioner is going to take a look at that and

14  there you go, it never gets corrected.

15       PRESIDING COMMISSIONER GARNER:  I guess

16  we could consider the options of -- I agree with

17  you, but this is on the record.  This report is

18  a permanent part of Mr. Menchaca's file.  It's

19  going to be considered by future Panels until

20  such time as a date is offered.  And I also

21  can't speculate as to how other review

22  authorities would do it, but it is certainly

23  going to be here.  So that's why I say that

24  based on our experience earlier in the week

25  where we had a significant error in the most

26  critical assessment that we as Panel members

27  need, I guess the options that are going to my

61

1    head is that there is the option to appeal the

2    psych, if he chooses to do that. I don't know

3    if that's anything that he's considered or if

4    you've had an opportunity to discuss that with

5    him. We want to go off record for a minute and

6    consult with your client for a decision?

7        ATTORNEY STRINGER: I don't know if the

8    Board is entertaining the options on this. I

9    mean it's going to be obviously in the

10   transcript. But it is my concern that this

11   false, because I look at his juvenile record and

12   there are other juvenile records that come

13   before this court and it's not that, for a lack

14   of a better word, outstanding. So I don't know

15   where that conclusion would come from. That's

16   what bothers me.

17       DEPUTY COMMISSIONER SMITH: Perhaps I

18   can, if not do anything more than further muddy

19   the water a little, but if you refer to the

20   prior psychological evaluation that was prepared

21   by a different psychiatrist an Adam Goldyne,

22   G-O-L-D-Y-N-E, on page seven, and I'll give you

23   a chance to find that.

24       ATTORNEY STRINGER: Is that the 9/25/00?

25       DEPUTY COMMISSIONER SMITH: January 21,

26   2004.

27       ATTORNEY STRINGER: I don't seem to have

62

1   my finger on the one from Dr. Goldyne, although

2   I'm intimate with Dr. Goldyne's report.

3       **DEPUTY COMMISSIONER SMITH:**   In that

4   report the doctor uses the same or a similar

5   list, not the same, but a similar list of

6   factors that would either increase or decrease

7   the risk of violence.  And the doctor concludes

8   in that report "that given the above risk

9   factors, Mr. Menchaca's violence risk will never

10  be considered as low as an average member of the

11  non-incarcerated population."  Which is the same

12  wording that Dr. Inaba uses.

13      **ATTORNEY STRINGER:**   Well, that in my

14  opinion makes it worse, because Dr. Inaba uses

15  that as if it's her own conclusion and it's --

16  could we go off the record for a minute?

17      **PRESIDING COMMISSIONER GARNER:**   Yes.

18                  (Off record)

19              (TAPE 1, SIDE A, ENDS)

20              (TAPE 1, SIDE B, BEGINS)

21      **DEPUTY COMMISSIONER SMITH:**   We're back on

22  the record.  Everyone that was previously

23  identified is back in the Hearing room and we

24  have Mr. Rico also back present via video.

25      **PRESIDING COMMISSIONER GARNER:**   All

26  right, for the record, the time is 12:00 Noon.

27  Mr. Stinger, what we are going to do today is

63

1  that we are going to go forward with the

2  Hearing.  We are not going to use nor will we

3  consider the Dr. Inaba's report in any aspect of

4  the decision today.  This will allow

5  Mr. Menchaca, should he chose to 602 the report,

6  he will have the opportunity to do that, and we

7  will also order a new psych exam to be conducted

8  before the next Hearing.  Again, for the record·

9  the reason that we are not considering

10  Dr. Inaba's May 2006 report is because of

11  previous serious discrepancies in a report of

12  another inmate and that there are indications

13  that that may be present today with

14  Mr. Menchaca's report.

15      **DEPUTY COMMISSIONER SMITH:**  And that

16  would be applicable only if Mr. Menchaca's is

17  not granted a date and we are some away from

18  making that decision.

19      **ATTORNEY STRINGER:**  Thank you.

20      **PRESIDING COMMISSIONER GARNER:**  Okay.  So

21  we are back on record.

22      **DEPUTY COMMISSIONER SMITH:**  And we opted

23  because of the issue regarding the psychological

24  evaluation I'm not going to address it for the

25  record.  We are simply going to proceed as

26  though that evaluation is not present.  So it's

27  back to you.

64

1        PRESIDING COMMISSIONER GARNER:    I don't

2   have any additional questions.    Do you have any

3   follow up questions that you would like to ask?

4        DEPUTY COMMISSIONER SMITH:    I've got a

5   couple of questions.    Mr. Menchaca, you

6   indicated that when you were back at the

7   residence with the other individual that the

8   vehicle containing the victim and the others

9   stopped and a female got out and made some

10  disparaging derogatory comments.    Is that right?

11       INMATE MENCHACA:    Yes.

12       DEPUTY COMMISSIONER SMITH:    And then they

13  drove off?

14       INMATE MENCHACA:    Yes.

15       DEPUTY COMMISSIONER SMITH:    And at that

16  point you and one other person --

17       INMATE MENCHACA:    Yes, sir.

18       DEPUTY COMMISSIONER SMITH:    -- got in the

19  vehicle and went after them?

20       INMATE MENCHACA:    I wouldn't say go after

21  them, but I followed them, yes.

22       DEPUTY COMMISSIONER SMITH:    My question

23  is:   why did you do that?

24       INMATE MENCHACA:   Well, when the lady got

25  out of the car she said:   "Now I know where you

26  guys live at and I'm going to get my 45 and come

27  back and blow your Mexican fucking head off."   I

65

1    go, Man.  And she jumped in her car, got in her

2    car and left.  And well, I decided to follow her

3    and find out where she lives at.  Hoping that

4    that would just like, well now I know where you

5    live at and that would be the end of it.

6          **DEPUTY COMMISSIONER SMITH:**  So you didn't

7    see that -- that decision-making, that behavior

8    as escalating a situation and what was likely to

9    be concluded?

10          **INMATE MENCHACA:**  I didn't think what

11   happened was going to happen.  If I did I

12   wouldn't have followed that car.  But my

13   intentions that night were to, under the

14   conditions that were there, was that since she

15   knows where she thought I lived at, because of

16   what she said, because it came out of her mouth,

17   is that well why shouldn't I know where she

18   lives at.  And then I can say the same thing to

19   her.  And that would be the end of that.

20          **DEPUTY COMMISSIONER SMITH:**  You indicated

21   that when you had the confrontation that when

22   the fight occurred between Mr. Figueroa and your

23   crime partner that it lasted just a moment and

24   that you had gotten in between the two of them,

25   suffered an injury and that you both got back in

26   the car.  It was just -- the event just took a

27   moment in the span of time.  Is that right?

66

1       INMATE MENCHACA:  If it took 30 seconds I
2   think it was too much.
3       DEPUTY COMMISSIONER SMITH:  Do you have
4   an explanation for the number of injuries that
5   the victim suffered?
6       INMATE MENCHACA:  Do I have an
7   explanation?
8       DEPUTY COMMISSIONER SMITH:  Uh huh.
9       INMATE MENCHACA:  To how --
10      DEPUTY COMMISSIONER SMITH:  How that many
11  injuries could have occurred in such a short
12  period of time?
13      INMATE MENCHACA:  No.  But my co-
14  defendant has an answer to that.
15      DEPUTY COMMISSIONER SMITH:  And yet you
16  were present right between your co-defendant and
17  the victim, correct?
18      INMATE MENCHACA:  Right.
19      DEPUTY COMMISSIONER SMITH:  You never saw
20  a weapon?
21      INMATE MENCHACA:  No.
22      DEPUTY COMMISSIONER SMITH:  You know the
23  victim was stabbed some 23 times.
24      INMATE MENCHACA:  Uh huh.
25      DEPUTY COMMISSIONER SMITH:  And in the
26  course of that you never saw a weapon?
27      INMATE MENCHACA:  No.

67

1          **DEPUTY COMMISSIONER SMITH:**    The other

2    question that I have is that you indicated that

3    your parole plans had changed and that your

4    plans are to reside with your mother.

5          **INMATE MENCHACA:**    Yes.

6          **DEPUTY COMMISSIONER SMITH:**    Why not

7    reside with your wife?

8          **INMATE MENCHACA:**    My wife is a drug

9    counselor.  She's a house manager to a program

10   that houses women with children.  Being a house

11   manager of that house she has to live there.

12   Now the last address that you have was for my

13   last parole  -- when I was going to Board for my

14   parole last time she would have gotten an

15   apartment.  She left that manager job to get an

16   apartment to have somewhere for me to parole to.

17   But this time I'm not going to put her through

18   this because of the nature of the situation, the

19   115s and everything.  I told her not to go out

20   and get another apartment or anything.  So I'll

21   just use my mother's address for now.  And my

22   mother is willing to take me in.

23         **DEPUTY COMMISSIONER SMITH:**    All right,

24   thank you.  No other questions.

25         **PRESIDING COMMISSIONER GARNER:**    Mr. Rico?

26         **INTERPRETER ALENID:**    Yes, Commissioner.

27   And I will address the questions to the Chair.

68

1    First of all, I know that there has been a

2    reference to Mr. Menchaca's prior driving under

3    the influence hit-and-run with a death.  Could

4    Mr. Menchaca indicate for the record the

5    circumstances involved in that?  How did that

6    incident occur?

7         DEPUTY COMMISSIONER SMITH:  Do you

8    understand the question?

9         INMATE MENCHACA:  Yes.

10        DEPUTY COMMISSIONER SMITH:  Go ahead and

11   answer, sir.

12        PRESIDING COMMISSIONER GARNER:  Address

13   your answers to us.

14        DEPUTY COMMISSIONER SMITH:  Yes, to us.

15        INMATE MENCHACA:  This was in 1981.  I

16   took my mother's car and went to a friend's, to

17   a party.  It was a Sunday night, I remember

18   clearly because I had to go to the dentist

19   Monday morning.  And I took about four or five

20   of my friends with me, they were all my age, and

21   on the way back down from the party I lost

22   control of the car, wrecked it, flipped it, and

23   one of the person's in the car died.

24        DEPUTY DISTRICT ATTORNEY RICO:  And the

25   hit-and-run, did Mr. Menchaca flee the scene

26   leaving the victim inside the car?

27        INMATE MENCHACA:  I walked away from the

69

1   scene.  I feel and they woke me up.

2         **DEPUTY DISTRICT ATTORNEY RICO:**  And how

3   intoxicated does Mr. Menchaca think that he was

4   in that situation?

5         **INMATE MENCHACA:**  I wasn't, I had to go

6   to the dentist the next day.

7         **DEPUTY DISTRICT ATTORNEY RICO:**  So moving

8   ahead in time to the time of the life-crime, I

9   was looking back through the probation report

10  and it would appear that Mr. Menchaca had

11  indicated at one point that he was under the

12  influence before he ever left home that evening.

13  Is that correct?

14        **INMATE MENCHACA:**  I was drinking at home.

15        **DEPUTY DISTRICT ATTORNEY RICO:**  And

16  nevertheless, Mr. Menchaca chose to drive to

17  another location to drink.  Is that correct?

18        **INMATE MENCHACA:**  Yes.

19        **DEPUTY DISTRICT ATTORNEY RICO:**  Did

20  Mr. Menchaca learn anything from the prior

21  incident where he had been driving under the

22  influence and killed someone?

23        **INMATE MENCHACA:**  At that time, no.

24        **DEPUTY DISTRICT ATTORNEY RICO:**  So in

25  terms of the life-crime, Mr. Menchaca was

26  present during the trial and testimony by

27  witnesses.  Isn't that true?

70

1        INMATE MENCHACA:  Yes.

2        DEPUTY DISTRICT ATTORNEY RICO:   And does

3   Mr. Menchaca have any recollection of being in

4   his vehicle that night when the passenger pulled

5   along side the other car and formed a gun with

6   his forefinger and thumb curling up his other

7   fingers?  Does Mr. Menchaca remember that?

8        INMATE MENCHACA:  I don't remember that

9   happening.

10       DEPUTY DISTRICT ATTORNEY RICO:   Does he

11  remember to hear testimony to that effect?

12       INMATE MENCHACA:  Yes.

13       DEPUTY DISTRICT ATTORNEY RICO:   And does

14  Mr. Menchaca have any recollection of anyone in

15  the car, the passenger or himself, displaying

16  some type of a knife to the occupants of the

17  other vehicle?

18       INMATE MENCHACA:  No.

19       DEPUTY DISTRICT ATTORNEY RICO:   Does

20  Mr. Menchaca remember there being testimony to

21  that effect during the trial?

22       INMATE MENCHACA:  Yes.

23       DEPUTY DISTRICT ATTORNEY RICO:   And

24  Mr. Menchaca denies pursuing the vehicle at

25  first.  Is that accurate?

26       INMATE MENCHACA:  From where it started?

27       DEPUTY DISTRICT ATTORNEY RICO:   I'll

71

1   withdraw that and ask it a different way.   I

2   though I heard Mr. Menchaca earlier when asked

3   by the Commissioner, when there was the initial

4   meeting of the two vehicles -- let me ask it

5   this way:   I heard Mr. Menchaca earlier deny or

6   at least say that he didn't remember recognizing

7   or thinking that he recognized someone in the

8   other car as someone that he had had a problem

9   with.   Is that accurate?

10          INMATE MENCHACA:   Yes.

11          DEPUTY DISTRICT ATTORNEY RICO:   But in

12   the probation report it would appear that

13   Mr. Menchaca told his wife at some point after

14   the offense that he had thought that someone in

15   the other car was someone that he had had

16   problems with.   Does Mr. Menchaca remember

17   telling his wife that?

18          ATTORNEY STRINGER:   Can we get a

19   reference on the probation report?

20          DEPUTY DISTRICT ATTORNEY RICO:   Page

21   four, the first large paragraph on that page.

22   Where it says that Menchaca told his wife that

23   he had initially thought that the guy was

24   someone else that he didn't get along with and

25   that words and gestures were exchanged.   Does he

26   recall telling his wife that?

27          INMATE MENCHACA:   I don't remember.

72

1          DEPUTY DISTRICT ATTORNEY RICO:   Okay, all

2     right.   And Mr. Menchaca has indicated that the

3     circumstances of the other car stopping and the

4     lady getting out and he has given his version of

5     what she said.   Isn't it true that the other car

6     had stopped one time prior to that during the

7     back and forth between the vehicles?

8          INMATE MENCHACA:   At the initial

9     incident.

10         DEPUTY DISTRICT ATTORNEY RICO:   All

11    right.   I guess what I'm talking about is:   Does

12    Mr. Menchaca remember during the trial there

13    being testimony that Ms. Douglas had turned

14    right off Southside onto a dead end street and

15    made a u-turn and came back and on the way back

16    she heard two loud thumps striking the rear of

17    the driver's side, so she pulled over to find

18    out what had happened.   Does he recall that

19    testimony?

20         INMATE MENCHACA:   Yes, I do.

21         DEPUTY DISTRICT ATTORNEY RICO:   And did -

22    - had Mr. Menchaca and Mr. Oroteza followed the

23    car and then when it did that action throw

24    something at the other vehicle to stop it and to

25    get the occupants out of the vehicle?

26         INMATE MENCHACA:   No, nothing was thrown

27    at that vehicle with intention to stop them.

73

1          PRESIDING COMMISSIONER GARNER:    Was

2    anything thrown at the vehicle?

3          INMATE MENCHACA:    Yes.

4          PRESIDING COMMISSIONER GARNER:    What was

5    thrown?

6          DEPUTY DISTRICT ATTORNEY RICO:    Can

7    Mr. Menchaca tell us about that, because I don't

8    recall hearing that during the Hearing?

9          INMATE MENCHACA:    When we drove to my

10   friend's Dan [phonetic] Novineta's [phonetic]

11   house, we got out of the car and we were going

12   up to his house, that's when the other car went

13   up and I guess hit the dead end and turned back

14   around and stopped in front of, on the side of

15   my car.    That's when we picked up a rock or some

16   piece of brick or something and threw it at the

17   car.

18          DEPUTY DISTRICT ATTORNEY RICO:    And could

19   Mr. Menchaca explain why he thought it necessary

20   to pick up a rock or a brick or something and

21   throw it at the other car, if he wasn't trying

22   to provoke a situation?

23          INMATE MENCHACA:    No, I can't.

24          DEPUTY DISTRICT ATTORNEY RICO:    Okay.

25   And would this have been prior to his alleged

26   version that the woman got out and -- let me

27   rephrase it.    After that incident, after

74

1  Mr. Menchaca threw the item at the car, did the

2  occupants of the other car get out?

3          INMATE MENCHACA:  I don't remember if it

4  was before or after but it was at the same time.

5          DEPUTY DISTRICT ATTORNEY RICO:  But did

6  the occupants get out and was there a

7  confrontation at that point?

8          INMATE MENCHACA:  No, just when the lady

9  got out there and said what she said.

10          DEPUTY DISTRICT ATTORNEY RICO:  All

11  right.  I guess I'm confused and if you will

12  bear with me.  I've hear Mr. Menchaca say that

13  he drove home after the confrontation and the

14  lady pulled up and got out of the car and made

15  the threatening words about going to get her 45.

16  But that seems to be that he is saying that she

17  followed him and there was that confrontation.

18  Where does this incident come in that the car

19  had turned around and he throws the rock at her?

20  Was it before or after that?

21          ATTORNEY STRINGER:  Can I state the

22  obvious for the record, and that is that my

23  client sits here convicted.  We have stipulated

24  to the facts.

25          DEPUTY DISTRICT ATTORNEY RICO:   I

26  understand.

27          ATTORNEY STRINGER:  We are not going to

75

1    retry it before the Board.

2            DEPUTY DISTRICT ATTORNEY RICO:  And I'm

3    not trying to retry it, but I'm inquiring about

4    insight and coming to terms with what it is that

5    he did.  That's the only question that I have

6    here.

7            ATTORNEY STRINGER:  Well, I guess my

8    concern is here that we have the objects being

9    thrown at the vehicle.  And he indicated that he

10   threw a rock at the victim.

11           INMATE MENCHACA:  Yes.

12           ATTORNEY STRINGER:  And let's just move

13   on.  And did that occur before or after the lady

14   got out and made the comments that you said?

15           INMATE MENCHACA:  I don't recall if it

16   was before or after.

17           DEPUTY DISTRICT ATTORNEY RICO:  All

18   right.  And I guess with the original

19   confrontation between the two vehicles I think

20   that Mr. Menchaca has conceded that he may have

21   done something by cutting off a vehicle that

22   caused the other occupants to be upset.  Is that

23   accurate?

24           INMATE MENCHACA:  I tried going to make -

25   - I tried going to the u-turn lane and I believe

26   it's at that time when I cut that car off by

27   accident.

76

1       **DEPUTY DISTRICT ATTORNEY RICO:**  So does

2  Mr. Menchaca concede that because he was driving

3  the car apparently under the influence of

4  alcohol that maybe he was in the wrong in that

5  regard?

6       **INMATE MENCHACA:**  As far as cutting that

7  car off?

8       **DEPUTY DISTRICT ATTORNEY RICO:**  Yes.

9       **PRESIDING COMMISSIONER GARNER:**  While

10  driving under the influence.

11       **INMATE MENCHACA:**  Yes.

12       **DEPUTY DISTRICT ATTORNEY RICO:**  So after,

13  under Mr. Menchaca's version, when he got home

14  or when he got to the other house and he stopped

15  his car and then he says the second vehicle

16  pulled up and the woman got out and made those

17  comments he alleges that she made, whey didn't

18  he just take down a license number and call the

19  police?

20       **INMATE MENCHACA:**  I have no idea --

21       **DEPUTY DISTRICT ATTORNEY RICO:**  Why did

22  he think --

23       **INMATE MENCHACA:**  -- why I did.

24       **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.

25  And in terms of that prior assault on the police

26  officer, I heard Mr. Menchaca explain those

27  circumstances and I heard him say that there was

77

1  a driving under the influence and he tried to

2  flee and two officers, I think in his words, he

3  got his ass whopped, I think he said something

4  to that effect, and he wound up with a charge.

5  Did Mr. Menchaca, does he concede he did

6  anything to assault the officers?

7          INMATE MENCHACA:   No.

8          DEPUTY DISTRICT ATTORNEY RICO:   Does

9  Mr. Menchaca think he did anything wrong that

10  night or that he's just a victim?

11          INMATE MENCHACA:   I understand that I was

12  driving under the influence, and I understand

13  that's wrong.

14          DEPUTY DISTRICT ATTORNEY RICO:   All

15  right.  And was that the same driving under the

16  influence where the young man died?

17          INMATE MENCHACA:   No.

18          DEPUTY DISTRICT ATTORNEY RICO:   Does

19  Mr. Menchaca think that he is still a risk if he

20  were to be released because of his problem with

21  alcohol and vehicles?

22          INMATE MENCHACA:   Only if I was to drink

23  and drive.

24          DEPUTY DISTRICT ATTORNEY RICO:   What was

25  Mr. Menchaca plan, if he is to be released, in

26  terms of getting around to wherever he's

27  working?

78

1          INMATE MENCHACA:  Well for that plan is

2    to go get a driver's license, get a job, and my

3    brother has a car for me if I want it for

4    transportation to work and back or meeting or

5    wherever I have to go.

6          DEPUTY DISTRICT ATTORNEY RICO:  And

7    Mr. Menchaca, as he sits there today, denies

8    these current most recent 115s, which involve

9    unlawful substances in prison.  Is that correct?

10         INMATE MENCHACA:  Yes.

11         DEPUTY DISTRICT ATTORNEY RICO:  And the

12   last question is:  How Mr. Menchaca feel that he

13   is different sitting there today than he was at

14   the time of this life-crime?

15         INMATE MENCHACA:  Well for sure I'm 15

16   years older than I was then when the incident

17   happened.  And a lot of changed in my life ever

18   since.  When this things happened not only did

19   one family, the victim's family get hurt but so

20   did mine.  I have children of my own, I have

21   children that are suffering out there, hurting,

22   going through struggles and I feel bad that I

23   can't be there for them.  And that's why I do

24   the things that I do today to try to have an

25   impact on somebody because if I can't have an

26   impact on my own children I want to try to help

27   somebody else.  But I want to be out there to

79

1    help my kids the most.  They are really

2    struggling with some of the problems that

3    they're going through today in life.

4         DEPUTY DISTRICT ATTORNEY RICO:   I would

5    have nothing further.

6         PRESIDING COMMISSIONER GARNER:   Thank

7    you, Mr. Rico.  Mr. Stinger?

8         ATTORNEY STRINGER:   Thank you,

9    Commissioner.  Mr. Menchaca, if the Board was to

10   grant you a date and impose a number of

11   conditions upon that date, including mandatory

12   attendance at AA, mandatory drug testing,

13   perhaps a residence in a halfway house, would

14   you comply with each and everyone of those

15   rules?

16        INMATE MENCHACA:   Yes.

17        ATTORNEY STRINGER:   And would you

18   consider obtaining -- obtaining sponsor once you

19   were released?

20        INMATE MENCHACA:   Yes.

21        ATTORNEY STRINGER:   And you plan to get a

22   list of the local AA meetings and attend those?

23        INMATE MENCHACA:   Yes, I have them.

24        ATTORNEY STRINGER:   I noticed from the

25   most current Board Report that you do have

26   marketable skills in roofing, landscaping, and

27   vocational print shop.  Is that right?

80

1          INMATE MENCHACA:  Yes, I do.

2          ATTORNEY STRINGER:  Are those skills up

3    to date to the point that you could get a job in

4    any one of those fields upon your release?

5          INMATE MENCHACA:  I have a job waiting

6    for me right now in landscaping.

7          ATTORNEY STRINGER:  And what is Local

8    271?

9          INMATE MENCHACA:  A local union; a

10   laborers' union.

11         ATTORNEY STRINGER:  And could you join or

12   re-join that union upon your release?

13         INMATE MENCHACA:  Yes.

14         ATTORNEY STRINGER:  And you are how old

15   now?

16         INMATE MENCHACA:  Forty-one.

17         ATTORNEY STRINGER:  And how old were you

18   when you came in to the institutions?

19         INMATE MENCHACA:  Twenty-six.

20         ATTORNEY STRINGER:  Do you know why the

21   First Step of AA is that you are powerless over

22   alcohol and cannot manage (indiscernible) in

23   your life?  Do you believe that?

24         INMATE MENCHACA:  Yes.

25         ATTORNEY STRINGER:  Do you know that you

26   can never drink again?

27         INMATE MENCHACA:  I do now.

1       ATTORNEY STRINGER:  If the Board was to
2   require, if you were given a date, and the
3   Parole Board was to require that you take a new
4   form of medication that prevents you from
5   abiding alcohol, would you consent to that?
6       INMATE MENCHACA:  Sure.
7       ATTORNEY STRINGER:  So you would do
8   anything the Board asked to monitor the
9   possibility that you might drink again?
10      INMATE MENCHACA:  Yes.
11      ATTORNEY STRINGER:  Okay.  And what if
12  the Board mandated that you couldn't drive for
13  the five years that you were on parole.  Would
14  you comply with that?
15      INMATE MENCHACA:  I wouldn't have any
16  problems with that at all.
17      ATTORNEY STRINGER:  Thank you.
18      PRESIDING COMMISSIONER GARNER:  Okay,
19  Mr. Rico, are you ready to close?
20      DEPUTY DISTRICT ATTORNEY RICO:  Yes, I
21  am, Commissioner.  Well, there has been -- it's
22  clear what the life-crime involved.  We have a
23  situation where according to all of the facts in
24  the record that on March 2, 1991, Mr. Menchaca
25  and his co-defendant Mr. Oroteza go out for an
26  evening of entertainment.  Now Mr. Menchaca has
27  indicated, and I think it's important to

82

```
 1    consider this, Mr. Menchaca has been using
 2    illegal substances from a young age, drugs as
 3    well as alcohol.  On the night -- prior to the
 4    night in question, going back to other times
 5    when he has gone out, there was the situation
 6    where was driving the car under the influence
 7    and there was an accident and a 16-year old
 8    passenger died as a result, and then
 9    Mr. Menchaca fled the scene.  That doesn't seem
10    to have left much of a lasting impression for
11    Mr. Menchaca, because there was at least one
12    other episode where he was driving under the
13    influence.  And that seems to be the situation
14    where he not only with that charge and hit-and-
15    run or fleeing the police, but an assault on
16    police officers.  And I heard Mr. Menchaca
17    describe the circumstances of the driving under
18    the influence with a death, and the way that I
19    heard it, it sounded almost like an unfortunate
20    accident as driving the car, lost control and
21    somebody died and he walked away.  But somebody
22    is dead there.  And then as far as the situation
23    with the police officers, he is driving under
24    the influence and tries to flee and as he put
25    it, he gets his ass kicked or whopped and he
26    didn't do anything to the police officers.  And
27    he recognizes, "yeah, he was wrong, because he
```

83

1    shouldn't have been driving under the
2    influence." But he sounded when he originally
3    indicated that he was a victim of sorts in that
4    crime. And it would appear to be the absolute
5    opposite that he hasn't come to terms with it.
6    Then we have the night of the life-crime, where
7    Mr. Menchaca has indicated that he was drinking
8    and he had been drinking at the house before he
9    even left. Nevertheless, he goes out and he
10   gets behind the wheel of a car again and drives
11   off with friends and they go out, they bowling
12   and drinking some more until closing time. Then
13   they leave and apparently along the way back,
14   with Mr. Menchaca no doubt quite intoxicated yet
15   driving a vehicle on the public highways and
16   streets. Along the way they encounter an
17   innocent victim who is in the wrong place at the
18   wrong time who just happens to be out on the
19   same streets that Mr. Menchaca is choosing to
20   drive on. And it would appear that in the past
21   that Mr. Menchaca has indicated that he thought
22   someone, he recognized someone in the car as an
23   enemy or someone that he had had problems with.
24   He seems to either deny that or say I don't
25   remember saying that, but he does concede that
26   maybe he did something, you know, that he
27   shouldn't have by cutting somebody off

84

1    unintentionally.  Again, he makes it sound like
2    an unfortunate incident, that he's just out
3    driving and unfortunately cut someone off.  He's
4    driving drunk.  And apparently quite drunk and
5    does this and I --- if his version is accurate
6    at the time, there are words and gestures that
7    are exchanged.  And I'm not saying that road-
8    rage is ever a good thing or for people to
9    respond to appropriately, but if an individual
10   is driving down the street and somebody was
11   drunk and cuts them off, it's easy to see why
12   somebody would be upset at the drunk driving.
13   So in any event there was a confrontation that
14   occurred.  Now, that's where the facts differ,
15   because all of the facts in the packet seem to
16   indicate that Mr. Menchaca then pursued the
17   vehicle; he's denying that.  He is indicating
18   that somehow he just drove away from the
19   situation and that it was the other car, the
20   woman that comes driving up, jumps out and
21   apparently threatens to go get a 45 and blow his
22   head off, which doesn't fit any of the facts
23   that appear to be in the file.  And, again,
24   seems to be Mr. Menchaca turning himself into a
25   victim.  But then he says that he chose to
26   follow her at that point, which again flies in
27   the face of common sense and reason.  Even if

```
 1   his version were accurate, that someone he
 2   doesn't know comes up and says I'm going to go
 3   my 45 and blow your head off, why would anyone
 4   get in the car and say, "Oh, I'm going to follow
 5   this person." And the other thing that doesn't
 6   make sense is his final admission here that
 7   there was at some point him and his co-defendant
 8   stopping and chucking a brick or a rock at the
 9   car of the occupants. Which seems to be clear
10   that there was a confrontation trying to be
11   provoked or that you were trying to stop the
12   vehicle so that they could get the people out of
13   the car and there could be a physical
14   confrontation. In any event the packet
15   indicates that when the victim's car got home
16   that Mr. Menchaca drove up and blocked it from
17   being able to retreat, and that's when the
18   confrontation took place. The facts suggest
19   that the victim, that the victim in this case
20   got out of the car without a weapon. Richard
21   Figueroa got out of the car without a weapon and
22   the facts indicate that he proceeded to the rear
23   of his vehicle with his hands up indicating,
24   "hey, what's the problem here," trying to be the
25   peacemaker. And that's when he was set upon.
26   And it would appear that he was set upon by two
27   people, Mr. Oroteza and Mr. Menchaca. I
```

86

1    recognize that Mr. Menchaca is maintaining that

2    he did not do any of the stabbing.  He is even

3    maintaining that he didn't see a knife, which

4    flies in the face of reason.  But I think it's

5    important and I would ask that the Panel during

6    deliberations review the materials in the file.

7    Dr. Osoa [phonetic] testified at the trial that

8    in addition to there being 23 wounds, 23 wounds

9    on the victim, Dr. Osoa, who performed the

10   autopsy, testified that the wounds had two

11   different patterns, and that this difference in

12   patterns was consistent with the possibility

13   that there were two assailants using similar

14   weapons.  Now, Mr. Menchaca again portrays

15   himself of some type of a victim in this case

16   saying that he was trying to step in and somehow

17   break-it up and he was stabbed.  I submit that

18   the evidence shows that he was stabbed during

19   the flurry of blows that were being

20   administered, and that he was an active and

21   willing participant on the assault on the

22   vulnerable victim, who was killed in this case.

23   I think that this is a vicious, senseless murder

24   of an innocent vulnerable victim by Mr. Menchaca

25   and his co-defendant and that Mr. Menchaca is in

26   serious denial about this.  If the Panel is not

27   going to refer to the current psych evaluation,

87

1    I understand that, I would ask that they look at

2    the previous psych evaluations, the '04 psych

3    eval, pages two, three and six. I submit that

4    Mr. Menchaca clearly hasn't come to terms with

5    what it is that he did and that he is still --

6    and there is a difference between him today, and

7    that is that he is appropriately 15-years older.

8    He has been found guilty of three 115s, serious

9    115s, serious drug related 115s since 2003, one

10   after the last postponement. I recognize that

11   his Counsel has submitted today a declaration or

12   affidavit from somebody who says:  "Gee, it was

13   my needle." And I understand that Mr. Menchaca

14   is contesting the other 115s, again portraying

15   himself somehow as a victim of either a lab that

16   has tainted the material that was found or mixed

17   up its records somehow. And either he is one of

18   the unluckiest people that walks this planet,

19   with everything going wrong for him, none of

20   which is his fault, or he is clearly not coming

21   to terms with his culpability, responsibility

22   and presents just as much of a significant risk

23   if he is to be released. There are a lot of

24   stressors waiting on the outside. And if he

25   goes back, I submit that the evidence shows that

26   he is not strong enough at this point to avoid

27   the drugs, to avoid the alcohol, either for a

88

1    vehicular risk or a risk of bad judgment,

2    exercising violence on citizens who have not yet

3    had the opportunity to encounter him on the

4    outside.  And I ask that he be denied at this

5    time.  I ask that it be a significant multi-year

6    denial, by talking into account all of the

7    factors including the life-crime as well as the

8    recent disciplinary history.  Thank you.

9            **DEPUTY COMMISSIONER SMITH:**  Thank you.

10           **COMMISSIONER GARNER:**  Thank you.

11   Mr. Stinger?

12           **ATTORNEY STRINGER:**  Thank you,

13   Commissioner.  I want to point out in the

14   Information Summary, dated July 29, 1991, from

15   the Santa Clara Court, initiated by David

16   N. [phonetic] Davies [phonetic], the Deputy

17   District Attorney, that my client is charged

18   with one count of Penal Code Section 187, with

19   special allegations of Prop [phonetic] 115.

20   However, Hector Oroteza, his co-defendant, was

21   charged with not only one count of Penal Code

22   Section 187, but also 12022 and 1203, which are

23   the weapons charges, which are the special

24   allegations.  Mr. Menchaca was never charged by

25   the District Attorney's Office with a weapons

26   offense.  I also want to quote from the

27   probation officer's report at page three, which

89

1    indicates, quote: "Mr. Menchaca's sister-in-law

2    overhead Oroteza state, quote: 'I think I hurt

3    you, referring to Menchaca's stab wounds.  He

4    also stated: I think I killed him, referring to

5    someone else.'"  As the Board knows the factors

6    of the life-crime will never change and the

7    courts have ruled that over time varying

8    versions can occur as to the life-crime and

9    that's not to be held against a candidate for

10   parole.  The standard that the Board must use

11   when evaluating anyone that comes before the

12   Board is:  does that person present an

13   unreasonable risk of danger to society and a

14   threat to public safety as he sits before you

15   now, not as he was 15 years prior.  Now

16   certainly it is my client's position that the

17   language of Penal Code Section 3041 poses an

18   affirmative obligation to grant parole on the

19   State and that my client does have a legally and

20   recognizable liberty interest in a parole date

21   and a presumption that release will be granted.

22   So what factors would the Board consider?  Well

23   some of those factors are uniform in principle,

24   in that the Board must set a date pursuant to

25   the principle of uniform terms that defines that

26   crimes of similar gravity and due with regard to

27   the statutory minimum term for the inmate's

90

```
 1   offense.  I would submit to you that this
 2   second-degree murder is not any greater or any
 3   less than any other second-degree murder that
 4   comes before the Board, and that there is
 5   significant evidence in the file that would
 6   demonstrate that Mr. Menchaca was not the
 7   principle perpetrator of this crime, and that it
 8   was clearly his crime partner, who in fact was
 9   charged as such.  While Mr. Menchaca has been
10   incarcerated within the various institutions he
11   has taken of the many and varying programs that
12   are available and, of course, some programs are
13   available at some institutions and some are not.
14   But generally he has participated in Alcoholics
15   Anonymous, he has participated in Over-Comers
16   Outreach, and he has participated in Impact, as
17   well as many other programs.  He has been an
18   outstanding worker in the institutions, as
19   evidenced by a letter dated April 27, 2004,
20   authored by Anita Brown, who is an Industrial
21   Supervisor.  Ms. Brown states: "Although I only
22   recently transferred to the Mattress
23   Refurbishing Department, I have been impressed
24   with Mr. Menchaca's productive work performance.
25   He's (indiscernible) machine operator.  He has
26   demonstrated his diligent and dependable work
27   habits on many occasions.  Working on that
```

91

 1   particular machine is can sometimes be

 2   overwhelming, yet he discharges his duties in a

 3   meticulous manner while still be attentive to

 4   detail.   These qualities are especially valuable

 5   during partial lockdowns when there is a

 6   shortage of workers causing everyone that's

 7   present to take on additional duties in order

 8   for the shop to meet the production schedule.

 9   Another admirable quality that Mr. Menchaca

10   displays is his ability to keep his co-workers

11   feeling energetic and motivated.   I believe this

12   partly because he doesn't take work related

13   issues as personal, although (indiscernible)

14   professional and respectful attitude toward all

15   staff is consist."   Mr. Menchaca has testified

16   before this Board that he would comply with each

17   and every condition that the Parole Authority

18   would impose on him if he was granted a date.

19   His parole period would be for appropriately

20   five years.   The State of California would have

21   complete control over him during that five-year

22   period.   They could require that he be tested

23   daily for substance abuse, that he enter a

24   halfway program, that he attend AA on a daily

25   basis.   Any of these violations would cause an

26   immediate return to the prison system.   So for

27   those five years the Board would know where

92

1   Mr. Menchaca was, what Mr. Menchaca was doing,

2   and whether or not Mr. Menchaca was sober.

3   These safeguards are all set up within the

4   parole system. He certainly has marketable

5   skills. He could rejoin Local 270 as a

6   construction worker. He does have skills in

7   working in landscaping and a vocational print

8   shop, but principally landscaping, which I

9   believe he performed before he came into the

10  institutions. He has outstanding family

11  support, people that want him back, people that

12  love him, people that want him again to be out

13  in society and a part of their lives. He also

14  has good employment offers. Certainly all of

15  this can be checked out by the Parole

16  Department. They can send investigators over to

17  check out his residence. They can send

18  investigators over to check out his employers.

19  I think recently in the United States District

20  Court, the Central District of California of

21  Western Division System, authored by Senior

22  United States District Judge Terry Haddock,

23  Junior, in the *Confluer E. Warden Case*, the

24  Judge opined that a continued reliance on

25  commitment offense undermines the use of prison

26  as a rehabilitative tool. Now, I will grant you

27  that Mr. Menchaca comes before this Board with a

93

1    115 in 2003 and two 115s in 2005. Those are

2    under appeal in the Federal Courts. I would

3    profess for the record that if those appeals

4    turn out in favor of my client that whatever the

5    Board does be contingent upon that and that he

6    possible be brought back sooner for another

7    Subsequent Hearing, if in fact those are

8    resolved in his favor. I would also remind the

9    Board that while it is certainly is fair for the

10   district attorney to quote the doctor at trial,

11   that that doctor's report is nothing more than

12   his opinion and we don't know here in this

13   setting if it was countered by a defense experts

14   or other testimony. But I am sure that the

15   District Attorney's Office, being very competent

16   in that particular county, if they had any

17   inkling at all that Mr. Menchaca was somewhat

18   involved in the actual death of this gentlemen

19   that he would have been charged with a weapons

20   enhancement, and they chose not to do so. And

21   as I said, the uncontroverter testimony of his

22   sister-in-law in the probation report is that

23   Mr. Oroteza indicates: "I think I killed him."

24   Therefore, Mr. Menchaca has done what the Board

25   has requested that he do. He has changed within

26   the prison system. He knows that he can't drink

27   anymore. If the Board imposed a condition on

94

1   him that he not drive, he would comply with

2   that.  So I would ask that the Board seriously

3   consider him for a date.  Thank you.

4           DEPUTY COMMISSIONER SMITH:  Thank you.

5           PRESIDING COMMISSIONER GARNER:  Okay,

6   Mr. Menchaca, this is your opportunity if you

7   wish to address the Panel regarding your

8   suitability for parole.

9           INMATE MENCHACA:  Can I say a thing

10  concerned to what the D.A. say as far as his

11  closing?

12          DEPUTY COMMISSIONER SMITH:  No.  This is

13  an opportunity for you to tell us why you think

14  you are suitable.

15          INMATE MENCHACA:  Well, first of all,

16  when this incident happened I was a lot younger.

17  I don't (indiscernible) turning myself into

18  being the victim in the situation as it was said

19  to be here.  I take full responsibility for my

20  part in what happened to this man.  And I'm

21  sorry it happened to him.  I'm sorry that his

22  family has to suffer for this.  And like I said

23  earlier, you know, you're not the only one

24  suffering, I suffer, my family suffer, my

25  children suffer, as well as the victim's family

26  does.  You know, I've done everything that I

27  could since I've been here to change my life in

95

1    different ways. You know, I go to school, I've

2    taken these self-help programs. I don't have no

3    desire to use drugs or drink anymore, I don't

4    want it. I want to go out, to get out someday

5    and be with my family. I have a 19-year old

6    boy. I left when he was a kid and he's all

7    messed up out there on drugs. I can't take

8    control of him. I've got a 15-year old son that

9    was born two months after I was arrested. He's

10   without a father and he's going through changes

11   himself. You know, I want to take the chance

12   for what I've learned here today in San Quentin,

13   to take out to the street to be able to try to

14   help somebody else. You know, there's a lot of

15   people out there that make bad choices and

16   decisions, which was my problem. I made a lot

17   of bad choices and I made a lot of bad decisions

18   in my life. You know, it's sad that it took me

19   longer than others to realize that or understand

20   that, but I understand that today. And I know

21   that I was no angle out there and I take full

22   responsibility for my part in it. You know, and

23   I'll say here today that I did not take part in

24   stabbing this man. Yes, I was the driver of the

25   car. Yes, if I didn't follow that car this

26   wouldn't have happened. But I did and I take

27   responsibility for what I did, and that would be

96

1  the driver of that car.  If I would have known

2  this was going to happen to that man, I wouldn't

3  have drove, I wouldn't have followed that car,

4  but I did.  You know, I just want to be given an

5  opportunity at life in society and give back if

6  I can.

7       **DEPUTY COMMISSIONER SMITH:**  Thank you.

8       **PRESIDING COMMISSIONER GARNER:**  Okay, Mr.

9  and Ms. Figueroa, in accordance with Penal Code

10  Section 3043 you have the right to

11  (indiscernible) reasonably express your views

12  concerning the crime.  Are both of you

13  (indiscernible).

14       **DAVE FIGUEROA:**  Yes, sir.

15       **PRESIDING COMMISSIONER GARNER:**  Well hear

16  from (indiscernible).

17       **DEPUTY COMMISSIONER SMITH:**  Since it's

18  been a while since you originally identified

19  yourselves, would you mind doing it again for

20  the record, please?

21       **CYNTHIA FIGUEROA:**  Yes.  My name is

22  Cynthia Figueroa, F-I-G-U-E-R-O-A, and I'm the

23  victim's sister.  It seems like it's been three

24  years to me, it doesn't seem like 15 years.  It

25  is just a big nightmare.  I feel sorry for my

26  father and my mother.  My father is in a wheel

27  chair, he is paralyzed on the right side.  My

97

```
 1   mother is in very, very bad health and she
 2   misses her son deeply.  We have Mother's Day,
 3   which is Sunday, and unfortunately he's not
 4   going to be here to share that day with us.   I
 5   remember the two were arrested, I went down to
 6   the San Jose Police Department, and they showed
 7   me a picture and they said that they thought
 8   that this is the guy that they thought my
 9   brother was, that it was a mistake of identity.
10   And I saw the picture and who they thought my
11   brother looked like.  And they said when it was
12   dark, it was at night and it was, you know, 1:30
13   in the morning, and they thought my brother was
14   somebody else.  It is a clear case of mistaken
15   identity.  And it's just been a nightmare of all
16   of us.  My brother was stabbed 23 times.  He was
17   stabbed in the heart.  He was stabbed in his
18   privates.  He was stabbed in his hands.  I saw
19   his hands when he was in the coffin.  It was
20   horrible.  And I remember about six months
21   before he died that he came to visit me and we
22   were in the car and he said:   "Cindy," he says:
23   "I sure hope when my time comes it's not
24   painful."  He says:   "I hope I die in my sleep."
25   And to know that my brother was stabbed 23 times
26   and I seen the photo in the courtroom by mistake
27   and the look and the pain on his face and how he
```

98

1    suffered.  And he had not one person stabbing

2    there, but he had two people he had to fight.

3    And I was in the courtroom, too, and he was the

4    only one who got out of the car.  He opened up

5    the seat to let the guy out, which the guy

6    didn't get out because the car drove up.  And my

7    brother was at the back of the car and he had

8    both of his hands up and he says: "hey guys,

9    what seems to be the problem."  And he was

10   attacked.  I think this is the perfect place for

11   Mr. Menchaca and he should be residing here with

12   Mr. Cary Stinger and Mr. Scott Peterson.  And

13   he's lucky to have a home and that they give him

14   three meals a day and a bed to sleep on.  So I

15   would like to see him stay here for the

16   remainder of his life.  Thank you.

17           **PRESIDING COMMISSIONER GARNER:**  Thank

18   you.

19           **DAVE FIGUEROA:**  My dad's (indiscernible).

20   But, you know, like she said it just seems like

21   it was yesterday.  But 15 years in prison will

22   definitely age you, like dog years, you know.

23   The whole swearing in thing seem to me kind of

24   like, you know, swear to tell the truth, the

25   whole truth and nothing but the truth seems kind

26   of blank and (indiscernible) kind of inadequate.

27   But inmate he's keeping the paper mills in

99

 1    business.  It's the thickest file that I've ever

 2    seen.  If I had a neighborhood coming in with a

 3    file like that guarantee you I would put my

 4    house up for sale the very next day.  He is

 5    lucky that he's not on a polygraph machine to

 6    decide his fate whether he is released or stays.

 7    You know, the whole thing of the meth and the

 8    needles and, you know, the art work that his,

 9    you know, his roommate drew, it just seems --

10    you know, just listening to him, you know, it's

11    just hard to listen to somebody defend

12    themselves when you're looking at a file from

13    the age of 13 on up to today.  And, you know, I

14    don't believe that San Quentin supplied his meth

15    and I don't believe that they supply syringes,

16    or not that I'm aware of.  So somehow, some way

17    they got put into the system, into his cell and,

18    you know, he's got his friends and his family

19    support to back him up.  But one of those

20    individual supplied to him.  And so, you know, I

21    feel bad for his family.  Yeah, I feel bad for

22    his two kids.  It's terrible that their dad,

23    their mentor, their supposed mentor is sitting

24    in San Quentin, you know.  But yet on the flip

25    side of that coin is thank God their dad is in

26    here and thank God their dad is not being out

27    there to be a mentor so they can end up being in

100

1  here and incarcerated the same exact way.  You

2  know, his kids are having problems, sure.  But,

3  you know, what their problems are nothing

4  compared to what he put himself through and what

5  he put himself into in this type of situation.

6  And, you know, it's just unbelievable.  So then

7  to have the two murders, I mean two people have

8  died and, you know, when you just walk away, you

9  know, from the car wreck and knowing that

10  somebody is dying and knowing that you just hit

11  somebody, a hit-and-run, and then just -- and

12  then several years later at age 26 to get

13  involved in a violent crime like he was in.  And

14  you don't have knives in your car unless you

15  intend to use them, not butcher knives.  And,

16  you know, it's like, you know, if you put on a

17  condemn you're using it because you want to take

18  care of business.  You have knives in your car

19  he had them to take care of business.  And the

20  scariest part about that knife is one was my

21  uncle [sic] getting murdered, but two we don't

22  know if anybody else got murdered before my

23  uncle [sic], besides the individual in that car.

24  And so it's like it's the crimes that we don't

25  catch, you know, that we don't know that are out

26  there.  And you don't murder somebody they way

27  they murdered my uncle [sic] and call that the

101

1    first time. There's no way, it just doesn't

2    happen. You know, it's a pretty scary

3    situation. And, you know, you two as

4    Commissioners I give you a lot of respect

5    because there is no way I could have your job,

6    because the amount of stress you got to, I mean

7    you've got to look at a file like that and

8    determine: okay, from age 13 to know, you know,

9    to evaluate that file and to listen to the

10   victims and to listen to what he's saying and to

11   see everything on writing has got to be

12   astronomical course or decision to make. To set

13   somebody free knowing that they can do it again.

14   And, you know, great he hasn't -- he's in AA and

15   he hasn't had a drink in 15 years. Well, I

16   guarantee you that if you put a night bar down

17   the street and down in San Quentin on the first

18   floor, he would be the first one to belly up to

19   the bar. And so it's, you know, it's just --

20   I've made, I've made a decision since my brother

21   was murdered I made the decision that I would

22   have to live his life, you know, I'm living his

23   life. And I have the life that he always

24   wanted, you know, the beautiful home, a great

25   job, and kids. You know, its great that I'm

26   able to get out there and have the freedom and

27   do what I want to do. And, you know, his life

102

1  is a nightmare.  I couldn't imagine being in

2  prison.  I could even fathom it.  My life is a

3  dream.  I have almost everything I want right

4  now and I've still got a bright future, because

5  I never made a decision to commit crimes when I

6  was a kid and also as an adult.  Hey, we all

7  make mistakes when were kids, but, you know, he

8  made a decision at age 26 to take a life.  You

9  know, whether he says he was physically involved

10  in the actual stabbing or not, the bottom line

11  is that my uncle is dead -- my bother is dead.

12  And it's, you know, it's just amazing.  It's

13  just amazing.  You know, I don't have much more

14  to say.  I think that kind of sums it all up.  I

15  wish you guys a lot of luck on making a

16  decision.

17          **DEPUTY COMMISSIONER SMITH:**  Thank you.

18          **PRESIDING COMMISSIONER GARNER:**  All

19  right, it is now 12:58 P.M., and we will recess

20  for deliberations.

21                    R E C E S S

22                    --oOo--

23

24

25

26

27

1      CALIFORNIA BOARD OF PAROLE HEARINGS
2                 D E C I S I O N
3      DEPUTY COMMISSIONER SMITH:  We're back on
4  the record.  And everyone previously identified
5  is in the Hearing room, with the exception of
6  Mr. Rico who is on video and can hear us at this
7  time.
8      PRESIDING COMMISSIONER GARNER:  All
9  right, it is now 1:31 P.M., in the matter of
10  Gerardo Menchaca, D, like David, 87412.
11  Mr. Menchaca, the Panel has reviewed all
12  information received from the public and relied
13  on the following circumstances in concluding
14  that you are not suitable for parole and would
15  pose an unreasonable risk of danger to society
16  or a threat to public safety if released from
17  prison.  We considered many factors and as
18  always we start with the commitment offense and
19  the Panel noted that the offense was carried out
20  in an especially cruel and callous manner.  The
21  victim Richard Figueroa was 33 years of age, he
22  received 23 wounds, 15 actual stab wounds and
23  there was some indication the stab wounds were
24  as deep as four and a half inches.  The offense
25  was carried out in a very dispassionate and
26  calculated manner.  The victim was no threat,
27  GERARDO MENCHACA D-87412 DECISION PAGE 1 5/12/06

104

1   actually he was trying to deescalate a

2   situation.  The offense was carried out in a

3   manner that demonstrate an exceptionally callous

4   disregard for human suffering and again the

5   victim suffered knife wounds to the chest, right

6   and left lung, the liver, colon, and basically

7   made his way back to the vehicle and collapsed

8   on the pavement.  The motive for this crime, the

9   motive certainly is trivial compared to the loss

10  of a human life.  And the Panel determined that

11  the closest thing we can come up with is that

12  this is a situation where it started with road-

13  rage and that there were many opportunities

14  where there were chances to disengage from the

15  situation.  These conclusions were drawn from

16  the Statement of Facts that were taken from the

17  May 2006 Board Report in that on May 1, 1991, at

18  appropriately 10:00 P.M., Gerardo Menchaca and

19  Hector Oroteza and another friend went bowling.

20  They consumed some alcohol while bowling and

21  then left.  While eastbound on the Capital

22  Expressway, Butler's vehicle, which was the

23  vehicle that the victim was in, and Menchaca's

24  vehicle apparently came along side of each

25  other.  Menchaca later reported to police that

26  he believed at the time that he recognized one

27  **GERARDO MENCHACA D-87412 DECISION PAGE 2 5/12/06**

105

1    of the males in Butler's vehicle as an

2    individual with whom he had previously had

3    problems with.  Testimony in this case also

4    indicates that there may have been some type of

5    near-miss accident caused by Menchaca.  What did

6    happen, however, was that words and gestures

7    were exchanged between the occupants of both

8    vehicles.  And I believe I made mention that the

9    victim was in the Butler vehicle and that's an

10   error.  Menchaca began to pursue Butler.  More

11   words were exchanged between the occupants of

12   the vehicles.  At some point in time Figueroa

13   exited the vehicle and was reportedly in the

14   process of moving the passenger seat forward to

15   allow a passenger to exit when Menchaca pulled

16   up behind the vehicle blocking it.  Oroteza and

17   Menchaca both exited their vehicle and rushed

18   toward Figueroa.  After one or two minutes of

19   blows, Oroteza and Menchaca fled back to their

20   vehicle and drove off, leaving Menchaca's red

21   baseball cap with the logo, quote, "San Jose Bad

22   Boys" lying under Douglas's car, where it had

23   fallen during the assault.  Figueroa got back

24   into Douglas's car and they noticed that his

25   white sweater had many slits in it and that he

26   was bleeding.  He tried to get out of the car

27   **GERARDO MENCHACA D-87412 DECISION PAGE 3 5/12/06**

106

1   and collapsed to the pavement.   So far as your

2   previous record, the Panel noted that you did

3   have a record of violence and assaultive

4   behavior.   There was an escalating pattern of

5   criminal conduct and that you had failed

6   previous grants of probation and parole and

7   cannot be counted upon to avoid criminality.

8   That you have also failed from society's

9   previous attempts to correct your criminality.

10  Those attempts included some time at the Boys

11  Ranch on the CYA commitment, a prior prison

12  term, adult probation and parole.   As far as

13  your prior criminality it includes battery,

14  Health and Safety Code violations, and battery

15  on a police officer.   And there was also the

16  situation with the driving under the influence

17  that resulted in the death of an individual.   So

18  far as your institutional behavior and

19  programming, the Panel noted that you haven't

20  sufficiently participated in beneficial self-

21  help programs and that principally that your

22  attendance at AA is sporadic and it needs to be

23  sustained, particularly in light of the

24  influence that alcohol has played in not just

25  one death but two.   So far as your 115s, you

26  have had three 115s, and they have all occurred

27  **GERARDO MENCHACA D-87412 DECISION PAGE 4 5/12/06**

107

1    since your last Hearing.  They are serious 115s,

2    the first one being October 20, 2003, and this

3    was for possession of a hypodermic needle,

4    January 1, 2005 and November 23, 2005, for

5    possession of controlled substances.  You have

6    had five 128s, the last one being October 2001

7    and this was for refusing to be interviewed by a

8    correctional counselor.  The Panel did not

9    consider the report dated April 7, 2006, by

10   Dr. Inaba, and that was not considered in the

11   decision because of significant errors that were

12   noted in an earlier report prepared this week

13   for another inmate.  And the difficulty that the

14   Panel had is that there was some very serious

15   and similar comments that were in the risk

16   assessment portion of the report that appeared

17   to be almost exact in the nature of the

18   language.  We will put it on the record now that

19   we have requested that a new psych exam be

20   conducted and for the record that Dr. Inaba not

21   perform the exam.  So far as parole plans, the

22   Panel noted that you do have offers of housing

23   and you have offers of a job, and also that you

24   do have employable skills, you have marketable

25   skills.  The Panel also noted, it was said

26   verbally today that we found nothing in the file

27   **GERARDO MENCHACA D-87412 DECISION PAGE 5 5/12/06**

108

1    that would verify the contacts with AA with

2    respect to vocations and programs or the

3    possibility of a sponsor.  And again because of

4    the sporadic AA, NA this takes on greater

5    significance.  So far as the 3042 Notices, you

6    were here and you heard the comments made by the

7    District Attorney's representative from Santa

8    Clara County opposing the granting of parole.

9    The Panel did consider a 2005 letter from the

10   San Jose Police Department, also indicating

11   opposition for parole.  The Panel made the

12   following findings:  Your gains are recent and

13   you are going to have demonstrate an ability to

14   maintain the gains over an extended period of

15   time.  We want to complement you on completing

16   the Trust Program, it is worthwhile and it is of

17   value.  And in a separate decision, the Hearing

18   Panel finds that you have been convicted of

19   murder, and it is not reasonable to expect

20   parole would be granted at a Hearing during the

21   next four years.  And the specific reasons for

22   these findings are that you committed the

23   offense in an especially cruel manner.

24   Specifically that on March 2, 1991, the victim

25   Richard Figueroa, he was 33, he was acting as a

26   peace maker, and he was assaulted and stabbed 23

27   **GERARDO MENCHACA D-87412 DECISION PAGE 6 5/12/06**

1    or more times, resulting in his death.  The
2    offense was carried out in a very dispassionate
3    manner in that the victim was unarmed and that
4    he posed no threat, and that he was stabbed and
5    essentially left.  He did make it back to the
6    vehicle but collapsed on the pavement.  The
7    offense was carried out in a manner that
8    demonstrates an exceptionally callous disregard
9    for human suffering in that that there were
10   multiple wounds to the chest, the lungs, the
11   colon, the intestines, the head, and the
12   abdomen.  And again the victim collapsed as a
13   result of these and subsequently died.  The
14   motive, again in the separate decision the Panel
15   noted that there were opportunities to disengage
16   from the road-rage.  What influence alcohol
17   played in the decision making that evening no
18   one will know.  Again, it at best was a road-
19   rage gone bad.  So far as your prior record,
20   there was the battery, there was the incident of
21   the assault on the peace officer, and also there
22   was the driving under the influence resulting in
23   an automobile accident where one of the
24   passengers in the vehicle died and, as indicated
25   today, you walked away from that.  So far as the
26   recently committed serious violations, the Panel
27   **GERARDO MENCHACA D-87412 DECISION PAGE 7 5/12/06**

110

1    noted in the separate decision that you have

2    three serious disciplines since your last

3    Hearing, the first one being October 20, 2003,

4    and this was for possession of a hypodermic

5    needle, January 1, 2005, and November 23, 2005,

6    for the possession of controlled substances.

7    The Panel also noted in the separate decision

8    that you have not completed the necessary

9    programs that is going to be essential to your

10   adjustment and that you need additional time to

11   gain such programming.  And again this is to

12   have a sustained participation in AA or NA.

13   Therefore, a longer period of observation and

14   evaluation is going to be required before the

15   Board can find that you are suitable for parole.

16   We are going to encourage that you become

17   disciplinary free, that you get yourself into AA

18   and have a very sustained and demonstrated

19   pattern of participation in the program, and

20   most importantly that you remain disciplinary

21   free.  You took a big step backwards.  And the

22   Panel realizes that you have these things on

23   appeal, but the record before us is what we have

24   to operate from today.  Commissioner, do you

25   have additional comments at this time?

26        DEPUTY COMMISSIONER SMITH:  Just to

27   GERARDO MENCHACA D-87412 DECISION PAGE 8 5/12/06

111

1    follow up with what you are saying, Commissioner

2    Garner.  If we see someone before us that can't

3    abide by the rules of the institution when they

4    are under seven days a week, 24-hour a day

5    supervision, there is absolutely no reason why

6    we are going to think or draw the conclusion

7    that the person can function appropriately in

8    the community on parole under a much less degree

9    of supervision.  I don't know what to tell you

10   other than one way or the other you have to get

11   over and around those 115s.  I wish you well.

12           PRESIDING COMMISSIONER GARNER:  Thank

13   you.  It is now 1:42 P.M. and that completes

14   this Hearing.  Good luck to you, sir.

15                      --oOo--

16

17

18

19

20

21

22                                        SEP  9 2006

23   PAROLE DENIED FOUR YEARS

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   GERARDO MENCHACA D-87412 DECISION PAGE 9 5/12/06

112

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, J. FARNCOMB, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total One in number and

cover a total of pages numbered 1 - 111, and which

recording was duly recorded at SAN QUENTIN STATE

PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of GERARDO

MENCHACA, CDC NO. D-87412, on MAY 12, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated July 21, 2006, at Sacramento, California.


J. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

E X H I B I T   B

INITIAL BOARD HEARING TRANSCRIPTS, AUGUST 27, 2001

DECISION

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

**LIFE PRISONER: PAROLE CONSIDERATION**
**PROPOSED DECISION  (BPT §2041)**

I.   [X]   PAROLE DENIED          *3 year Denial*

     If this proposed decision denying parole is approved, the Board will send you a copy of the approved
     decision, including the reasons for denial of parole, within 30 days of the hearing.

II.   [ ]   PAROLE GRANTED

    A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

        _____
        Case No.         Count No.        Offense

    B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

    C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

        _____ _____ mos.
        Case No.         Count No.        Offense

        _____ _____ mos.
        Case No.         Count No.        Offense

        _____ _____ mos.
        Case No.         Count No.        Offense

    D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

    E. Postconviction Credit From _____ To _____ — _____ Months
                            (Date)           (Date)

    F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed
pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days.
At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-
ponement of your parole date.

II.   If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed
    decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be
    scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | | Date |
|---|---|---|
| *[signature]* | | *[handwritten date]* |
| Name | | Date |
| *[signature]* | | *8-* |
| Name | | Date |
| MENCHACA, GERARDO    D87412 | CTF-SOLEDAD | |
| NAME | CDC NUMBER    INSTITUTION | HEARING DATE |

Distribution: White—C. File
Canary—BPT

57

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    PRESIDING COMMISSIONER MOORE:    All right,

4    we're back on the record.    Let the record show the

5    time is 15:10 hours and that all interested

6    parties have returned to the room for Gerardo

7    Menchaca D-87412.    The Panel has reviewed all

8    information received from the public and relied on

9    the following circumstances in concluding that the

10   prisoner is not suitable for parole and would pose

11   an unreasonable risk of danger to society or a

12   threat to public safety if released from prison.

13   The committing offense was carried out in a

14   manner, which demonstrates an exceptionally

15   callous disregard for human suffering.    The motive

16   for the crime was inexplicable and very trivial in

17   relation to the offense.    These circumstances are

18   drawn from the Statement of Facts wherein you and

19   your crime partner drove in together with the

20   victim's in what appeared to be possibly a road

21   rage if you don't understand at this time if it

22   was or not.    Followed them, the victims to the

23   home of one of the victims and stabbed the victim,

24   Richard Figueroa, 23 times, subsequently killing

25   him, brutal stab wounds.    The prisoner has an

26   escalating pattern of criminal conduct.    A history

27   GERARDO MENCHACA D-87412    DECISION PAGE 1  8/27/01

58

1    of unstable tumultuous relationships with others,

2    your family, your growing up.  Your parents

3    separated and divorced, you were sent to live with

4    your father in LA and then to your grandmother in

5    Texas.  You failed to profit from society's

6    previous attempts to correct your criminality.

7    Such attempts include juvenile probation, juvenile

8    camp, placement, CYA commitment, as well as you

9    were on parole at the time of the committing

10   offense.  The prisoner has programmed in a limited

11   manner while incarcerated.  He has not

12   sufficiently participated in beneficial self-help

13   and therapy programming.  As well, he has failed

14   to demonstrate evidence of positive change.

15   Misconduct while incarcerated have included four

16   128s, one for failing to report to assignment,

17   circumventing the mail process, and unauthorized

18   alterations at the job in the institution while on

19   inmate day labor.  The Hearing Panel notes that

20   the responses to PC 3042 indicates opposition to

21   finding of parole suitability.  Specifically, the

22   District Attorney's office of Santa Clara County

23   sent their representative here to speak your

24   unsuitability for parole as well as the letter

25   that was sent from the San Jose Police Department

26   under the signature of the Chief of Police in

27   GERARDO MENCHACA D-87412  DECISION PAGE 2  8/27/01

59

1    opposition to your suitability.  They were the law

2    enforcement agency that investigated the case and

3    other important bearings on the suitability for

4    parole is your CCI, an L. D. Patrick, writes in

5    the Board report dated December 2000, if you were

6    released to parole at this time would pose an a

7    high degree of threat to the public.  The Panel

8    makes the following findings:  The gains are

9    recent and must demonstrate an ability to maintain

10   gains over an extended period of time.

11   Nevertheless, the prisoner should be commended for

12   remaining disciplinary free, participation in AA

13   and NA since '98 as well as your participation in

14   the 12 Step program and the Friends Outside

15   program, the completion of that.  As well as your

16   ability to receive positive work reports from your

17   vocational print shop.  However, these positive

18   aspects of your behavior do not outweigh your

19   factors of unsuitability.  Mr. Menchaca, this is a

20   three year denial.  In a separate decision, the

21   Hearing Panel finds that the prisoner has been

22   convicted of murder and it is not reasonable to

23   expect that parole would be granted at a Hearing

24   during the next three years.  The specific reasons

25   for this finding are as follows:  The prisoner's

26   committing offense was committed in an especially

27   GERARDO MENCHACA D-87412   DECISION PAGE 3   8/27/01

60

1   cruel manner where you stabbed the victim some 23

2   times after you followed the victim for sometime

3   and followed him to one of the victim's home.  The

4   offense was carried out in a dispassionate

5   calculated manner.  The motive for the crime was

6   inexplicable or very trivial in relation to the

7   offense.  The prisoner has an extensive history of

8   criminality where you've had Youth Authority time

9   as well as you have had county camp time, you've

10  been convicted of drunk driving manslaughter, hit

11  and run in 1981.  The prisoner has a history of

12  unstable tumultuous relationships with others.  He

13  comes from a dysfunctional home.  He was sent from

14  his home and sent to live with his father and then

15  lived with his grandmother in Texas.  As well, the

16  prisoner has not completed necessary programming,

17  which is essential to his adjustment and needs

18  additional time to gain such programming and to

19  continue to participate in NA and AA.  Therefore,

20  a longer period of observation or evaluation of

21  the prisoner is required before the Board should

22  find that the prisoner is suitable for parole.

23  The Panel recommends to the prisoner that he

24  continue to remain disciplinary free, that you

25  upgrade if available vocationally, continue to

26  some other trades or continue in that particular

27  GERARDO MENCHACA D-87412   DECISION PAGE 4   8/27/01

61

1    trade as well as upgrade self-help and therapy

2    programming, participate if available to you.

3    That's concludes the reading of our decision.  Mr.

4    Patterson, do you have any comments, sir?

5           DEPUTY COMMISSIONER PATTERSON:  I have none.

6           PRESIDING COMMISSIONER MOORE:  Mr.

7    Bordonaro?

8           COMMISSIONER BORDONARO:  No comments.

9           PRESIDING COMMISSIONER MOORE:  That's

10   concludes the reading and the time is 15:15 hours.

11   Sir, good luck to you.

12

13                    --o0o--

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION _____SEP 2 6 2001_____

27   GERARDO MENCHACA D-87412   DECISION PAGE 5   8/27/01

E X H I B I T   C

ABSTRACT OF JUDGMENT

DEPT. No. 27          CASE No. 148873

# In the Superior Court of the State of California

IN AND FOR THE _____ COUNTY OF  SANTA CLARA _____

### ABSTRACT OF JUDGMENT
(Commitment to State Prison as provided by Penal Code Section 1213.5)

The People of the State of California, )
                                        )
                                        )      Hon   JAMES H. CHANG _____
                                        )                (Judge of Superior Court)
                    vs                  )
                                        )      DAN CARR _____
GERARDO JERRY MENCHACA                  )                (District Attorney)
                        Defendant )
                                        )      JOHN VAUGHN (Public Def.)
_____ )                (Counsel for Defendant)

This certifies that on the  7th  day of  Feb. , 19 92    judgment of conviction of the above-named defendant was entered as follows:
In Case No. 148873 _____ Count No. 01 _____ he/she was convicted by  JURY _____; on his/her plea of
 not guilty _____ (guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of
insanity); of the crime of  Second Degree Murder _____

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same
offense if that affects the sentence and if under Section 209 of the Penal Code whether victim suffered bodily harm):

in violation of  Penal Code Section 187 _____
(reference to Code or Statue, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|---|---|---|---|
| 07-22-86 | Santa Clara, California | case #105477 HS 11378.5 | State Prison--PC667.5(b) |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Defendant  was not  charged and admitted being, or was found to have been armed with a deadly weapon at the time of commission of
            (was) or (was not)

the offense, or a concealed deadly weapon at the time of his/her arrest within the meaning of Penal Code Sections 969c and 3024.

7956A Rev 11/91

Defendant __was not__ adjudged a habitual criminal within the meaning of Sub-division _____ of
(was) or (was not)

Section.

Section 644 of the Penal Code; and the defendant __is not__ a habitual criminal in accordance with Sub-division (c) of that
(is) or (is not)

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by

imprisonment in the State Prison of the State of California for the term provided by law, and that he/she be remanded to the

Sheriff of the _____ County of __Santa Clara__ and by him/her delivered to the

Director of Corrections of the State of California at the place hereinafter designated.

It is ordered that sentences shall be served in respect to one another as follows __Count 1: 15 years to life;__
(Note whether concurrent or consecutive as to each count):

__on PC 667.5(b) prior: one year consecutive to count 1; for total of 16 years to life.__

and in respect to any prior incomplete sentence(s) as follows: __not applicable__
(Note whether concurrent or consecutive as to all incomplete sentences from other jurisdictions):

Defendant advised of parole period of 5 years to life. Defendant to pay restitution fund
fine of $100 and attorneys fees of $100. Defendant advised of appeal rights.
Credit for time served= 252 actual + 126 (4019) = 378 total days.

To the Sheriff of the _____ County of __Santa Clara__ and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the

custody of the Director of Corrections at __San Quentin Reception Center__

at your earliest convenience.

Witness my hand and seal of said court

this __13th__ day of __February, 1992__

GRACE YAMAKAWA _____ Clerk

by: _____ Deputy

Bonnie Estes

State of California, )ss.
)
_____ County of __Santa Clara__ )

I do hereby certify the forgoing to be a true and correct abstract of the judgment duly made and

entered on the minutes of the Superior Court in the above entitled action as provided by Penal Code

Section 1213.

Attest my hand and seal of the said Superior Court this __13th__ day of __February__ 19__92__

GRACE YAMAKAWA

County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the

County of __Santa Clara__

The Honorable: _____, James H. Chang

Judge of the Superior Court of the State of California, in and for the _____ County of

__Santa Clara__

Note: If probation was granted in any sentence of which abstract of judgment is certified, attach a minute order reciting the fact
and imposing sentence or ordering a suspended sentence into effect.

7956C Rev 11/91

E X H I B I T   D

LETTER FROM JANA J. CLARK

STATE OF CALIFORNIA                                                                 GRAY DAVIS, *Governor*

# OFFICE OF THE STATE PUBLIC DEFENDER

Jana J. Clark
Deputy State Public Defender
221 Main Street, Suite 1000
San Francisco, CA 94105
(415) 904-5600, FAX: (415) 904-5635



March 27, 2001

Board of Prison Terms

      Re:    Hector Oropeza
               P.O. Box 689, Z-306 L
               Soledad, CA 93960-0689
               Board of Prison Terms hearing date: March 6, 2001

Dear Sir or Madam:

      I write on behalf of Hector Oropeza, who I understand was first seen before this Board on or about March 6, 2001. I am a Deputy State Public Defender and have served in that capacity since December of 1989. I represented Mr. Oropeza on direct appeal from his conviction for second degree murder and have assisted him in collateral proceedings. In the past 11 years, I have had the opportunity to review countless trial transcripts, in particular homicide trials, and meet and interview countless inmates convicted of murder. This is the first and only time I have written a letter to this Board on behalf of a prisoner. I am doing this because I believe that Mr. Oropeza's case for parole consideration is unique in two ways.

      First, as I learned after thorough and careful investigation of this case, the entire picture of this serious crime was not fairly or accurately presented by the prosecution at Mr. Oropeza's trial and sadly, Mr. Oropeza's trial lawyer did nothing to correct the distorted picture presented by the prosecution. The prosecution argued that Mr. Oropeza sought out and executed the victim without provocation. On the contrary, a fair reading of the evidence available, including that which the jury never heard, was that this was a case of mutual combat seriously and irrevocably made worse by both the victim's and Mr. Oropeza's intoxication, that the victim had a very serious history of assaultive behavior and substance abuse, including at least one arrest and conviction for assault and days before the fatal incident had been fired from his job for assaulting a customer, that the victim was an ex-Marine who stood well over 6 feet tall and Mr. Oropeza is approximately 5'7", that Mr. Oropeza, unlike the victim, had no history of violence, and met the victim's blows with deadly force only after he feared for his life. Finally, Mr. Oropeza has at all times been remorseful for his actions and expressed this remorse to his jury. This horrible incident was clearly an aberration in Mr. Oropeza's life.

      Second, since his incarceration, Mr. Oropeza has sincerely pursued any and all programs for self-improvement. I have kept in contact with him throughout his incarceration because he has so impressed me with his level of remorse, sincerity and hope. He maintains a relationship

BPT
March 27, 2001
Page 2

with his children which is central to his life.  In my experience, his sincere remorse for his actions during the crime and his commitment to his family are unique among those incarcerated. I was not surprised to learn that the Department of Corrections Psychologist Report concludes that Mr. Oropeza would not pose an unreasonable threat to public safety if released and is, "an excellent candidate for parole."  I wholeheartedly agree with this expert assessment.

In sum, by his own admission, Mr. Oropeza is clearly responsible for Mr. Figueroa's death, and for this I am terribly sorry.  By this letter, I mean no disrespect to the victim or the victim's family.  I write because I believe it is important that the critical and difficult work of this Board be based on honest and accurate information.  If you have any questions or if you require any more information, please do not hesitate to contact me.


Sincerely,


JANA J. CLARK
Deputy State Public Defender

E X H I B I T  E

DECLARATION FROM JANA J. CLARK, OFFICER OF THE COURT

## DECLARATION OF JANA J. CLARK

I, JANA J. CLARK, hereby declare under penalty of perjury as follows:

I am an attorney licensed to practice law in the State of California and a Deputy State Public Defender. In that capacity, I represented Hector Oropeza in his direct appeal of his second degree murder conviction. In addition, I assisted Mr. Oropeza in the investigation of and preparation of a petition for writ of habeas corpus which he filed in propria persona. Through this work, I came to know both Mr. Oropeza and the circumstances of the crime for which he is incarcerated. In March of 2001, I prepared and mailed to Hector Oropeza the letter attached to this declaration and labeled appendix A. If called upon, I could and would testify to the matters set forth in that letter.

Executed on September 24, 2001, at San Francisco, California.

JANA J. CLARK