# EXHIBIT 11

# ORIGINAL

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

FILED

APR 2 3 2007

MICHAEL J. YEHLY, Clerk

By _____
DEPUTY

In re GERARDO JERRY MENCHACA,

on Habeas Corpus.

H031326
(Santa Clara County
Super. Ct. No. 148873)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated ___APR 2 3 2007___        _____ Acting P.J.

# EXHIBIT 12

IN THE CALIFORNIA SUPREME COURT

In re:                              )
                                    )
    GERARDO JERRY MENCHACA,          )   CASE NO. S._____
                                    )
        Petitioner,               )
                                    )
On Habeas Corpus.                   )
                                    )
_____)

Court of Appeal - Sixth App. Dist.

# RECEIVED

APR 3 0 2007

MICHAEL J. YERLY, Clerk

By _____
             DEPUTY

PETITION FOR REVIEW

Sixth Appellate District, Case No. H031326
Honorable Paul Bernal, Judge of the Superior Court
State of California, County of Santa Clara, Case No. 148873

GERARDO JERRY MENCHACA
D-87412, 4N-29 LOW
SAN QUENTIN STATE PRISON
SAN QUENTIN, CA 94974

Petitioner in Pro Se

## IN THE CALIFORNIA SUPREME COURT

| | |
|---|---|
| In re: | ) |
| | ) |
| GERARDO JERRY MENCHACA | ) CASE NO. S._____ |
| | ) |
| Petitioner, | ) H031326 |
| | ) |
| On Habeas Corpus. | ) (Santa Clara County |
| | ) Super. Ct. No. 148873) |
| | ) |

### PETITION FOR REVIEW

TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND THE HONORABLE ASSOCIATE JUSTICE OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

Petitioner, Gerardo Jerry Menchaca, hereby petitions this Honorable Court, proceeding in pro se and with the assistance of a fellow inmate, pursuant to rule 28 and 29 of the California Rules of Court, for review of the unpublished summary denial of Petitioner's Petition for Writ of Habeas Corpus in the Court Appeal, Sixth Appellate District, filed in the above captioned matter on April 23, 2007. A copy of the opinion is attached, as Index 1.)

### ISSUES PRESENTED FOR REVIEW:

1. Whether any fact used to deny parole, and therefore denying Petitioner's earned good time credit, by the Board of Parole Hearings can be based on elements that were not admitted by Petitioner by pled or proven to a jury beyond a reasonable doubt. Petitioner was not found guilty of using of weapon, yet the Board denied parole based on the victim being stabbed?

2. Whether the Board of Parole Hearings is allowed to rely on an element used for first degree murder with special circumstances - Penal Code § 190.2 (14) - as a stated reason to deny parole, when no court or jury found this element to be true pursuant to Penal Code § 190.4?

3. Whether it is unreasonable and impermissible for the Board of Parole Hearings to base a decision to deny Petitioner parole

beyond the Matrix guidelines on the same factors that went
into formulating the guidelines in the first place?

4. Whether the Board of Parole Hearings may rely on nearly two
decade old behavior as "some evidence" that a prison currently
pose an unreasonable threat to public safety?

5. Whether the Board may used a disciplinary action to deny parole
when it has already been used to take away good time credit,
and is based on unreliable information?

6. Whether it is unreasonable to use the elements of the second
degree murder as being especially grave to deny parole now
that, with conduct credit, Petitioner has passed the Matrix
for second degree murder and now entering the matrix for first
degree murder?

7. Whether the Board of Parole Hearings failure to consider all
relevant factors and public support for parole violates due
process?

8. Whether the Board of Parole Hearing's policy of retrying the
commitment offense violates due process and equal protection
and an unconstitutional ex post facto enhancement of the
indeterminate sentence imposed by the sentencing court?

9. Whether it is illegal for the Board to allow public outcry
to determine if a prisoner is suitable for parole?

NECESSITY FOR REVIEW

The Board of Parole Hearings ("Board") holds suitability hearings
for inmates serving term-to-life sentences. During Suitability hearing, the
Board is suppose to weigh a number of factors in order to determine whether
parole of an inmate will pose an "unreasonable risk of danger" to public
safety. At suitability hearings, when the factors are weighed and parole is
denied, the hearing panel is suppose to recommend direction that the inmate
should take to be found suitable for parole in the future. For example, "Remain
disciplinary free" or "have a job offer."

When the Board finds an inmate suitable for parole, it refers to the
Matrix guidelines to find the offense circumstances and the victim situation
that closely fits the description of the circumstances and situation of the
inmate's case to set a base term. The Board guidelines also take into account

2.

mitigating and aggravating factors that authorizes the Board to set a term
lower or higher than the base term prescribed for certain offense situation
and circumstances. This position is unsupported by the legislative intent
that the release date shall be set in a manner that will provide uniform terms
for offenses of similar gravity and magnitude in respect to their threat to
the public, and that will comply with the sentencing rules that the Judicial
Council may issue and any sentencing information relevant to setting of parole
release dates.

There have been 28,798 parole suitability hearings for term-to-life
inmates between 1998 and 2005, and only 267 of those hearings resulted in
a finding of suitability by the Board. (Statistics cited were published in
the California Lifer Newsletter, Volume 2, Number 6, published in November
2006.) The Board rarely, if ever, finds a life term inmate suitable for parole
at the initial parole consideration hearing. For instance, from 1999 to 2003,
the parole board denied parole to every one of the life term inmates who were
serving a sentence with the possibility of parole at least once to every single
one of them 100 percent of the time. (Evidentiary Hearing held in In re
Jameison, Case No. 71194, in the Santa Clara Superior Court, held on October
20, 2006, Reporter Transcripts at p. 54.) If the a Board panel is able to
deny parole based on elements that were not found true by any court or jury,
and ignore the criteria that has been promulgated for setting terms for first
and second degree murders, that denial abrogates the inmate's protected liberty
interest in their parole due to the arbitrariness and lack of notice employed
by the Board.

The chief or only reason for denying parole to a large number of
inmates is the alleged gravity of the commitment offense, and other factors
that inmates cannot change, or already have been punished for. However, as

determined by other cases such as In re Elkins (2006) __Cal.App.4th___, the
gravity of the commitment offense is unconstitutionally vague and first and
second degree murderers are doing the same amount of time, if not more, as
first degree murderers. It is prison time that the Board is requiring, no
matter what degree of the murder. In Elkins, the petitioner there killed his
high school friend in order to rob him. Elkins beat his victim with a baseball
bat while he slept. When the victim showed signs of life, Elkins beat him
some more until he thought he was dead. Nevertheless, the Board found Elkins
suitable for parole. In the instant case, Petitioner did not strike the victim.
He tried to breakup the fight between the victim and his co-defendant who
stabbed the victim only after the victim attacked him. Neither defendants
in this case were found guilty of using a weapon so it is difficult to know
exactly what the jury found true. However, what is clear is that the victim
was allowed to walk away and lived for two hours before dying in surgery.
No one tried to determine that the victim was dead, and because of the alcohol
levels of both parties, it is not certain why the victim's party got so upset
and followed petitioner to his friend's house in the first place. It is also
obvious that the jury rejected the prosecutor's case of first degree
premeditated murder. Furthermore, if the Board is permitted to deny parole
on the same factors that went into formulating the guidelines for setting
terms in the first place, the inmate is being denied his protected liberty
interest in his parole and the decision is clearly arbitrary and capricious
in violation of State and Federal Due Process. What is it about Petitioner's
commitment offense that sets it apart from those described in the matrix?

      For all of these reason, and the reasons set forth in the petition,
Petitioner respectfully requests this Honorable Court grant review to consider
these important issues that continue to occur approximately 5,000 times a

year and keep the prisons dangerously over-crowded.

Dated: April, 29, 2007

Respectfully submitted;

*Gerardo J. Menchaca*

Gerardo J. Menchaca
Petitioner in Pro Se.

## Ground 1

THE BOARD OF PAROLE HEARING'S FINDINGS THAT PETITIONER POSES A CURRENT UNREASONABLE RISK OF DANGER TO SOCIETY OR THREAT TO PUBLIC SAFETY IF RELEASED FROM PRISON IS BASED ON UNRELIABLE INFORMATION AND IS NOT SUPPORTED BY "SOME EVIDENCE" AND THEREFORE IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL (14th Amendment) DUE PROCESS.

On May 12, 2006, Gerardo Menchaca ("Petitioner") appeared before the Board of Parole Hearings ("Board") for his subsequent hearing. The Board found petitioner poses an reasonable risk of danger to society or a threat to public safety if released from prison. The record (Exhibit A, Board Hearing Transcripts ("BT")) shows that the Board based its decision on an unreliable probation report that derived from a pretrial hearing, and unchanging factors of the crime and precommitment behavior, which were: 1) already used in formulating the guidelines for setting terms; 2) had not been found true by a jury or court; 3) already been used at the sentencing hearing by the trial judge; and 4) used to deny Petitioner parole at his initial parole consideration hearing (See Exhibit B, "Initial" Parole Consideration Hearing, Decision portion of transcripts). The Board also relied on unreliable information of prison misconduct that is being challenged and under review in the Northern District Court. The record also indicates that the Board failed to give proper consideration of petitioner's post-commitment offense factors that indicate remorse, rehabilitation, and suitability for parole. The Board stated reasons to deny parole, in pertinent part are:

1. [T]he offense was carried out in an especially cruel and callous manner. The victim Richard Figueroa was 33 years of age, he received 23 wounds, 15 actual stab wounds and there was indication the stab wounds were as deep as four and a half inches. The was carried out in a very dispassionate and calculated manner. The victim was no threat, actually he was trying to deescalate a situation. The offense was carried out in a manner that demonstrate an exceptionally callous disregard for human suffering and again the victim suffered knife wounds ... The motive for this crime, the motive certainly is trivial compared to the loss of a human life. ... (BT 103-104.)

6.

2.    There was an escalating pattern of criminal conduct and that you had failed previous grants of probation and parole and cannot be counted upon to avoid criminality. Those attempts included some time at the Boys Ranch on the CYA commitment, a prior prison term, adult probation and parole. As far as your prior criminality it includes battery, Health and Safety Code violations, and battery on a police officer. And there was also the situation with the driving under the influence that resulted in the death of an individual.

3.    So far as your institutional behavior and programming, the Panel noted that you haven't sufficiently participated in beneficial self-help programs and that principally that your attendance at AA is sporadic and it needs to be sustained, particularly in light of the influence that alcohol has played in not just one death but two.

4.    So for as your 115s, you have had three 115s, and they have all occurred since your last Hearing. They are serious 115s, the first one being October 20, 2003, and this was for possession of a hypodermic needle, January 1, 2005 and November 23, 2005, for possession of controlled substances. You had five 128s, the last one being October 2001 and this was for refusing to be interviewed by a correctional counselor.

5.    The Panel also noted, it was said verbally today that we found nothing in the file that would verify the contacts with AA with respect to vocations and programs or the possibility of a sponsor. And again because of the sporadic AA, NA this takes on greater significance.

6.    So far as the 3042 Notices, you were here and you heard the comments made by the District Attorney's representative from Santa Clara County opposing of parole. The Panel did consider a 2005 letter from the San Jose Police Department, also indicating opposition for parole.

(Exhibit A, BT at 103-104, 106-108) The record shows that the Board ignored the avalanche of appositive evidence that supports a finding of suitability and instead continued to rely on the unchangeable factor or the commitment offense. "The Hearing Panel finds that [Petitioner] have been convicted of murder, and it is not reasonable to expect that parole would be granted at a Hearing during the next four years." (BT 103.)

The Board's reason[s] to deny parole must be supported by "some evidence" pertinent to the "relevant standards" promulgated by the Board

7.

to comply with constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp. 657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071, 1084, 1095, fn. 16.) This requires a Board panel's decision to deny parole to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590, fn. 6.) As the administrative record of the Board's review and consideration of the pleadings make clear, there simply is no such rational basis supporting the Board's decision to deny Petitioner parole.

This is another case which demonstrates the Board's continued reliance on the severity of the offense to deny parole, which not only contravenes the discretionary scheme mandated by statute, but also effectively constitutes an unauthorized resentencing of the Petitioner. Putting aside the pre-commitment factors, which are now over 16 years old and will never change, and commitment offense, "all other factors indicate [Petitioner] is suitable for release on parole." (Scott II, supra, 133 Cal.App.4th at 594.)

The Rosenkrantz Court, citing Minnis, reaffirmed the principle that:

> [E]ven before factors relevant to parole decisions had been set forth expressively by the statute and by regulation, we concluded that "[a]ny official or board vested with discretion is under an obligation to consider all relevant factors [citation], and the [official or Board] cannot, consistently with its obligation, ignore post-conviction factors unless directed to do so by the Legislature."

In re Rosenkrantz (2002) 29 Cal.4th 616, 656 (quoting Minnis, 7 Cal.3d at 645.)

1. THE FACTS OF THE COMMITMENT OFFENSE DO NOT PROVIDE A REASONABLE BASIS TO DENY PAROLE.

As brutal as Petitioner's homicidal conduct may have been, it did not go beyond what caused that conduct to constitute a second degree murder, he did nothing beyond what accomplished the killing to "cruelly or callously

8.

exacerbate[] the victim's suffering." Parole authorities may use the factors in Petitioner's case, driving co-defendant to the scene of the crime, trying to break up the fight, and then driving away from the scene, to aggravate his term, but that manner of death does not disqualify a prisoner from parole. Petitioner "was not charged and admitted being, or was found to have been armed with a deadly weapon at the time of commission of the offense, or concealed deadly weapon at the time of his[] arrest within the meaning of Penal Code Section 969c and 3024. [Petitioner] was not adjudged a habitual criminal within the meaning of [] Section 644 of the Penal Code; and the [Petitioner] is not a habitual criminal in accordance with Sub-division (c)..." (See Exhibit C, Abstract of Judgment.) As the California Court of Appeals (1st Appellate District) noted, the Board's observation that "[t]he offense itself is of sufficient severity for the denial, could be repeated annually until [Petitioner] dies or is rendered helpless by the infirmities of sickness or age." (Scott II, supra, 133 Cal.App.4th at p. 595.) The manner in which Petitioner and co-defendant reacted to the threats of the victim and his party is not atypical for a murder case, and hardly acts to "distinguish this crime from ... murders as exceptionally callous." (In re Smith, supra, 114 Cal.App.4th at p. 367.) As the California Supreme Court has noted on more than a score of occasions, "murder is seldom pretty." (See, e.g., People v. Hinton (2006) 37 Cal.4th 839, 896.) Eye witnesses testified that they saw the victim approach the defendant and started fighting with him. Other witnesses of the victim's party testified of making threats to blow the Petitioner's and his co-defendant's "fucking head[s] off" with a ".45." (See Exhibit D, Letter from Jana J. Clark and Exhibit E, Declaration from Jana J. Clark, Officer of the Court.) The Board's denial of parole to such murders is contrary to the statute.

9.

In In re Scott II, supra, the California Court of Appeals cautioned the Governor about reversing a grant of parole based solely on the commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the [Board] "did not fulfill" the requirement "to consider all other relevant factors," the decision cannot stand. (Id. at p. 595.) Such is the case here.

Second degree murder is not a crime automatically deemed unsuitable for parole. Under California Penal Code § 190.2, for a first degree murderer to be deemed unparoleable ("Death penalty or life imprisonment without parole") a jury or court, must find at least one of the twenty-two "special circumstances" described in Cal. Penal Code § 190.2 to be true. One of these special circumstance, § 190.2 (14), is that "[t]he murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase 'especially heinous, atrocious, or cruel, manifesting exceptional depravity' means a conscienceless or pitiless crime that is unneccessarily torturous to the victim." The Board may not relitigate the Petitioner's commitment offense in order to used it as a reason to deny parole. Nor may the Board use a factor that was not either submitted to a jury or rejected by the jury (not found true beyond a reasonable doubt.) (See e.g. United States Constitution, Fifth Amendment (double jeopardy);

and <u>Apprendi v. New Jersey</u>, 120 S.Ct. 2348, 147 L.Ed.2d 435.) The Board's own Matrix recognize that Petitioner's commitment offense falls under one that does not preclude a finding of suitability. (Cal. Code of Regs. tit. 15 ("CCR-15") § 2403 (c), Matrix guidelines.)

Pursuant to Cal. Penal Code § 3041(b), the Board has established criteria for setting parole release dates (CCR-15 § 2402.)

CCR-15, § 2403, states, in pertinent part that:

(a) General. The panel shall set a base term for each life prisoner who is found suitable. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. ...
The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation. ...

If the Board finds circumstances in aggravation of the base term the "panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances." (CCR-15 § 2404.) Circumstances in aggravation of the base term includes, in pertinent part:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis that the categories chosen as most closely related to the crime;
...
(17) The prisoner has a history of criminal behavior for which the term is not being enhanced under Section 2407;
(18) The prisoner has engaged in other reliably documented criminal conduct which was an integral part of the crime for which the prisoner is currently committed to prison;
(19) The prisoner was on probation or parole or was in custody of had escaped from custody at the time the crime was committed;
(20) Any circumstances in aggravation including those listed in the Sentencing Rules for the superior Court.

CCR-15 § 2405 describes "Circumstances in Mitigation for the Base Term," which include, in pertinent part:

11.

(1) The crime involved some factors described in the appropriate matrix in a category lower on either axis than the categories chosen as most closely related to the crime;
...
(6) The crime was committed during or due to an unusual situation, unlikely to reoccur;
(7) The crime was committed during a brief period of extreme mental or emotional trauma;
...
(9) Any Sentencing Rules for Superior Courts.

The record shows that the Board based its decision to deny parole on the same factors that went into creating the guidelines and matrix in the first place. This violates due process and makes the regulations to be used for determining suitability and setting prison terms unconstitutionally vague and meaningless. The Board used factors that may be used to impose the upper base term as reasons to deny parole, and totally ignored the mitigating circumstance that may be used to lower the base term.

In Little v. Hadden, 504 F.Supp. 558, 561, a federal court addressed the same type of abuse that is present here:

> [I]t is unreasonable and impermissible for the Commission to base a decision to continue beyond the guidelines on the same factors that went into formulating the guidelines in the first place. No one disputes that this was a serious crime, but the factors of seriousness indicated by the this record are included in the guidelines themselves. ... It is clear to the Court from the record in this case that the Commission has attempted to continue Little in custody beyond the guidelines because of its **ad hoc** decision regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in formulating the guidelines. ... In short, the Commission's decision is arbitrary and capricious because it is not based on anything in the record before it. Moreover, it reflects an abuse of discretion because it attempts to continue Little's confinement beyond the guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

The Board failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the Board's finding

12.

of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a second degree murder. He did not torture Mr. Figueroa, or lie in wait for him; he did not prolong his suffering, or kill him in order to rob him or incite a race war. His crime, while terrible, does not rise to the level of callousness present in Dannenberg, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or Rosenkrantz, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for 24 days; or Van Houten, where defendant assisted with multiple stabbings of the victim with a knife and bayonet, after the victim witnessed her husband receiving the same fate, all an effort to incite a race war. See Van Houten, 116 Cal.App.4th at 365. (See Exhibit A, BT 18-28.)

Not only does Petitioner's crime fail on its own to constitute "some evidence" that he is a continuing threat to public safety, but the Board erred by failing to consider all of the factors required by the regulations.

2. PETITIONER'S PREVIOUS JUVENILE AND OVER 18 YEAR OLD PRIOR MISCONDUCT AND DISMISSED CHARGES DOES NOT CONSTITUTE "SOME EVIDENCE" THAT PETITIONER IS A CURRENT UNREASONABLE THREAT TO PUBLIC SAFETY.

The Board also pointed to Petitioner's precommitment offense behavior as "some evidence" that he would pose an unreasonable threat to public safety if released from prison. "And you got three years probation, a year in jail, and a fine of $750. And on July 25, 1987, you were arrested by San Jose P.D. for battery on a police officer, possession of PCP for sale, possession of controlled substance, obstruction, and resisting a police office[r]. In the Court the charges were dismissed; however, the original probation was revoked and you were sent back to CDC for a three-year term. You paroled from CDC

13.

in November of '89." (BT 30.) Petitioner's driving under the influence which resulted in the death of his best friend occurred when Ray, the victim of the DUI incident, and two other friends kept horse-playing with Petitioner while he was driving. Petitioner crashed and flipped the car. Petitioner panicked and ran away from the scene. These charges do not rise to the level anticipated in the Regulations which define "Previous Record of Violence" as "previous occasions [prisoner] inflicted or attempted to inflict serious injury on a victim." CCR-15 § 2402(b)(2); see also Van Houten, 116 Cal.App.4th at 353. Possession of a control substance or sells, are not assaults and Petitioner's adult probation was not an attempt to inflict injury, of any severity, on anyone. Nor may the Board use dismissed charges as "some evidence" to deny parole. No reasonable interpretation (Rosenkrantz, 29 Cal.4th at 680) of these facts can transform them into becoming "some evidence" of "Previous Record of Violence." (CCR-15 § 2402(b).)

Courts have also made clear that the evidence cited by the Executive must be **relevant** and **probative** to the factors that such evidence is being used to support. For instance, in Smith, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." Smith, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry –- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its matter, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

(Id. at 368.)

14.

California statute and regulations provide that an offense, or pervious offenses, must be committed in an exceptionally callous or particularly egregious manner for an inmate's offense to justify a determination that he is unsuitable for parole. By the Board's own Matrix guidelines for setting term, unusual violence describes the circumstance of an offense wherein the inmate acted to torture the victim over a period of time or intentionally made the victim endure great pain and suffering. However, even those circumstances do not necessarily qualify as one that prohibits parole. (CCR-15 § 2403 (b).) Also, the inmate must constitute a present danger to society at the time of the suitability hearing. While the "gravity of the commitment offense or offenses alone may be a sufficient basis for denying a parole application," that can only be the case where there is "some evidence that the particular circumstances of the prisoner's crime - circumstance beyond the minimum element of his conviction - indicated exceptional callousness and cruelty with trivial provocation." (In re Scott (2005) 133 Cal.App.4th 573, 598 [hereafter "Scott II"], citing In re Dannenberg, supra, 34 Cal.4th at p. 1098; see also Rosenkrantz, supra, 29 Cal.4th at pp. 680, 683, and Scott I, supra, 119 Cal.App.4th at p. 889.) In this regard, the crime must be "especially heinous, atrocious or cruel" within the meaning of the parole regulations. (See CCR-15 § 2402 (c)(1).) Which must also be found true by a jury or court. Petitioner was not found to have had a weapon or used a weapon at the time of his offense. (See Exhibit C.) (See Cunningham v. California, DJDAR 1003, 1004.)

As a comparison, the present case is far less serious than that of In re Ernest Smith (2003) 114 Cal.App.4th 343, 366, where the petitioner was found guilty of second degree murder when he shot his wife in the head three times at point blank range while her parents were in the next room.

15.

INSERT A

Yet, in that case the court found it arbitrary to rely on it to deny parole. The court explained there was no evidence that the petitioner "tormented, terrorized, or injured [his victim].. or that he gratuitously increased or unnecessarily prolonged her pain or suffering." (Id. at p. 367.) In assessing the commitment offense, the court concluded:

> Was the crime callous? Yes. However, are the facts of the crime some evidence that [he] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No.

(Ibid.)

Petitioner possesses a short criminal record that persisted into his early twenties. The question is, however, whether that criminal history in conjunction with the life offense and Petitioner's fifteen-year post-conviction history reasonably supports the conclusion that Petitioner constitutes an unreasonable risk of danger to the public if released at the present time? (See, e.g., § 3041.)

"A continued reliance ... on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment [to deny parole], runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (Biggs v. Terhune, supra, 334 F.3d at p. 917.) Thus, the Board's denial of parole to a prisoner based primarily on his commitment offense and prior record, despite many years of rehabilitation, violates due process. (See, e.g., Irons v. Warden of California State Prison Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 ("Irons").)

California cases have endorsed precisely these principles, citing both Biggs and Irons. (See Scott II, supra, 133 Cal.App.4th at p. 595; see also In re Smith, supra, 114 Cal.App.4th at p. 372 [rejecting ability of

16.

California's parole board to deny parole forever based on immutable factors without regard to or consideration of subsequent circumstances or evidence indicating little risk of current danger if released].)

Petitioner does have a juvenile and adult criminal record pre-dating the commitment offense. However, Petitioner received a one year enhancement for his prior adult offenses. The Board is not allowed to violate the Double Jeopardy Clause by continuing to deny parole based on his prior offense. Furthermore, some of Petitioner's juvenile and adult record consists of some charges that were dismissed but still used by the Board to deny parole. His worse pre-commitment offense occurred when his friends were horseplaying in the car he was driving. Petitioner flipped his car, and walked away from the scene. His friend died as a result of the accident. Based on his juvenile record, Petitioner never "demonstrated serious assualtive behavior at an early age." (CCR-15 2288(c)(2).)

Petitioner's adult criminal record cover the period prior to the life crime also lacks any violent history. In Biggs v. Terhune, the Ninth Circuit Court of Appeals held the Board's continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs v. Terhune, 334 F.3d 910, 917 (2003). The 2006 hearing was Petitioner's third parole suitability hearing since his commitment to the California Department of Corrections in 1992. As occurred in two previous parole suability hearings, this most recent Board panel maintained a pattern of relying on the "unchanging factors" of Petitioner's crime, prior criminal record, and social history to deny Petitioner a parole release date. Petitioner can do nothing to change the circumstances of his crime or his social history prior to coming

17.

INSERT A

to prison. In addition, since his incarceration Petitioner has demonstrated exemplary behavior and evidence of rehabilitation. Therefore, the Board's continued reliance on the "unchanging" aspects of Petitioner's case in the presence of evidence that Petitioner has "demonstrated exemplary behavior and evidence of rehabilitation," converts Petitioner's sentence of life with the possibility of parole into "de facto life imprisonment without the possibility of parole" thereby violating Petitioner's due process rights. Iron v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (2005).

3, 4, & 5.   PETITIONER'S INSTITUTIONAL BEHAVIOR DOES NOT CONTAIN ANY VIOLENT OR ASSAULTIVE BEHAVIOR, THE BOARD'S DECISION TO DENY PAROLE BASED ON DISCIPLINARY ACTIONS THAT ARE NOT RELIABLE OR HAVE ALREADY BEEN USED TO PUNISH PETITIONER BY DEDUCTING GOOD TIME CREDIT VIOLATES DUE PROCESS. (See Ground 3.)

The Board violated Petitioner's due process rights by failing to consider relevant reliable information that Petitioner's post-conviction record lacked violent or assaultive behavior. CCR-15 § 2281(b). The Board further violated Petitioner's due process rights by failing to apply two factors from the regulations tending to demonstrate parole suitability to Petitioner's case. The Board's failure to consider substantial evidence that Petitioner was suitable for release violates Petitioner's due process rights. (In re Scott, 119 Cal.App.4th at 899.)

While the regulations allow the Board to consider Petitioner's prison disciplinary record in its parole suitability determinations, the evidence cited to deny parole must provide evidence as to Petitioner's current or "present" dangerousness. In re Dannenberg, 34 Cal.4th at 1079-1080. In re Ernest Smith, 114 Cal.App.4th at 370. All other evidence would be irrelevant in the context of parole suitability determinations.

Two of CDC-115s relied on are being reviewed in the United States

18.

District Court, Northern District Court. The reliability of the Disciplinary Reports are suspect because they were based on contaminated evidence and administrative failure to follow its own guidelines when processing urine samples. The third CDC-115 relied by the Board was also not violent and did not receive a final disposition by the Board. Nevertheless it was used against Petitioner along with the other non-violent CDC-115s. While these non-violent CDC-115s may be an indication that Petitioner at times fails to follow institutional rules where no physical harm occurs, they do **not** provide reliable evidence that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released. Khalifah E.D. Saif'ullah v. Carey, 2005 WL 1555389, 15 (E.D. Cal.) (2005). Furthermore, this portion of Petitioner's disciplinary record does not demonstrate Petitioner is incapable of adjusting to parole release. Id. On the contrary, the extent of Petitioner's support from family members and friends, the job offer and housing offers he has received, his participation in college courses and marketable skills, and self-help accomplishments while incarcerated all serve as substantial evidence of Petitioner's ability to adjust to parole release quite successfully. Because these CDC-115s are not "serious disciplinary infraction[s] of violent nature," the Board cannot use them to substantiate a parole denial. Kalifah E.D. Saif'ullah v. Carey, 2005 WL 1555389 at 18. See also In re Irons, 358 F.Supp.2d 936, 949 (2005).

6.  THE BOARD'S RELIANCE ON THE DISTRICT ATTORNEY'S REPRESENTATIVE AND SAN JOSE POLICE DEPARTMENT'S OPPOSITION TO PAROLE VIOLATES PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL HEARING AND STATE AND FEDERAL DUE PROCESS.

The Board is giving the District Attorney's Office and San Jose Police Department authority that they do not possess, prohibiting parole. Public outcry cannot be used to determine whether an inmate is suitable for parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139

Cal.App.3d 295.) Furthermore, because Petitioner had no notice that this factor would be used against him, this factor is unconstitutionally vague. (United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989) [A statute (or regulation) is void for vagueness: if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.].) This factor clearly invites discriminatory enforcement since it illegally allows the Board to deny parole if a certain state agency opposes parole.

In a recent motion filed by the Respondent, the respondent admits that it already has a system in place to punish indeterminate sentenced prisons when they are disciplined. The Respondent is now contradicting its own motion and law that they raised in their motion. (See Attached Exhibit F, "Respondent's Reply to Petitioner's Response to Motion to Dismiss, No. C 06-2120 RMW (PR).) The Board cannot have both ways.

In another recent decision, the Sixth District Appellate Court found that: "[The Board's] position, that inmates who were only convicted of second degree murder may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging the fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it." (In re Weider, 2006 DJDAR 15795, 15798.) With good time credit, Petitioner has served the maximum term set forth in the second degree matrix guidelines.

For the forgoing reasons, the Court should grant the petition and order the Board to set Petitioner's term within the second degree murder matrix guidelines.

GROUND 2

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S LIBERTY
INTEREST TO BE RELEASED ON PAROLE. UNDER CALIFORNIA'S PAROLE
SCHEME PETITIONER HAS A CONSTITUTIONALLY PROTECTED LIBERTY
INTEREST IN RELEASE ON PAROLE. THE BOARD IS REQUIRED TO NORMALLY
SET A PAROLE RELEASE DATE PURSUANT TO PENAL CODE § 3041 AND
CAL. CODE REGS, TIT. 15 § 2401 UNLESS THE BOARD FINDS PETITIONER
POSES A CURRENT DANGER TO SOCIETY.

Under the "clearly established" framework set forth by the United

State Supreme Court in Greenholtz v. Inmate of Nebraska Penal and Board of

Pardons v. Allen, when a state's statutory scheme uses mandatory language

that "creates a presumption that parole release will be granted," unless

certain statutorily defined determinations are met, that gives rise to a

constitutionally protected liberty interest in release on parole. Greenholtz

v. Inmate of Nebraska Penal, 442 U.S. 1, 12 (1979); Board of Pardons v. Allen,

482 U.S. 369, 377-378 (1987).

In McQuillion v. Duncan, the Ninth Circuit Court of Appeals held

California's parole scheme, as codified in Penal Code § 3041, largely

parallels the schemes used in Greenholtz and Allen and therefore gives rise

to a cognizable liberty interest in release on parole. McQuillion v. Duncan,

306 F.3d 895, 901 (9th Cir. 2002). See also Biggs v. Terhune, 334 F.3d 910,

914 (2003) ("Section 3041 of the California Penal Code creates in every inmate

a cognizable liberty interest in parole which is protected by the procedural

safeguards of the Due Process Clause.") While McQuillion involved a Board-

granted parole release date that the Governor subsequently rescinded, the

McQuillion Court concluded California's parole scheme created a general

expectation in parole to all life-term inmates, not only to those who have

or previously had a parole release date. McQuillion v. Duncan, 306 F.3d at

903. This point was further clarified by the Ninth Circuit Court of Appeals

in Biggs v. Terhune, supra. There the Court concluded the liberty interest

in parole was created upon the incarceration of the inmate and not upon the

grant of a parole release date. <u>Biggs</u>, 334 F.3d at 915. However, a prisoner such as McQuillion who had previously been granted a parole release date has a heightened liberty interest in release on parole. <u>McQuillion</u>, 306 F.3d at 903. In the instant case petitioner's crime does not of the gravity that prevents parole. The Board has failed to "normally grant parole" at his initial hearing, first subsequent hearing, and second subsequent hearing and continues to rely on the pre-commitment offense behavior, and commitment offense, which by its own Matrix and guidelines provides a term somewhere in the area of 17-20 years, which with post conviction credit as provided in CCR 15 § 2290, may be reduced by one-third. (CCR 15 § 2403(c).) Petitioner therefore had a specific expectation of release on parole. (<u>Id</u>.)

In reviewing the applicable statutory law and Board regulations, the California Supreme Court has determined life prisoners such as petitioner have an expectation of release upon parole. In <u>In re Rosenkrantz</u>, the Supreme Court concluded "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." <u>In re Rosenkrantz</u>, 29 Cal.4th 616, 654 (2002). The <u>Rosenkrantz</u> Court further concluded this "expectation" is a liberty interest protected by due process of law. (<u>Id</u>. at 659-661.)

For the foregoing reasons, the Court should grant the petition and declare the rights of petitioner having a protected liberty interest in parole. The Court should order the Board to follow its own guidelines and California law.

22.

INSERT C

## GROUND 3

THE BOARD OF PAROLE HEARINGS' FAILURE TO, CONSIDER ALL RELEVANT FACTORS AND IGNORING POST-CONVICTION FACTORS IN PETITIONER'S PAROLE SUITABILITY DETERMINATION VIOLATED PETITIONER'S RIGHTS TO A FAIR AND MEANINGFUL HEARING IN VIOLATIONS OF STATE AND FEDERAL DUE PROCESS.

The California Supreme Court has consistently held the Board "is under an obligation to consider all relevant factors" and may not ignore post-conviction factors in its parole suitability determinations. In re Rosenkrantz, 29 Cal.4th at 655 (citing In re Minnis, 7 Cal.3d. 639, 645 (1972)). Despite this mandate, the Board has inexplicable and unjustifiably ignored abundant, undisputed evidence contained in petitioner's post-conviction record showing petitioner is suitable for release on parole. In re Scott, 119 Cal.App.4th 871, 899 (2004).

First, although the Board noted that petitioner has been involved in many programs when it stated: "With the exception of the 115s here, your adjustment since your Initial Hearing, you know, has been very positive, you know, has been very active in a number of different programs[]" (Exhibit A, BT 46), the Board failed to mention consideration of evidence that petitioner has demonstrated signs of remorse as a factor indicating parole suitability. 15 CCR § 2402(d)(3) ("[T]he prisoner has given indications that he understands the nature and magnitude of the offense."). Petitioner's "Board Report" provided the Board with a "fairly extensive" list of programs and acts which tend to indicate the presence of remorse[,]" and has involved himself in institutional activities that enhance his ability to function within the law upon release. (15 CCR § 2403(d)(8), Exhibit A, BT 46-47.) Petitioner acknowledge his responsibility for the crime and expressed his remorse. (BT 94.) Furthermore, at the May 2006 hearing the Board failed to consider the mitigating circumstances : "The crime was committed during or due to an unusual situation unlikely to reoccur[.]" (CCR 15 § 2405(a)(6).

The Board also failed to mention consideration of petitioner's advancing age which is yet another factor set forth in the regulations tending to demonstrate parole suitability: "The prisoner's present age reduces the probability of recidivism." 15 CCR 2402(d)(7). Petitioner was 26 years old at the time he was involved with the life crime. When petitioner appeared before the 2006 hearing panel, petitioner was 41 years old. Fifteen-years have transpired since the commission of the crime during which time petitioner has aged, matured and experienced numerous accomplishments.

The Board ignored the evidence cited above and provided by petitioner and "Board Report" as to the above two factors tending to demonstrate parole suitability. This resulted in the Board violating petitioner's due process rights by ignoring relevant, reliable information (CCR 15 § 2402(b)) and failing to apply two parole suitability factors which are relevant to petitioner's case. In re Rosenkrantz, 29 Cal.4th at 655.

Based on the record, petitioner has clearly participated in beneficial self-help programs; however, the Board fails to articulate a reason why it believes petitioner's participation is insufficient. In fact, the Board contradicts itself when it stated: "With the exception of the 115s here, your adjustment since you Initial Hearing, you know, has been very positive[.]" (Exhibit A, BT 46.) The Board's failure to consider this "very positive" programming violates due process. Furthermore, lay persons such as the Board of Parole Hearings Commissioners have no training in the field of psychology and predictions of human behavior. They are unequipped to assess whether an individual "could benefit from" or need self-help programs. As such, their conclusion should be viewed as no more than mere speculation. Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (2005).

INSERT C

The Board's determination that petitioner "has not sufficiently participated in beneficial self-help programs" is a determination unrelated to the issue of petitioner's dangerousness to the public and unrelated to any of the authorized factors tending to show suitability or unsuitability. In fact, the regulations do not set forth "self-help participation" as a factor tending to indicate either suitability or unsuitability. Thus, even if the Board thinks that more self-help programming would be beneficial to petitioner, it was wrong for the Board to deny parole to petitioner based on such an unauthorized factor.

For the foregoing reasons, the Court should grant the petition and order the Board to release petitioner on parole, or set his term within the Matrix guidelines for second degree murder.

Ground 4

THE BOARD OF PAROLE HEARINGS HAS ILLEGALLY DENIED PAROLE
BASED ON AND ILLEGAL POLICY OF RETRYING THE CASE IN ORDER
TO SUPPORT THEIR FINDINGS OF UNSUITABILITY FOR PAROLE. THE
BOARD IS "NORMALLY" DENYING PAROLE TO TERM-TO-LIFE PRISONERS
AND THUS VIOLATING DUE PROCESS AND EQUAL PROTECTION AND IS
AN UNCONSTITUTIONAL EX POST FACTO ENHANCEMENT OF THE
INDETERMINATE SENTENCES IMPOSED BY THE SENTENCING COURT.

Gerardo Jerry Menchaca ("Petitioner"), is a prisoner in the custody
of the California State Department of Corrections and Rehabilitation ("CDCR")
at the San Quentin State Prison. Petitioner is serving a sentence of 16 years
to life pursuant to his 1991 commitment offense of murder in the second
degree, Cal. Penal Code § 187 and prior prison enhancement. On May 12, 2006,
Petitioner was denied parole release for his third time. This adverse
determination of the Board of Parole Hearings reads as follows:

> [T]he offense was carried out in an especially cruel and
> callous manner, The victim Richard Figueroa was 33 years
> of age, he received 23 wounds, 15 actual stab wounds and
> there was indication the stab wounds were as deep as four
> and a half inches. The offense was carried out in a very
> dispassionate and calculated manner, The victim was no threat,
> actually he was trying to deescalate a situation. The offense
> was carried out in a manner that demonstrate an exceptionally
> callous disregard for human suffering and again the victim
> suffered knife wounds ... The motive for this crime, the
> motive certainly is trivial compared to the loss of a human
> life. ... (Exhibit A, 103-104.)

The record shows that the Board did in fact retried the case and
totally ignored the trial evidence and sentencing court's findings, and thus
did not give proper consideration to any other relevant or statutorily
mandated factors. Petitioner was not found guilty of using a weapon. He was
found not guilty of first degree murder. Furthermore, if the Board is allowed
to retry the case, Petitioner should be allowed to call witnesses and
reexamine the actually wounds. Petitioner asserts that many of the wounds
were in fact a result of incisions made during surgery when a "Heart and
Lung" machine was attached to Richard Figueroa, victim, during the two hour
open heart surgery. Petitioner further asserts that eye witnesses that were

not involved in the altercation testified that Richard Figueroa approached one person and started to argue and then a fight occurred between the two individuals. Petitioner should be allowed to present expert testimony that may show that many of the wounds were a result of the surgery, or due to the lack of intent to kill. Instead of striking at the upper body first, the trail evidence shows that Petitioner's co-defendant stabbed at the victim's legs in an attempt to get the victim off of him. Petitioner could and would provide evidence that indicates the pattern of wounds on the victim are typical in wounds that occur during surgery.

The Board's illegal policy violates the express mandates of Cal. Penal Code § 3041(b), which provides that parole release "normally" be granted. This policy also violates state statutory law and the United States Supreme Court holdings that every element of the commitment offense be found true by the jury. (Cal. Penal Code § 190.2.(a); Apprendi v. New Jersey, 120 S.Ct. 2348, 147 L.Ed.2d 435.)(Cunningham v. California, DJDAR 1003, 1004.)

The Board's findings that was especially cruel and callous and carried out in a calculated manner violates the statutory law that unequivocally mandates that:

> The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true.

> (14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase "especially heinous, atrocious, or cruel, manifesting exceptional depravity" means a conscienceless or pitiless crime that is unnecessarily tortuous to the victim.

The Board unauthorized retrying the offense and resentencing based on this retrial violates state and federal due process.

By providing for parole eligibility after a period ranging from ten

27.

(10) years for second degree murderers, to sixteen years-eight months (16.66 years) for first degree murderers. The Legislature made a determination that there is nothing about the release of a murderer within that range, in and of itself, which necessarily deprecate[s] the seriousness of the crime. Thus, when the Board repeatedly retries the commitment offense in order to deny parole, without any meaningful or intelligent bases for distinguishing the subject murders from any of the others, and in the face of the other suitable factors calling for release, it is, in reality, substituting its view of a proper sentencing scheme for that of the Legislature's.

All murders are by nature violent, horrific, abhorrent and morally repugnant. But the Legislature decided that murder, **per se**, is not a sufficient basis for denying parole. There has to be something more. Otherwise the statutory provision for indeterminate sentences would make no sense, as every parole release of a murderer would then deprecate the seriousness of the crime. If the seriousness of [the Petitioner's] crime had been intended as the sole criteria by which release was to be measured, there would have been no reason for Petitioner's original sentence to be anything but "Life in Prison." Clearly the laws of California did not contemplate this scenario.

"Parole eligibility is a facet of a criminal sentence ... and thus the statutes and regulations governing parole eligibility are considered to be part of the law annexed to a crime when it is committed." Warden v. Marrero, 417 U.S. 653, 661-664 (1974) and Weaver v. Graham, 450 U.S. 24, 32-33 (1981). "[T]he Ex Post Facto Clauses provide a means of assuring that an individual receives fair warning of criminal statutes and the punishments they carry." Weaver, 450 U.S. at 28-30.

In Garner v. Jones, 529 U.S. 244, 250 (2000), the "Supreme Court held that the Ex Post Facto Clause is violated when a parole authority adopts

28.

a retroactive procedural change that creates 'a sufficient risk of increasing the measure of punishment attached to covering crime.'" <u>California Dep't of Corrections v. Morales</u>, 514 U.S. 499, 509 (1995). "If the inmate shows that application of the new rule will result in a longer period of incarceration than under the previous rule, the Ex Post Facto Clause is implicated." <u>Garner</u>, 529 U.S. at 255, 120 S.Ct. 1362. "To determine whether there is in fact a 'significant risk of increased punishment' ... the reviewing court may consider policy statement and evidence of the actual practice of the parole board." <u>Garner</u>, 529 U.S. at 256.

A prisoner may be entitled to Ex Post Facto relief if he can establish that a revision in parole regulations "was motivated by a punitive desire to extend the incarceration of a particular category of inmates." <u>Miller v. Florida</u>, 482 U.S. 423, 433-34 (1987) (holding that a statute whose "sole reason" was to "punish sex offenders more heavily" violated the Ex Post Facto Clause). The danger that vindictiveness will cause disfavor of certain persons after-the-fact is present in the parole context. <u>Garner</u>, 529 U.S. at 253.

Petitioner asserts that the Board's illegal underground policy of retrying murder cases is based upon impermissible political and economic factors, and has brought about an ex post facto enhancement of the punishments imposed upon the Petitioner and members of the prospective class at their respective sentencings.

The adverse parole decision in this case shows that Petitioner is being denied parole largely in part due to the retrying and recharacterization of the commitment offense. The fact that the decisions in all three parole consideration hearings routinely contain boilerplate that Petitioner's crime was "especially cruel" or "callous" does not alter the fact that the **stated** reason for all denials by the Board is one and the same — the inmate committed

a murder.

Petitioner does not minimize the inherent seriousness of his offense. But the inherent seriousness of his offense is not enough to deny parole. The Board must still be able to point to some non-arbitrary, distinguishing feature of the offense that was found true and explain why that feature has some hearing on the question of whether the prisoner is ready to be released. This is especially critical when each of the other statutorily mandated release standards point to release.

"[I]n a system which is premised on the hope and possibility of rehabilitation, and a statutory system which mandates a serious, rational, and meaningful evaluation of the statutory criteria, we must allow an individual who has taken advantage of opportunities to rehabilitate himself to move beyond a horrific act of many years ago and to rejoin society to contribute accordingly to his ability." (See Cappiello, 2004 WL 3112629, at **5-6.)

In a recent ruling, the United States Supreme Court held that:

> The DSL, by placing sentence-elevating factfinding within the judge's province, violates a defendant's right to trial by jury safeguarded by the sixth and Fourteenth Amendment ... In all material respects, California's DSL resembles the sentencing systems invalidated in Blakely and Booker. Following the reasoning in those cases, the middle term prescribed under California law, not the upper term, is the relevant statutory maximum. Because aggravating facts that authorize the upper term are found by the judge, and need only be established by a preponderance of the evidence, the DSL violates the rule of Apprendi.

(Cunningham v. California, DJDAR 1003, 1004.)

In the instant case, the Board is using elements, such as Petitioner stabbing the victim and the crime being especially cruel and callous, which are elements that must be found true by a jury in order to aggravate a term to life in prison without the possibility of parole, or the death penalty. (See Cal. Penal Codes §§ 190.2 (14) and 190.4.) Petitioner was not found

30.

INSERT D

guilty of using a weapon and was never charged with the special allegation described in the section 190.2 (14) of the penal code. Therefore by above U.S. Supreme Court holding, the Board is violating federal due process and therefore their decision cannot stand.

For the foregoing reasons, and in light of the United States Supreme Court's holdings, the Court should grant the petition and find that the Board is violating the Ex Post Facto Clause by implementing an illegal policy of retrying murder case, using elements that were either not found true by a jury or dismissed in trial court, in order to aggravate a minimum term of 16 years to a life without the possibility of parole. The Court should order the Board to set Petitioner's term within the Matrix for second degree murder, base term.

## Ground 5

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S RIGHT
TO A FAIR AND LAWFUL HEARING AND STATE FEDERAL DUE PROCESS
WHEN IT ALLOWED THE NEPHEW OF THE VICTIM TO TESTIFY AS A
NEXT TO KIN IN ORDER TO GIVE FALSE EVIDENCE OF PETITIONER'S
UNSUITABILITY FOR PAROLE. THE BOARD HAS A DUTY TO FOLLOW
THE LAW AND PROTECT PETITIONER'S DUE PROCESS.

At the May 12, 2006 parole hearing, Dave Figueroa, identified himself
as the victim's brother. At prior hearings, Dave Figueroa has identified
himself as the victim's nephew. The Board illegally allowed Dave Figueroa
to participate and give testimony without any cross-examination. The Board
has then used his testimony as some evidence to support a finding of
unsuitability. This illegal practice is now under review in Oropeza v.
Woodford, Case No. CV-03-1373 RMW (PR) and Oropeza v. Stokes, CV-05-3089
RMW (PR), co-defendant of Petitioner who is challenging Dave Figueroa's
participation in the parole hearings. Since then, Dave Figueroa has identified
himself as the brother of the victim, this is indication that he has been
made aware of the law and instead of following it has perjured himself in
order to give false information.

California Penal Code § 3043. states that:

The victim , next of kin, or two members of the victim's
immediate family have the right to appear, personally or
by counsel, at the hearing and to adequately and reasonably
express his or her views concerning the crime and the person
responsible. The board, in deciding whether to release the
person on parole, shall consider the statements of victim,
next of kin, and immediate family members of the victim made
pursuant to this section and shall include in its report
a statement of whether the person would pose a threat to
public safety if released on parole. ...

Penal Code § 3043.3 defines Immediate family as:

As used in Section 3043, 3043.1, and 3043.2, the term
"immediate family" shall include the victim's spouse, parent,
grandparent, brother, sister, and children or grandchildren
who are related by blood, marriage, or adoption.

During his testimony, Dave Figueroa stated:

My dad's (indiscernible). But, you know, like she said it

is just seem like it was yesterday. But 15 years in prison
will definitely age you, like dog years, you know. The whole
swearing in thing seem to me kind of like, you know, swear
to tell the truth, the whole truth and nothing but the truth
seems kind of blank and (indiscrenible) kind of inadequate.
But inmate he's keeping the paper mills in business. It's
the thickest file that I've ever seen. If I had a neighborhood
coming in with a file like that guarantee you I would put
my house up for sale the very next day. He is lucky that
he's not on a polygraph machine to decide his fate whether
he is released or stays. ... (BT 98) And you don't murder
somebody they way they murdered my uncle [sic] and call that
the first time. ... (BT 100) I've made a decision since my
brother was murdered I made the decision that I would have
to live his life, ... (BT 101) You know, whether he says
he was physically involved in the actual stabbing or not,
the bottom line is that my uncle is dead -- my brother is
dead. (BT 102).

The record clearly shows a conscience decision to contaminate the
parole consideration hearing by falsifying the identification in order to
participate in the hearing and influence the decision-makers.

In light of the perjury shown here, Petitioner's petition should
be granted. The decision to deny parole was partly based on perjury. The
Court should find that the victim's next of kin should be allowed to
participate at the "Initial" parole consideration hearings but not at
subsequent hearings. This process is unfair and violates Petitioner's right
to a fair and impartial hearing. Petitioner further wishes to exhaust and
preserve this issue for further litigation in a federal lawsuit of violation
of his civil rights by Dave Figueroa.

Dated April 26, 2007

Respectfully Submitted

Gerardo J. Menchaca

33.

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: <u>In re Gerardo Jerry Menchaca on Habeas Corpus</u>

No.: S_____, Sixth Appellate H031326, Superior Court No. 148873

I declare:

I am over the age of 18 years, a prisoner of the State of California, and I
am a party to the cause within. My residence is San Quentin State Prison. I
am familiar with the mailing process at the San Quentin State Prison for
processing of correspondence of mailing with the United States Postal Service.
In accordance with that practice, correspondence placed in the internal mail
collection system at San Quentin State Prison is deposited with the United
States Postal Service that same day in the ordinary course of business.

On April__, 2007, I served the attached <u>PETITION FOR REVIEW</u> by placing a true
copy thereof enclosed in a sealed envelope with postage thereon fully prepaid,
in the internal mail collection system at San Quentin State Prison, San Quentin,
CA 94974, addressed as follows:

CLERK OF THE COURT
SIXTH APPELLATE DISTRICT
333 W. SANTA CLARA ST. #1060
SAN JOSE, CA 95113-1717

CLERK OF THE COURT
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA CLARA
191 N. FIRST ST.
SAN JOSE, CA 95113-1090

EDMUND G. BROWN
ATTORNEY GENERAL OF CALIFORNIA
455 GOLDEN GATE AVE
SAN FRANCISCO, CA 94102-7004
DISTRICT ATTORNEY OF SANTA CLARA
190 WEST HEDDING STREET
SAN JOSE, CA 95110

I declare under penalty of perjury under the law of the State of California
the foregoing is true and correct and that this declaration was executed on
April 26, 2007, at San Quentin, California.


Gerardo Jerry Menchaca

Declarant

*Gerardo Jerry Menchaca*

Signature

INDEX 1



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



FILED

Court of Appeal - Sixth App. Dist.

APR 2 3 2007

MICHAEL J. YERLY, Clerk

By _____
            DEPUTY

In re GERARDO JERRY MENCHACA,

on Habeas Corpus.

H031326
(Santa Clara County
Super. Ct. No. 148873)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated  APR 2 3 2007 _____          _____ PREMO, J. _____ Acting P.J.

# EXHIBIT 13

# CALIFORNIA APPELLATE COURTS
## Case Information

| | |
|---|---|
| Supreme Court | **Supreme Court**   Change court |
| Welcome | Court data last updated: 04/18/2008 05:53 PM |
| Search | **Case Summary   Docket   Briefs** |
| E-mail | **Disposition   Parties and Attorneys   Lower Court** |
| Calendar | **Docket (Register of Actions)** |
| Help | **MENCHACA (GERARDO J.) ON H.C.** |
| Opinions | **Case Number S152247** |

CC home

| Date | Description | Notes |
|---|---|---|
| 04/30/2007 | Petition for review filed | Gerardo J. Menchaca, petitioner in pro per |
| 04/30/2007 | Record requested | via phone |
| 05/02/2007 | Received Court of Appeal record | file jacket/brief |
| 06/20/2007 | Time extended to grant or deny review | The time for granting or denying review in the above-entitled matter is hereby extended to and including July 27, 2007, or the date upon which review is either granted or denied. |
| 07/11/2007 | Petition for review denied | |

**Click here** to request automatic e-mail notifications about this case.

©2007 Judicial Council of California

# EXHIBIT 14



*San José Police Department*

ROBERT L. DAVIS, CHIEF OF POLICE

January 10, 2005

San Quentin State Prison
Board Desk Coordinator
San Quentin, CA  94964

Attn:  Tina Mattis, O.A.

I submit the following comments and recommendations regarding Gerardo Menchaca's (CDC No. D-87412) Life Prisoner Subsequent Parole Consideration Hearing, which is scheduled for Tuesday, March 1, 2005.

On March 2, 1991, Gerardo Menchaca and a co-defendant followed the victim, Richard Figueroa, into the parking area of a condominium complex.  When Figueroa exited his parked vehicle, Menchaca, along with the co-defendant, abruptly, and without provocation, viciously attacked Figueroa, stabbing him more than 20 times.  Figueroa died of his wounds.  According to a witness, Figueroa had no weapon and did not contribute to the incident.

Gerardo Menchaca and the co-defendant were arrested and the Santa Clara County District Attorney charged them with murder.  Gerardo Menchaca was found to be deceptive, untruthful, and without remorse regarding his involvement in this attack.

When taking into account the nature of this crime and considering the totality of the circumstances, I would recommend against the parole of Gerardo Menchaca as he is not suitable at this time.  Further, I would recommend that Mr. Menchaca serve the maximum sentence prescribed by law.

Sincerely,

ROBERT L. DAVIS
Chief of Police

RLD:MS:mb



# EXHIBIT 15

91-061-004

COUNTY OF SANTA CLARA
OFFICE OF THE MEDICAL EXAMINER-CORONER

REPORT OF AUTOPSY

Decedent: FIGUEROA, Richard

Date and Time of Autopsy: March 2, 1991 at 10:15 A.M.-1:00 P.M.

Autopsy At: Santa Clara County Morgue

Prosector: Angelo K. Ozoa, M.D.

Present At Autopsy: David Fraasch, Forensic Technician

Photographs by: David Fraasch, Forensic Technician

EXTERNAL EXAMINATION:

The body is that of a well developed, well nourished adult white male which measures 69 inches in length, weighs 201 pounds and appears consistent with the stated age of 33 years. The body is nude. The scalp hair is brown. The irides are brown. The mouth shows natural teeth with some restorations. An endotracheal tube is in place in the mouth. There is a mustache which varies from 1/4 to 1/2 inch in length. There are injuries on the face which will be described elsewhere in this report. An intravenous line enters the left side of the neck. The left front chest shows a recent thoracotomy incision which measures 14 inches in length located at about the level of the fourth intercostal space. A drainage tube enters the right upper front chest. The anterior abdomen is slightly protuberant and is free of surgical scars. The external genitalia are adult male. There are numerous injuries on the trunk and extremities which will be described elsewhere in this report. Tattooed on the lateral aspect of the right upper arm are the figures of "a dagger, skull and heart" and the words "Death Before Dishonor". An intravenous line enters the left antecubital fossa. Rigor mortis is complete. Lividity is dorsal.

(Page 1 of 8)

-2-

91-061-004
FIGUEROA, Richard

EXTERNAL AND INTERNAL EVIDENCES OF INJURY:

There are multiple stab wounds as detailed below.

#① This is a diagonal wound on the front of the chin which measures 1
inch in length and is located approximately 1/2 inch below the
lower margin of the lower lip.  The wound involves only the skin
and subcutaneous tissue.

#② This wound is located on the left side of the chin just below and
to the left of the left angle of the mouth. The wound measures 0.6
inch in length and involves the skin and subcutaneous tissue.

#③ This wound is located on the left upper front chest, approximately
6-1/2 inches to the left of the midline and 14 inches below the
top of the head. The wound measures approximately 0.7 inch in
length. From the skin wound a wound track is determined which
proceeds from front to back, inclined downwards approximately 30
degrees from the horizontal plane and inclined to the right
approximately 15 degrees from the sagittal plane.  After going
through the entire thickness of the left anterior chest wall, the
track enters the left chest cavity and produces a through-and-
through perforation of the upper lobe of the left lung. The track
is lost within the left chest cavity. The depth of this wound is
estimated at 4 to 4-1/2 inches.

*mgth:.07 in*
*ypth: 4-4½ in*
*lane:*
*Hit /*
*Lung*

#4. This wound is located on the right upper front chest approximately
4 inches to the right of the midline and 15 inches below the top
of the head. The wound measures approximately 3/4 inch in length.
A drainage tube has been inserted into this wound.  From the skin
wound a wound track is determined which proceeds from front to
back, inclined to the left at an angle of approximately 15 degrees
from the sagittal plane and inclined downwards at an angle of
approximately 5 degrees from the horizontal plane.  After entering
the anterior chest wall the track enters the right chest cavity
and produces a through-and-through perforation of the upper lobe
of the right lung. The track is lost within the right chest
cavity.  The depth of this wound is estimated at about 4 to 4-1/2
inches.

*mgth: 3/4 inch*
*pth: 4-4½*

-3-

91-061-004
FIGUEROA, Richard

External and Internal Evidences of Injury (continued):

#5.  This is a wound on the right front chest at the level and just to
the right of the right nipple. The wound measures 2 inches in
length, up to 1 inch in width and involves only the thickness of
the anterior chest wall without entering the chest cavity.

#6, ⑦, ⑧, ⑨   This is a somewhat diagonal row of four wounds located at
about the junction of the left lower chest and the left upper
abdomen. The highest and most lateral of these wounds measures 3/4
inch in length and is located 6 inches to the left of the midline
and 19 inches below the top of the head. The second highest
measures 5/8 inch in length and is located 5 inches to the left of
the midline and 30 inches below the top of the head. The third
highest measures 3/4 inch in length and is located 4-1/2 inches to
the left of the midline and 21 inches below the top of the head.
The lowest and most medial of the wounds measures 3/4 inch in
length and is located 2 inches to the left of the midline and 23
inches below the top of the head.  The tracks of these wounds are
difficult to define individually but the overall direction is from
front to back inclined to the right at an angle of approximately
30 degrees from the sagittal plane and inclined slightly upwards
at an angle of approximately 10 degrees from the horizontal plane.
One of the tracks, possibly that from the second highest wound,
enters the pericardial cavity and produces a perforation of the
anterior wall of the left ventricle just to the left of the
septum. The wound measures approximately 1/2 inch in length and
has been sutured.  There are two through-and-through perforations
of the left lobe of the liver; one measuring 1 inch in length x 3
inches in depth and the other measuring 1-1/2 inches in length x 4
inches in depth. There is also a through-and-through perforation
of the lower lobe of the left lung which measures 1/2 inch in
length.

#10. This wound is located in the right upper abdomen approximately 2
inches to the right of the midline and 20 inches below the top of
the head. The wound measures 3/4 inch in length. From the wound of
entry a wound track is determined which proceeds from front to
back, inclined slightly downwards at an angle of approximately 10
degrees from the horizontal plane and inclined slightly to the
left at an angle of approximately 10 degrees from the sagittal
plane. The tracks goes through the entire thickness of the
anterior abdominal wall, then produces a through-and-through
perforation of the transverse colon. The track is then lost within
the abdominal cavity. The depth of this wound is estimated at 3-
1/2 inches.

-4-

91-061-004
FIGUEROA, Richard


External and Internal Evidences of Injury (continued):

#11, 12, 13, 14, 15 and 16.    These are a rough cluster of wounds on
    the anterior abdominal wall. Wound #11 appears as an inverted "T"
    located in the right upper abdomen and may actually be two wounds.
    The horizontal portion of the inverted "T" measures 1 inch in
    length. The vertical portion measures 1/2 inch in length. Wounds
    #12 and 13 are two almost identical and parallel wounds just above
    and just to the right of the umbilicus, each measuring
    approximately 5/8 inch in length. Wound #14 is located in the
    midline approximately 2 inches below the umbilicus and measures
    5/8 inch in length. Wound #15 measures 5/8 inch in length and is
    located 1-1/4 inches to the left of the midline and 32 inches
    below the top of the head.   Wound #16 measures 5/8 inch in length
    and is located in the midline approximately 33-1/2 inches below
    the top of the head.

    Each of this cluster of wounds just described enters the
    peritoneal cavity but their individual tracks are difficult to
    define.   The tracks produce multiple perforations of loops of
    small intestines which vary from 1/4 to 1/2 inch in length. The
    depth of these wounds can only be roughly estimated at 3 to 4
    inches.

#17  This wound measures 1/2 inch in length and is located in the left
    flank along the mid-axillary line and 11 inches below the level of
    the left axilla. The wound involves only the soft tissues of the
    left flank without entering the abdominal cavity.

#18  This wound which measures 3/4 inch in length is located on the
    front of the left thigh approximately 10 inches above the level of
    the knee. The wound involves only the skin, subcutaneous tissue
    and portions of the underlying muscle without injury to the
    underlying bone.

#19  This is a superficial wound on the scrotum which measures 3/4 inch
    in length and involves only the skin of the scrotum without
    entering the testicular cavity.

#20  This is a superficial incised wound which measures 3/4 inch in
    length, located on the back of the left hand. The wound involves
    only the skin layers.  Adjoining this and extending to the back of
    the middle finger is a scratch-like laceration which measures 1-
    1/2 inches in length.

-5-

91-061-004
FIGUEROA, Richard

## External and Internal Evidences of Injury (continued):

#21  On the back of the right hand is, likewise, a superficial scratch-
     like laceration measuring 1/2 inch in length.

#22  This is a somewhat curved wound located just medial to the left
     knee measuring a total length of 1-1/2 inches. The wound involves
     only the skin and subcutaneous tissue.

#23  This wound is located on the top of the left shoulder near the
     junction of the base of the neck. The wound measures 1/2 inch in
     length and is located 2 inches below the left ear lobe and 4
     inches to the left of the midline of the back. The wound measures&kl
     approximately 1 inch in depth and involves only the skin,
     subcutaneous tissue and portions of the skeletal muscle of the top
     of the shoulder.

## INTERNAL EXAMINATION:

Head:  The scalp, calvarium and the base of the skull are intact and
show no evidence of injury. The brain weighs 1470 grams and is
symmetrical. Except for mild swelling, no remarkable abnormalities are
noted on the external surface or on multiple coronal sections through
the cerebral hemispheres, cerebellum and brain stem. The ventricular
system is of the usual caliber and the cerebrospinal fluid is clear.
The meninges are smooth. The blood vessels comprising the Circle of
Willis are free of atherosclerosis. There is no epidural, subdural,
subarachnoid or intracerebral hemorrhage.

Neck:  The hyoid, larynx, trachea, soft tissues and cervical spine are
unremarkable and show no evidence of injury. The airway is patent and
free of foreign material.

Body Cavities:  There is a left thoracotomy as previously described.
Approximately 400 cc. and 300 cc. of liquid and clotted blood are
present within the right and left pleural cavities, respectively.
Approximately 50 cc. of liquid and clotted blood are also present
within the pericardial sac. The peritoneal cavity contains
approximately 200 cc. of bloody fluid mixed with some intestinal
contents.

-6-

91-061-004
FIGUEROA, Richard


<u>Cardiovascular System:</u>  The heart weighs 520 grams. The walls of the left ventricle and right ventricle measure up to 2.4 cm. and 0.5 cm. in thickness, respectively. No remarkable valvular abnormalities are seen. As previously mentioned, there is a sutured wound of the anterior wall of the left ventricle measuring 5/8 inch in length. The coronary arteries and the aorta show minimal atherosclerosis. The great veins are collapsed but are otherwise unremarkable.

<u>Respiratory System:</u>  The tracheobronchial tree is patent. The right lung weighs 290 grams, the left 260 grams. There are stab perforations of both lungs as described. The pulmonary arteries are patent.

<u>Liver:</u>  The liver weighs 2170 grams and shows the two through-and-through stab perforations previously described. The gallbladder and bile ducts are unremarkable.

<u>Spleen:</u>  The spleen weighs 220 grams and is unremarkable.

<u>Pancreas:</u>  The pancreas is not unusual.

<u>Endocrine System:</u>  The pituitary, thyroid and adrenals are unremarkable.

<u>Genitourinary Tract:</u>  The right kidney weighs 160 grams, the left 170 grams. No remarkable abnormalities are noted in either kidney except for moderate pallor.  The ureters and urinary bladder are unremarkable. The bladder contains approximately 120 cc. of straw-colored urine. The prostate, seminal vesicles and testes are unremarkable. There is a superficial wound of the scrotum as described.

<u>Gastrointestinal Tract:</u>  No remarkable abnormalities are noted in the esophagus or stomach. There are stab perforations of the small and large intestines as described. The appendix is unremarkable.

<u>Musculoskeletal System:</u>  The injuries and abnormalities are as described.


<u>dictated:</u>  3-2-91 AKO:sw

-7-

91-061-004
FIGUEROA, Richard


LABORATORY STUDIES:
    Samples submitted: Blood, Urine, Bile, Liver.
    Tests requested:  Sedative Screen, Urine Drug Screen, Blood Type.

    Analysis of Blood: Ethanol  -  0.15%

    No other common Volatiles or Sedatives are recovered. The
following drugs were tested: Ethyl, Methyl, Isopropyl Alcohols,
Acetone, Barbiturates, Meprobamate, Glutethimide, Phenytoin,
Acetaminophen, Salicylates, Diazepam, Nordiazepam, Methaqualone and
Chlordiazepoxide.

    Analysis of Urine:  No common Narcotics, Antihistamines,
Phenothiazines, Analgesics, Antidepressants, Stimulants or other
organic bases are recovered.

    Blood Typing Results:  Group "B"   Rh(D) Positive.


DIAGNOSES:

    1.    Stab wounds of the chin.

    2.    Stab wounds of right and left upper chest.
          a) Perforations of anterior chest wall.
          b) Perforations of both lungs.
          c) Hemothorax, bilateral.

    3.    Stab wounds of lower chest/upper abdomen.
          a) Perforations of anterior chest wall.
          b) Perforations of pericardium and heart.
          c) Perforations of liver.
          d) Perforations of transverse colon.
          e) Hemoperitoneum.

    4.    Stab wounds of lower abdomen.
          a) Perforations of anterior abdominal wall.
          b) Perforations of small intestines.
          c) Hemoperitoneum.

    5.    Stab wound of left flank.

    6.    Stab wound of left thigh.

-8-

91-061-004
FIGUEROA, Richard

Diagnoses (continued):

    7.     Stab wound of left shoulder.

    8.     Incised wound of scrotum.

    9.     Superficial incised wounds of both hands.

    10.    Laceration of left knee.

    11.    Alcohol intoxication (blood ethanol level 0.15%)

CAUSE OF DEATH:  Multiple Stab Wounds of Head, Chest and Abdomen.

Angelo K. Ozoa, M.D.
Assistant Medical Examiner-Coroner

AKO:sw
completed:  4-10-91

## AUTOPSY FINDINGS

| OUND # | LENGHTH | DEPTH | ANGLE |
|---|---|---|---|
| 1) Chin-----> | 1 inch | | Diagonal |
| 2) Chin-----> | 0.6 inches | | |
| 3) Left -----> Chest | 0.7 inches | 4-4 1/2 | 30 Downward horizontal plane |
| | | | 15 Right of the vertical plane |
| 4) Right-----> Chest | 3/4 inch | 4 - 4 1/2 | 5 Downward horizontal plane |
| | | | 15 left of the vertical plane |
| 5) Right-----> Chest | 2 inches 1inch wide | | |
| 6) Left-----> Chest | 3/4 inch | | 10 Downward horizontal plane |
| | | | 30 right of the vertical plane |
| 7) Left-----> Chest | 5/8 inch | | |
| 8) Left-----> Chest | 3/4 inch | | |
| 9) Left-----> Chest | 3/4 inch | | --- |
| 10) Right---> abdomen | 3/4 inch | 3 1/2 | 10 Downward horizontal plane |
| | | | 10 left vertical plane |
| 11) Right---> Abdomen | 1 inch 1/2 inch | | |
| 12) Right---> Abdomen | 5/8 inch | 3 - 4 inches | |
| 13) Right---> Abdomen | 5/8 inch | | |
| 14) Right---> Abdomen | 5/8 inch | | |
| 15) Right---> Abdomen | 5/8 inch | | |
| 16) Right---> Abdomen | 5/8 inch | | |
| 17) Left----> Flank | 1/2 inch | | |
| 18) Left----> Thigh | 3/4 inch | | |
| 19) Scrotem-> | 3/4 inch | | |
| 20) Left----> Hand | 3/4 inch 1 1/2 inch | | |
| 21) Right---> Hand | 1/2 inch | | |
| 22) Left----> Knee | 1 1/2 inch | | |
| 23) Left----> Sholder | 1/2 inch | 1 inch | |

## AUTOPSY FINDINGS

| WOUND # | LENGHTH | DEPTH | ANGLE |
|---|---|---|---|
| 3 | 0.7 inches | 4-4 1/2 | 30 horizontal plane / 15 right sagital — down Right |
| 4 | 3/4 inch | 4 - 4 1/2 | 5 horizontal plane / 15 left sagital Downward |
| 5 | 2 inches / 1inch wide | | |
| 6 | 3/4 inch | 3 - 4 | 10 horizontal downward / 30 right sagital |
| 7 | 5/8 inch | | |
| 8 | 3/4 inch | | |
| 9 | 3/4 inch | | --- |
| 10 | 3/4 inch | 3 1/2 | 10 horizontal plane downward / 10 left sagital |
| 11 | 1 inch / 1/2 inch | | |
| 12 | 5/8 inch | 3 - 4 inches | |
| 13 | 5/8 inch | | |
| 14 | 5/8 inch | | |
| 15 | 5/8 inch | | |
| 16 | 5/8 inch | | |
| 17 | 1/2 inch | | |
| 18 | 3/4 inch | | |
| 23 | 1/2 inch | 1 inch | |

Grouped (11-16)

① Wasn't Flaling here
② wound inflicted while alive
③ Fast motions → # of wounds Consistent w/ 2 stabbers
④ Consistent w/ 2 people stabbing